**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MOHAMMED MANSOUR and MARK
MOSES,

                Plaintiffs,                      No. 13 Civ. 2443 (SDW)(MCA)

      v.

FACTORY DIRECT OF SECAUCUS, LLC
d/b/a ASHLEY FURNITURE HOMESTORE,

              Defendant.

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**THE OTTINGER FIRM, P.C.**
401 Park Avenue South
New York, New York 10016
Telephone: (212) 571-2000
Facsimile: (212) 571-0505

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ..........................................................................1

STATEMENT OF MATERIAL FACTS ..............................................................2

   I.   PLAINTIFF MARK MOSES'S EMPLOYMENT AT ASHLEY...................2

     A. Plaintiff Moses is Subjected to a Hostile Work Environment......................4

     B. Plaintiff Moses is Terminated by Ashley in Retaliation for his
        Protected Complaints...........................................................................5

  II. PLAINTIFF MOHAMMED MANSOUR'S EMPLOYMENT
      AT ASHLEY ........................................................................................8

     A. Plaintiff Mansour is Subjected to a Hostile Work Environment .................8

     B. Plaintiff Mansour Complains About the Harassment and
        Hostile Work Environment.................................................................10

     C. Plaintiff Mansour Complains About the Inadequate
        Investigation of a Sexual Harassment Complaint .......................................11

     D. Plaintiff Mansour is Terminated by Ashley ................................................13

ARGUMENT .....................................................................................................15

   I.   STANDARD OF REVIEW FOR MOTIONS FOR SUMMARY
      JUDGMENT .......................................................................................15

  II. DEFENDANT MAKES NO ARGUMENT IN SUPPORT OF
      ITS MOTION TO DISMISS PLAINTIFFS' HOSTILE WORK
      ENVIRONMENT CLAIMS ...................................................................16

  III. SUMMARY JUDGMENT ON PLAINTIFFS' RETALIATION
      CLAIMS MUST BE DENIED................................................................18

A.  Plaintiffs Have Established A Prima Facie Case Of Retaliation ................19

B.  Defendants' Purported Justifications For Terminating
    Plaintiffs Are Pretextual ..........................................................................25

IV. SUMMARY JUDGMENT ON PLAINTIFFS'
    DISCRIMINATORY DISCHARGE CLAIMS MUST BE
    DENIED ....................................................................................................29

V.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY
    JUDGMENT ON PLAINTIFFS' DAMAGES BECAUSE THE
    AFTER-ACQUIRED EVIDENCE OF THEFT IS ONLY
    RELEVANT TO PLAINTIFF MANSOUR'S CLAIM FOR
    FRONT PAY...............................................................................................31

VI. THE INTERESTS OF JUDICIAL ECONOMY AND
    EXPEDIENCY WOULD BE FRUSTRATED BY SEVERING
    PLAINTIFFS' CLAIMS.............................................................................33

CONCLUSION ....................................................................................................34

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................15, 16, 26

*Andersen v. Exxon Co., U.S.A.*,
  89 N.J. 483 (1982) ..................................................................................18

*Bergen Commercial Bank v. Sisler*,
  723 A.2d 944 (N.J. 1999) .........................................................................30

*Blakney v. City of Philadelphia*,
  559 Fed. Appx. 183 (3d Cir. Mar. 19, 2014) ........................................23, 25

*Bowers v. Nat'l Collegiate Athletic Ass'n*,
  475 F.3d 524 (3d Cir. 2007) .......................................................................32

*Brown v. J. Kaz, Inc.*,
  581 F.3d 175 (3d Cir. 2009) .......................................................................18

*Burrage v. United States*,
  134 S. Ct. 881 (2014) ................................................................................23

*Burlington Coat Factory Warehouse Corp.*,
  2014 WL 4105015 (D.N.J. Aug. 19, 2014) ..................................................23

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..............................................................................15,

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
  450 F.3d 130 (3d Cir. 2006) .......................................................................21

*Daniels v. Sch. Dist. of Philadelphia*,
  776 F.3d 181 (3d Cir. 2015) .......................................................................19

*E.E.O.C. v. Bimbo Bakeries USA, Inc.*,
  2010 WL 598641 (M.D. Pa. Feb. 17, 2010) ................................................18

*Farrell v. Planters Lifesavers Co.,*
206 F.3d 271 (3d Cir. 2000)..................................................................24

*Fuentes v. Perskie,*
32 F.3d 759 (3d Cir. 1994)....................................................................19

*Gist v. Burlington Coat Factory Warehouse Corp.,*
2014 WL 4105015 (D.N.J. Aug. 19, 2014)............................................23

*In re Unisys Sav. Plan Litig.,*
1997 WL 299425 (E.D. Pa. May 29, 1997) ...........................................34

*Jones v. Sch. Dist. of Philadelphia,*
198 F.3d 403 (3d Cir. 1999) .................................................................31

*Masson v. New Yorker Magazine, Inc.,*
501 U.S. 496 (1991) .............................................................................16

*Mardell v. Harleysville Life Ins. Co.,*
65 F.3d 1072 (3d Cir. 1995).............................................................28, 33

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973)........................................................................18, 30

*McKennon v. Nashville Banner Publishing Co.,*
513 U.S. 352 (1995) .............................................................................32

*Miller v. Beneficial Mgmt. Corp.,*
855 F. Supp. 691 (D.N.J. 1994) ...........................................................33

*Moss v. Ret. Value, LLC,* 2013
WL 5816657 (D.N.J. Oct. 29, 2013).......................................................17

*Moore v. City of Philadelphia,*
461 F.3d 331 (3d Cir. 2006)..............................................................21, 22

*Nagle v. Marron*
663 F.3d 100 (2d Cir. 2011)..................................................................22

*Shaner v. Synthes,*
204 F.3d 494 (3d Cir. 2000)..................................................................19

iv

*Tomoko Funayama v. Nichia Am. Corp.*,
    482 Fed. Appx. 723 (3d Cir. 2012) ......................................................17, 30

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013) ......................................................................22, 23

*Verdin v. Weeks Marine Inc.*,
    124 F. App'x 92 (3d Cir. 2005)..................................................................17

*Walker v. Wholesale, Inc.*,
    2013 WL 5502912 (M.D. Tenn. Oct. 2, 2013) ...........................................23

*Watkins v. Nabisco Biscuit Co.*,
    224 F. Supp. 2d 852 (D.N.J. 2002) ............................................................30

*Zann Kwan v. Andalex Grp.*,
    737 F.3d 834 (2d Cir. 2013)................................................................24, 25

## Statutes

42 U.S.C. § 1981 .................................................................................*passim*

42 U.S.C. §§ 2000e, *et seq* .................................................................*passim*

42 U.S.C. § 2000e-2(m) ...........................................................................23

N.J.S.A. §§ 10:5-1 .............................................................................*passim*

## Other Authorities

Fed. R. Civ. P. 42(b).....................................................................33, 34, 35

Fed. R. Civ. P. 56(c) ..............................................................................15

## PRELIMINARY STATEMENT

Plaintiffs Mohammed Mansour and Mark Moses ("Plaintiff Mansour" and "Plaintiff Moses," collectively "Plaintiffs") by their attorneys, The Ottinger Firm, P.C., respectfully submit this memorandum of law in opposition to the motion for summary judgment of Defendant Factory Direct of Secaucus d/b/a/ Ashley Furniture ("Ashley" or the "Company"). Plaintiffs Moses and Mansour both endured sustained harassment and discrimination on the basis of their race, religion, national origin and/or ethnicity, culminating in their termination after complaining to Defendant about that harassment and discrimination. Plaintiffs consequently filed a Complaint and Jury Trial Demand on April 15, 2013 (ECF No. 1), which was amended on August 12, 2013 (ECF No. 3) (the "Complaint"), seeking relief from Defendant for: (1) discrimination and harassment in violation of Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1871; (2) retaliation in violation of Section 1981; (3) discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*; (4) retaliation in violation of Title VII; (5) discrimination and harassment in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1, *et seq.*; and (6) retaliation in violation of the NJLAD.

In the first place, Defendant makes no substantive argument whatsoever in support of its motion for summary judgment on Plaintiffs' claims of harassment under a hostile work environment theory in violation of state and federal law.

Moreover, Defendant's attempt to resolve Plaintiffs discriminatory discharge and retaliation claims at summary judgment is altogether misplaced, as virtually every material fact at issue regarding those claims are in dispute, including with respect to the elements of Plaintiffs' prima facie cases, Defendant's purportedly non-discriminatory and non-retaliatory justifications, and the existence of pretext alike. The Court should therefore deny Defendant's motion for summary judgment in all respects and allow Plaintiffs' claims to proceed to a jury.[1]

## STATEMENT OF MATERIAL FACTS

### I.     PLAINTIFF MARK MOSES'S EMPLOYMENT AT ASHLEY

Plaintiff Moses, an African-American Muslim, was hired in June 2011 as a Sales Manager at the Company's Fairfield store. (Pls.' Counter-Stmt. ¶ 40).[2] Beginning June 28, 2011, Plaintiff Moses reported to the Ashley location in Fairfield for approximately three days, getting to know staff and completing the

---

[1]     Plaintiffs do not contest Defendant's request that this Court take judicial notice of Plaintiff Mansour's indictment or guilty plea or that the Court grant summary judgment on Plaintiff Mansour's claims for front-pay in lieu of reinstatement from January 18, 2012, the date Defendant discovered the conduct underlying the criminal charges to which Plaintiff Mansour ultimately plead guilty. *See* Def.'s Mem. in Supp. of Mot. for Summ. J. (ECF # 33-1) (hereinafter "Def.'s Brief") 13-14; *see also infra* Section V.

[2]     References to (Pls.' Counter-Stmt. ¶ 40) are to the concurrently filed Plaintiffs' Rule 56.1 Counter-Statement of Material Facts in Response to Defendant's Rule 56.1 Statement and Plaintiff's Statement of Additional Material Facts.

onboarding process. (Pls.' Counter-Stmt. ¶ 41) Plaintiff Moses had no performance problems while at the Fairfield location. (Pls.' Counter-Stmt. ¶ 41).

On or about Monday, July 5, 2011 Mr. Cook requested that Plaintiff Moses meet him Ashley's warehouse and headquarters in Edison, New Jersey to learn the warehouse aspect of the business. (Pls.' Counter-Stmt. ¶ 42). Plaintiff Moses spent approximately two days at the Edison location and had no performance problems while there. (Pls.' Counter-Stmt. ¶ 42). Approximately four days later, on or about July 9, 2011, Mr. Cook told Plaintiff Moses that he would be sent to the Ashley Furniture in Nanuet, New York to continue his training by learning the sales techniques and store processes, and instructed Plaintiff Moses to observe the store managers and assist in running the store while there. (Pls.' Counter-Stmt. ¶ 43). Plaintiff Moses likewise had no performance issues in Nanuet. (Pls.' Counter-Stmt. ¶ 43).

On or about July 11, 2011, Mr. Cook directed Plaintiff Moses to report to Ashley's Secaucus location "*to learn from Sal* [Sciarrino] *and Mohammed* [Mansour]," the Store Managers there. Plaintiff Moses was supposed to be in the Secaucus store for about three to four days—similar to his training at Edison and Nanuet—before returning to Ashley's Fairfield location to serve as Store Manager, as he was initially hired to do. However, he was never reassigned to the Fairfield store. (Pls.' Counter-Stmt. ¶ 44).

### A.    Plaintiff Moses is Subjected to a Hostile Work Environment

Shortly after Plaintiff Moses began his training at the Company's Secaucus location, on or around July 12, 2011, he greeted Plaintiff Mohammed Mansour in Arabic on the Company's sales floor in the presence of Mr. Sciarrino. (Pls.' Counter-Stmt. ¶ 47). Upon recognizing that Plaintiff Moses speaks Arabic and is Muslim, Mr. Sciarrino responded, with evident disdain, "*Oh, you are one of those Muslims.*" (Pls.' Counter-Stmt. ¶ 47).

Beginning that same day, and continuing throughout the duration of Plaintiff Moses' employment at the Company's Secaucus location, Mr. Sciarrino directed an unrelenting barrage of discriminatory, offensive, racist, and bigoted comments toward Plaintiff Moses on the basis of his religion and race, typically on multiple occasions each day. (Pls.' Counter-Stmt. ¶ 48). By way of examples only, Mr. Sciarrino frequently insinuated that Plaintiff Moses was a terrorist and enemy of the United States, demanding to know, for example, if Plaintiff Moses was carrying "*a bomb*" in his bag, or if he and Plaintiff Mansour were conspiring to wage "*jihad*" or "*making bombs*" as part of a terrorist plot. (Pls.' Counter-Stmt. ¶ 49). Mr. Sciarrino would also make regular comments about Plaintiff Moses's race, such as, for example, when ordering lunch, declaring: "*I'm ordering sandwiches. Let me make sure I put pork in it for you Muslims. But you're black. You eat chicken. Right?*" (Pls.' Counter-Stmt. ¶ 50). In another illustrative incident, on the sales floor and in the presence of Mr. Moses, Mr. Sciarrino referred to an African-

American co-worker with whom he had just been arguing as an "*angry nigger*."
When Plaintiff Moses objected, Mr. Sciarrino stated that Plaintiff Moses was being
"*uppity*." (Pls.' Counter-Stmt. ¶ 51).

### B.   Plaintiff Moses is Terminated by Ashley in Retaliation for his Protected Complaints

Mr. Sciarrino persisted in directing these and other bigoted and derogatory
statements at Plaintiff Moses despite the fact that Plaintiff Moses repeatedly told
him that his comments were offensive and requested that he refrain from using
racial and religious slurs in the workplace. (Pls.' Counter-Stmt. ¶ 52). Finally, on
or around July 28, 2011, Plaintiff Moses complained about Mr. Sciarrino's
constant stream of bigoted, discriminatory and offensive statements in a meeting
with Mr. Cook. (Pls.' Counter-Stmt. ¶ 53). Mr. Cook simply dismissed Plaintiff
Moses's complaints, however, stating "*Sal just jokes like that.*" (Pls.' Counter-Stmt.
¶ 53).

During that very same meeting, Mr. Cook informed Plaintiff Moses that he
was being demoted from his position as a Sales Manager to Product Specialist.
(Pls.' Counter-Stmt. ¶ 54). Mr. Cook told Plaintiff Moses that the demotion was
due to the fact that the Company wanted "*other managers*" and was "*going in a
different direction.*" (Pls.' Counter-Stmt. ¶ 55). This change in title—together with
the attendant reduction in earning potential and diminishment in responsibilities—

was extremely visible and humiliating for Plaintiff Moses. (Pls.' Counter-Stmt. ¶ 63).

Although Defendant now asserts that this demotion was a result of "poor performance," (*see, e.g.*, Def.s' Brief 9), at no time prior to his demotion did any employee of Ashley—including Plaintiff Mansour, Mr. Sciarrino, or Mr. Cook—ever contact Plaintiff Moses about his purportedly poor performance. (Pls.' Counter-Stmt. ¶ 56). Plaintiff Mansour was likewise not informed of Plaintiff Moses's purportedly poor performance, despite the fact that he was involved in training Plaintiff Moses while he was at the Secaucus location. (Pls.' Counter-Stmt. ¶ 57).

Significantly, the only documentary evidence upon which Defendant relies to support their argument that Plaintiff Moses was demoted for poor performance ironically undermines that assertion. (*See* Horn Decl. in Supp. Summ. J. Ex. 21 (ECF No. 33-24)). The "Monthly Productivity by Product Specialist" Report, offered by Defendant as evidence of Plaintiff Moses' allegedly lackluster sales figures, actually tracks Plaintiff Moses' performance *after he was demoted* to Product Specialist, a position he held for only six days before he was unlawfully terminated by Defendant. (Pls.' Counter-Stmt. ¶¶ 31, 63). Plaintiff Moses's performance was not quantified while he was in training to be a manager because his responsibility was naturally limited by his role as an observer and trainee. Nonetheless, on the one occasion when Plaintiff Moses was in fact entrusted with

running the Secaucus location as a Sales Manager, on or about July 25, 2011—

three days prior to his demotion—he and his team achieved Ashley's sales target,

for which he was congratulated by both Mr. Sciarrino and Plaintiff Mansour. (Pls.'

Counter-Stmt. ¶ 58). Plaintiff Moses had furthermore only been employed at the

Secaucus location for approximately two weeks at the time of his demotion, a

stunningly short period of time for Defendant to purportedly evaluate his

performance.

Six days after the demotion, on or around August 3, 2011, Mr. Sciarrino

abruptly confronted Plaintiff Moses and falsely accused him of "*falling asleep*" in

a meeting, and ordered him to "*go home and don't come back.*" (Pls.' Counter-

Stmt. ¶ 60). Plaintiff Moses had not in fact fallen asleep but had only wiped his

face, as he was fatigued by the Ramadan fast. (Pls.' Counter-Stmt. ¶ 34). Several

hours after Mr. Sciarrino sent him home, Plaintiff Moses therefore contacted Aazel

Bautista, the Human Resources Manager at the Company, by telephone to discuss

Mr. Sciarrino's outburst and to complain again about his consistent and escalating

harassment. (Pls.' Counter-Stmt. ¶ 61). Ms. Bautsita, however ignored Plaintiff

Moses's complaint and reaffirmed the termination: "*If you have an attitude and

you think it's going to be some tension . . . I think it's best that you part ways with

the company.*" (Pls.' Counter-Stmt. ¶ 62).

## II.   PLAINTIFF MOHAMMED MANSOUR'S EMPLOYMENT AT ASHLEY

### A.      Plaintiff Mansour is Subjected to a Hostile Work Environment

Plaintiff Mansour, a Palestinian/Arab Muslim, was hired on March 1, 2010 as a Product Specialist at the Company's Secaucus, New Jersey location. After approximately five months of exemplary performance, Plaintiff Mansour was promoted to a Sales Manager position in or around August 2010, in which position he served without any documented performance problems until his unlawful termination in January 2012. (Pls.' Counter-Stmt. ¶ 64).

As noted above, in or around July 2011, Plaintiff Moses began managerial training at the Company's Secaucus location, where Plaintiff Mansour was one of two Sales Managers. When Mr. Cook introduced Plaintiff Moses to Plaintiff Mansour, he stated to Plaintiff Mansour that "*he* [Plaintiff Moses] *is one of your people.*" (Pls.' Counter-Stmt. ¶ 65). Moreover, when Mr. Cook told Mr. Sciarrino, the second (and more senior) Sales Manager at the Secaucus location, that Plaintiffs Mansour and Moses were both Muslim, Mr. Sciarrino expressed dismay, stating, "*Uh, oh, we should get a metal detector now*" in the presence of Plaintiff Mansour. (Pls.' Counter-Stmt. ¶ 66).

Throughout Plaintiff Mansour's employment, Mr. Sciarrino directed an unrelenting barrage of discriminatory and offensive racist and bigoted comments toward Plaintiff Mansour on the basis of his religion, national origin and ethnicity,

typically on multiple occasions each day. (Pls.' Counter-Stmt. ¶ 67). By way of examples only, Mr. Sciarrino's discriminatory and offensive statements to Plaintiff Mansour included the following:

    a.  *"The Taliban is here"* [when referring to Plaintiff Mansour];

    b.  *"We need to place a metal detector at the door to check you for bombs"*;

    c.  *"Are you carrying bombs in your bag?"*;

    d.  *"Are you mad today because we captured Bin Laden?"*;

    e.  *"I have not met a Muslim who is not a terrorist"*;

    f.  *"Are you part of a hidden Muslim terrorist cell in New Jersey?"*;

    g.  *"Can you give me heads up when they're going to blow the tunnel so I won't drive through that day?"*;

    h.  *"If you don't give Muslims discounts they will blow up the store"*;

    i.  *"We cannot hire anymore Muslims here; this place is turning to be Afghanistan"*;

    j.  *"We destroyed Islam and Muslims"*; and

    k.  *"Niggers accept Islam because we don't accept them in our society."*

(Pls.' Counter-Stmt. ¶ 68).

      In addition to the hostile and discriminatory comments set forth above, Plaintiff Mansour was also subjected to constant harassment about his religious faith and attempts to convert him to Christianity by the owner and CEO of Ashley.

In or around mid-November 2011, for example, Eugene Chrinian, the Company's CEO, approached Plaintiff Mansour on the floor of the Company's Secaucus showroom and exhorted him to convert to Christianity, which Plaintiff Mansour respectfully declined to do. (Pls.' Counter-Stmt. ¶ 71). Mr. Chrinian again approached Plaintiff Mansour at the Company's Secaucus store approximately one month later and again urged him to reconsider his previous rejection of Mr. Chrinian's urging that he convert to Christianity. (Pls.' Counter-Stmt. ¶ 74). When Plaintiff Mansour again responded that he was not interested in conversion, Mr. Chrinian replied by threatening that Plaintiff Mansour would "*burn in Hell unless* [he] *accepts Jesus as* [his] *Lord and Savior.*" (Pls.' Counter-Stmt. ¶ 75).

Mr. Chrinian made similar attempts to urge Plaintiff Mansour to abandon his faith and convert to Christianity on approximately seven different occasions during his employment at the Company, despite Plaintiff Mansour's clear and repeated requests for Mr. Chrinian to stop confronting him about his religion in that unwanted and offensive manner. (Pls.' Counter-Stmt. ¶¶ 71-76).

**B.    Plaintiff Mansour Complains About the Harassment and Hostile Work Environment**

After Plaintiff Mansour's attempts to address the harassment by Mr. Sciarrino directly had failed, he complained about Mr. Sciarrino's conduct in a meeting with Ms. Bautista in or around September 2011. Ms. Bautista assured him that she would look into the matter. (Pls.' Counter-Stmt. ¶¶ 77-78). Two weeks

10

later, however, when Plaintiff Mansour complained again to Ms. Bautista regarding Mr. Sciarrino's behavior and inquired as to the status of her investigation into his prior complaint, she told him that she was very busy, and would look into the issue when she had time. (Pls.' Counter-Stmt. ¶ 79).

Plaintiff Mansour made further complaints to Ms. Bautista regarding the ongoing discrimination and harassment by Mr. Sciarrino—and also Mr. Chrinian's intervening insistence that he convert, which began in November 2011—on at least six different occasions, with his final such complaint being raised with her or around January 3, 2012. (Pls.' Counter-Stmt. ¶ 80). The Company never investigated Plaintiff Mansour's repeated complaints of discrimination and harassment, and no employee or executive at the Company was subjected to any meaningful discipline in connection with the misconduct his complaints raised. (Pls.' Counter-Stmt. ¶ 81).

### C.  Plaintiff Mansour Complains About the Inadequate Investigation of a Sexual Harassment Complaint

In or around November 2011, an employee of Ashley under the supervision of Plaintiff Mansour complained to him that she had been sexually harassed by another Ashley employee on the sales floor. (Pls.' Counter-Stmt. ¶ 82). Plaintiff Mansour in turn immediately passed this complaint on to Ms. Bautista and Mr. Cook for investigation. (Pls.' Counter-Stmt. ¶ 82). When Plaintiff Mansour subsequently followed up with Ms. Bautista, she informed him that she had

completed an investigation and determined that the employee's complaints were without merit. Plaintiff Mansour subsequently discovered in discussions with coworkers that Ms. Bautista had in fact not spoken with a number of employees she claimed to have interviewed. (Pls.' Counter-Stmt. ¶ 82-83). ). When Plaintiff Mansour confronted Ms. Bautista with this fact on January 3, 2012, however, and again inquired about the status of the co-worker's complaint, she informed him that "*per Eugene* [Chrinian]*, the case has closed*" and that it was "*beyond her control*." (Pls.' Counter-Stmt. ¶ 83).

Plaintiff Mansour informed Ms. Bautista at that January 3 meeting that the former coworker who had reported being sexually harassed had contacted him to request that he serve as a witness in connection with a charge of discrimination that she was planning to file with the Equal Employment Opportunity Commission ("EEOC") after the Company failed to investigate or take action in response to her complaint. (Pls.' Counter-Stmt. ¶ 84). Plaintiff Mansour also informed Ms. Bautista that Plaintiff Moses had contacted him with a similar request to serve as a witness in connection with a charge of discrimination that Plaintiff Moses had filed with the EEOC about his employment and termination by the Company. (Pls.' Counter-Stmt. ¶ 85). Ms. Bautista responded to the latter revelation that Plaintiff Moses had contacted Plaintiff Mansour to be a witness in an EEOC proceeding by informing him she would speak to Mr. Chrinian and get back to him, which she never did. (Pls.' Counter-Stmt. ¶ 86).

12

Finally, at the January 3 meeting Plaintiff Mansour yet again inquired about the status of Ms. Bautista's investigation into his own complaints of harassment by Mr. Sciarrino and Mr. Chrinian, and Ms. Bautista responded that she was still looking into it. (Pls.' Counter-Stmt. ¶ 87). Later that month, frustrated by Ashley's evident indifference to his complaints, Plaintiff Mansour contacted the EEOC himself to begin the process of filing a Charge of Discrimination on his own behalf regarding the discriminatory actions of Ms. Sciarrino and Mr. Chrinian, which were continuing unabated despite his half-dozen or more complaints to Ms. Bautista. (Pls.' Counter-Stmt. ¶ 88).

### D.   Plaintiff Mansour is Terminated by Ashley

On or around January 17, 2012, however, Mr. Cook informed Plaintiff Mansour he was being terminated for "*violating company policy*." (Pls.' Counter-Stmt. ¶ 4). When Plaintiff Mansour asked which policy he had violated, Mr. Cook referenced a purported company policy prohibiting ordering a customer's furniture to be delivered to the store, as opposed to ordering it directly to the customer's residence—despite the fact that this supposed policy had never been reduced to writing and ordering merchandise to the store was a common practice among management to secure a sale when a customer insisted on avoiding a delivery charge. (Pls.' Counter-Stmt. ¶ 4). Plaintiff Mansour asked Mr. Cook if he could see a written policy to that effect, but Mr. Cook was unable to identify one. (Pls.' Counter-Stmt. ¶ 4). When Plaintiff Mansour then attempted to return to work, he

was stopped by Mr. Cook and informed that he was being terminated. (Pls.'
Counter-Stmt. ¶ 6). While Defendant now asserts that Plaintiff Mansour was not
terminated but had in fact resigned, Ashley previously admitted through its CEO
that Plaintiff Mansour was in indeed terminated. (Pls.' Counter-Stmt. ¶ 3).

Moreover, it is simply untrue that Plaintiff Mansour was terminated for theft.
It is undisputed that the allegations of theft that resulted in Plaintiff Mansour's
guilty plea—relied upon so heavily by Defendant in support of this motion—were
not discovered by Ashley until January 18, 2012, the day *after* Plaintiff Mansour
was terminated. (Pls.' Counter-Stmt. ¶ 4). More significantly, Ashley has already
admitted, again through Mr. Chrinian, that Plaintiff Mansour was terminated not
for theft, but for "*violations of company policies and procedures regarding the
handling of money and store pick-up of furniture items by customers*." (Pls.'
Counter-Stmt. ¶ 4). As set forth above, this stated reason was pretextual, as no such
policy existed and Plaintiff Mansour's conduct was consistent with the standard
practice of Ashley managers. Nonetheless, the admission entirely undermines
Defendant's post hoc, pretextual assertion that Plaintiff Mansour was terminated
for "theft."[3]

---

[3]     It is also significant that the police report filed by Ashley on January 20,
2012—three days after Plaintiff Mansour's termination—makes no mention of the
alleged theft that Ashley now asserts was the basis of Plaintiff Mansour's
termination. (Pls.' Counter-Stmt. ¶ 4).

## ARGUMENT

### I.   STANDARD OF REVIEW FOR MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* The movant has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the movant has met its burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*

In determining whether there is a genuine issue of material fact, the court may not engage in a determination of credibility or veracity. *Anderson*, 477 U.S. at 249. Instead, the court must construe the facts and inferences in "a light most favorable" to the non-moving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521 (1991). If the non-moving party identifies specific facts and

affirmative evidence that contradict those offered by the moving party, summary judgment must be denied. *Anderson*, 477 U.S. at 256–57.

As set forth below, Defendant is not entitled to summary judgment because the facts established during discovery create an overwhelming inference that Defendant terminated the employment of both Plaintiffs for discriminatory and retaliatory reasons. Moreover, Defendant does not even attempt to establish the nonexistence of a dispute of material fact with respect to Plaintiffs' hostile work environment claims.

## II.    DEFENDANT MAKES NO ARGUMENT IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS

Defendant's brief fails even to make a conclusory assertion—let alone a substantive argument—regarding Plaintiffs' hostile work environment claims under Section 1981, Title VII, and the NJLAD. (*See* Complaint ¶ 50 (alleging that Defendant discriminated against Plaintiffs by "creating, fostering, accepting ratifying and/or otherwise failing to prevent or to remedy a hostile work environment" in violation of Section 1981); ¶ 63 (same for Title VII); ¶ 76 (same for the NJLAD)). Although Defendant's brief does, in passing, correctly state the standard for establishing a hostile work environment claim, (*see* Def.'s Brief 6), Defendant's entire argument in support of their motion for summary judgment on Plaintiffs' discrimination claims is focused exclusively on the *McDonnell Douglas*

16

burden-shifting analysis applicable to claims of discriminatory discharge and retaliation. (*See* Def.'s Brief 6-10; *see also infra* Section IV).

A plaintiff establishes a claim for hostile work environment in violation of federal and state law by demonstrating that harassment on the basis of a protected characteristic was so severe or pervasive that it changed the terms and conditions of the plaintiff's employment. *Tomoko Funayama v. Nichia Am. Corp.,* 482 Fed. Appx. 723, 725 (3d Cir. 2012) (analyzing a hostile work environment claim arising under Title VII).[4] Defendant's failure to make an argument in support of its motion for summary judgment on those claims is perhaps unsurprising, as the record evidence in this case—including testimony regarding the outrageously offensive racial, ethnic and religious slurs directed at Plaintiffs Mansour and Moses by Mr. Sciarrino on a near daily basis, together with Mr. Chrinian's persistent attempts to convert Plaintiff Mansour—overwhelmingly support Plaintiffs' hostile work environment claims. *See***,** *e.g.*, *E.E.O.C. v. Bimbo Bakeries USA, Inc.*, No. 09-cv-1872, 2010 WL 598641, at *5 (M.D. Pa. Feb. 17, 2010) ("While simple teasing, off-hand comments, and isolated incidents usually do not amount to discriminatory changes in the terms and conditions of employment, the use of racial epithets . . .

---

[4]      *See also Verdin v. Weeks Marine Inc.*, 124 F. App'x 92, 96 (3d Cir. 2005) (holding that, for hostile work environment claims, "the same standard used under Title VII applies under Section 1981"); *Moss v. Ret. Value, LLC*, No. 12-cv-157 (JBS)(KMW), 2013 WL 5816657, at *6 (D.N.J. Oct. 29, 2013) (internal citations and quotation marks omitted) ("Because the hostile work environment analyses for Title VII claims and NJLAD claims are 'strikingly similar' the Court will analyze both simultaneously.").

can quickly change the atmosphere, environment, and culture of a workplace from positive to poisonous."). Accordingly, Defendant's motion for summary judgment should be denied with respect to Plaintiffs' claims of discrimination under Section 1981, Title VII and the NJLAD.

## III.   SUMMARY JUDGMENT ON PLAINTIFFS' RETALIATION CLAIMS MUST BE DENIED

Plaintiffs' retaliation claims arising under federal law are governed by the burden-shifting analysis set forth by the Supreme Court. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *see also Brown v. J. Kaz, Inc.,* 581 F.3d 175, 186 (3d Cir. 2009) ("Title VII-style burden shifting naturally controls in § 1981 cases."). The New Jersey Supreme Court has also adopted the *McDonnell Douglas* standard to the NJLAD. *Andersen v. Exxon Co., U.S.A.,* 89 N.J. 483, 492 (1982).

Under this analysis, a plaintiff first bears the burden of establishing a prima facie case by showing "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) (internal citations and quotations omitted). If the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for the adverse action at issue. *Id.* If the defendant succeeds in articulating such a reason, the burden finally shifts back to

the plaintiff to negate the defendant's showing by demonstrating that the proffered reason is in fact a pretext for unlawful retaliation. *Id.*

With respect to the final step of the analysis, a plaintiff can discredit the employer's articulated reason by presenting "some evidence . . . from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764–65 (3d Cir. 1994). In doing so, a plaintiff may rely on direct or circumstantial evidence, such as "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. *Shaner v. Synthes*, 204 F.3d 494, 503 (3d Cir. 2000) (quoting *Fuentes*, 32 F.3d at 764–65).

## A.    **Plaintiffs Have Established A Prima Facie Case Of Retaliation**

Plaintiffs here have satisfied the initial burden of making out a prima facie case by establishing that (1) they made protected complaints to Defendant about discrimination and harassment; (2) they each suffered adverse action when Defendant terminated them; and (3) a causal connection is demonstrated by both the temporal proximity between the protected conduct and adverse actions and by inconsistencies and implausibilities in Defendant's articulated reasons.

### 1. Plaintiffs Engaged in Protected Conduct By Opposing Defendants' Discriminatory Actions in the Workplace

As alleged in the Complaint and set forth in the recitation of facts above, both Plaintiffs complained numerous times to various Ashley employees about Mr. Sciarrino's constant use of racial, ethnic and religious epithets, as well as Mr. Chrinian's persistent proselytizing in the workplace. (Pls. Counter-Stmt. ¶¶ 53, 61, 66-69, 71-76). For example, Plaintiff Moses complained both to his supervisor Jerry Cook and to the Human Resources Manager Aazel Bautista, while Plaintiff Mansour raised complaints with Ms. Bautista on at least six occasions. (Pls. Counter-Stmt. ¶¶ 53, 61, 77-80).

Defendant premises its argument that Plaintiffs cannot satisfy this element in large part on the mistaken assumption that the EEOC Charges are the only protected conduct at issue. (*See, e.g.*, Def.'s Brief 12-13).[5] To the contrary, however, protected activity includes "informal protests of discriminatory employment practices, including making complaints to management," as in the case of Plaintiffs' complaints to Mr. Cook and Ms. Bautista here. *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,* 450 F.3d 130, 135 (3d Cir. 2006). The only question is whether Plaintiffs opposed what they reasonably perceived to be

---

[5] This mistaken assumption is also fatal to Defendant's argument that there is no causal connection between the protected conduct and adverse actions; Defendant does not even consider the relationship between Plaintiffs' informal complaints and their ultimate terminations. (*See* Def.'s Brief 12-13; *see also infra* Section III.A.2).

violations of federal and state anti-discrimination laws. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). The above facts are accordingly more than sufficient to establish that Plaintiffs engaged in protected activity by opposing Mr. Sciarrino's pervasive use of slurs derogatory toward African-Americans, Palestinians and Muslims, as well as Mr. Chrinian's constant attempts to convert Plaintiff Mansour.

In addition to opposing Mr. Sciarrino's casually racist and bigoted remarks and Mr. Chrinian's insistent demands that Plaintiff Mansour convert to Christianity, Plaintiff Mansour also repeatedly complained about Defendant's utterly insufficient investigation of a subordinate's sexual harassment complaint. (Pls. Counter-Stmt. ¶¶ 82-83). Indeed, after he was assured by Ms. Bautista that she had investigated the claims and found them to be without merit, Plaintiff Mansour discovered by following up with co-workers that they had in fact never been interviewed by Ms. Bautista. (Pls. Counter-Stmt. ¶ 83). When Plaintiff Mansour confronted her with that fact, he was told that the case was closed "*per Eugene* [Chrinian]" and that there was "*nothing she could do*." (Pls. Counter-Stmt. ¶ 83).

A reasonable jury could infer from the temporal proximity between those conversations and Plaintiff Mansour's termination—a mere two weeks—that Ashley's decision to terminate him was motivated by his insistence that his coworker's allegations be investigated and his willingness to participate in administrative proceedings on her behalf. It is wholly irrelevant for the purposes of

21

establishing a prima facie case of retaliation that the underlying investigation involved another employee. *See Moore*, 461 F.3d at 343 (finding that a white police officer engaged in protected activity when he objected to his supervisor's use of derogatory terms toward African-American police employees). Plaintiff Mansour correctly opposed activity that he reasonably perceived to be a violation of state and federal anti-discrimination laws, and those complaints can accordingly ground his retaliation claims.

### 2. The Record Demonstrates A Causal Connection Between Plaintiffs' Protected Complaints And Their Termination by Defendant

With respect to the third element—causal connection—the Supreme Court recently held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).[6] As the Supreme Court has since explained, a "but-

---

[6]     Plaintiff respectfully submits that the but-for causation standard should apply only to Plaintiffs' Title VII retaliation claims, and that their other retaliation claims should instead be governed by the more lenient "motivating factor" test, pursuant to which Plaintiffs establish pretext by demonstrating that their protected conduct was a substantial motivating factor in the adverse employment actions. *Nagle v. Marron*, 663 F.3d 100, 110 (2d Cir. 2011). The Supreme Court's holding in *Nassar* was based on a careful construction of the language of 42 U.S.C. § 2000e-2(m). The Court concluded that, because that provision does not mention retaliation, its "motivating factor" test applies only to status based-discrimination claims. *Nassar*, 133 S. Ct. at 2533; *see also Walker v. Wholesale, Inc.*, No. 12-cv-0595, 2013 WL 5502912, at *6 (M.D. Tenn. Oct. 2, 2013). Because the language of Section 1981and the NJLAD do not make such a distinction, *Nassar* does not support the application of the but-for-cause standard to claims brought under those statutes. It should be noted however, that even under the but-for-cause regime,

for cause" in this context refers to one factor that "combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back." *Burrage v. United States*, 134 S. Ct. 881, 888 (2014).

In "applying [the but-for] causation standard to Title VII cases, the Third Circuit has validated the temporal proximity analysis, indicating that close temporal proximity is considered unusually suggestive of but-for causation." *Gist v. Burlington Coat Factory Warehouse Corp.*, No. 13-cv-1094 (JEI)(KMW), 2014 WL 4105015, at n.8 (D.N.J. Aug. 19, 2014). The Third Circuit has held that a temporal proximity of less than ten days between the protected activity and the adverse action is suggestive of causal connection even in the absence of any other proof. *Blakney v. City of Philadelphia*, 559 Fed. Appx. 183, 186 (3d Cir. Mar. 19, 2014). Where temporal proximity alone is not enough to suggest a causal connection, courts "apply the 'timing plus other evidence' test to determine whether other pleaded facts suggest retaliatory motive." *Id*. (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280 (3d Cir. 2000); *see also Zann Kwan v. Andalex Grp.*, 737 F.3d 834, 847 (2d Cir. 2013).

Here, the record amply supports the inference that Defendant's termination of each Plaintiff was causally connected to their complaints to Mr. Cook and Ms.

---

Plaintiffs can more than meet their burden of proof with respect to all of their claims.

Bautista respectively. Plaintiff Moses, for instance, was demoted during the very same meeting that he complained about Mr. Sciarrino's harassment to Mr. Cook, and terminated a mere six *days* later. (Pls. Counter-Stmt. ¶ 53-54, ¶ 60). Plaintiff Moses also complained to Ms. Bautista, Ashley's Human Resources Manager, about Mr. Sciarrino's unlawful and harassing conduct in a conversation that occurred hours after his termination by Mr. Sciarrino. (Pls. Counter-Stmt. ¶ 61). During that conversation, Ms. Bautista ignored the complaint and confirmed Plaintiff Moses's termination. (Pls. Counter-Stmt. ¶ 62).

Plaintiff Mansour was likewise terminated a mere two weeks after his latest in a series of complaints to Ms. Bautista about the harassment he was subjected to by Mr. Sciarrino and Mr. Chrinian. (Pls. Counter-Stmt. ¶ 80).  Even if this proximity alone were not enough to suggest a causal connection, which it is, Defendant's "shifting and inconsistent" explanations for Mr. Mansour's termination—ascribing it first to "*violations of company policy*" and subsequently to "*theft*," despite not having discovered any evidence of theft until *after* Mr. Mansour was terminated (Pls. Counter-Stmt. ¶ 4)—are more than sufficient to satisfy the causation element. *See Zann Kwan*, 737 F.3d at 847 (2d Cir. 2013) (finding "shifting and inconsistent explanations" for termination, together with temporal proximity, sufficient to survive the summary judgment).

Finally, statements made to both Plaintiffs during their employment at Ashley serve as additional evidence suggesting a retaliatory motive behind the

termination of each Plaintiff's employment. *See Blakney*, 559 Fed. Appx. at 186.

For example, the fact that Mr. Cook responded to Plaintiff Moses's complaints by

suggesting that "*Sal just jokes like that*," or the complete indifference of Ms.

Bautista to Plaintiff Mansour's frequent complaints—at least six over

approximately four months between September 2011 and January 2012—

demonstrates a corporate culture that is definitely resistant to acknowledging, let

alone investigating or remedying, instances of unlawful harassment or retaliation.

(Pls. Counter-Stmt. ¶¶ 53, 77-81).

## B. Defendants' Purported Justifications For Terminating Plaintiffs Are Pretextual

In an effort to avoid a trial on Plaintiffs' retaliation claims, Defendant claims

that each Plaintiff resigned or, in the alternative, was terminated for legitimate

business reasons; Plaintiff Moses for alleged poor performance and Plaintiff

Mansour for alleged theft. (Def.'s Brief 13). However, as set forth above and in

greater detail in the accompanying Counter-Statement of Material Facts, all of the

critical events that Defendant cites as "undisputed facts" in support of their motion

are in fact disputed, which underscores the need for Plaintiffs' retaliation claims to

be resolved by a jury.

### 1. Ashley Terminated the Employment of Both Plaintiffs

In the first place, Defendant's primary defense rests on the assertion that

neither Plaintiff was actually terminated, but rather that each resigned. (*See* Def.'s

Brief 12). To the contrary, however, both Plaintiffs have testified that they were terminated by Defendant. Specifically, Plaintiff Moses asserts that he was terminated by Mr. Sciarrino—purportedly for "*falling asleep*" during a meeting— and that the termination was confirmed by Ms. Bautista after Plaintiff Moses complained about Mr. Sciarrino's persistent harassment. (Pls. Counter-Stmt. ¶¶ 35, 60). The circumstances surrounding Plaintiff Moses's separation therefore represent, at the very least, a sharply contested dispute of material fact that is inappropriate for disposition at the summary judgment stage.

Defendant's assertion that Plaintiff Mansour resigned is even less credible, as it is directly contradicted not only by Plaintiff Mansour's own testimony, but also by the testimony of Mr. Chrinian himself, the CEO of Ashley. (Pls. Counter-Stmt. ¶ 8). Given the contradictory testimony and lack of documentary evidence, Ashley cannot shield itself from liability by simply asserting that Plaintiffs resigned. Such credibility determinations must instead be made by a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (holding that, in determining whether there is a genuine issue of material fact, the court may not engage in a determination of the credibility or veracity of witnesses).

### 2.   Ashley's Articulated Reasons for Terminating Plaintiffs Are Pretexts for Discriminatory and Retaliatory Motives

In the alternative, Defendant asserts that Plaintiffs were terminated for legitimate business reasons. The record is replete with evidence, however, that

could support a juror's reasonable inference that these articulated reasons are pretextual.

The circumstances surrounding Plaintiff Moses's termination, for instance, present an almost paradigmatic example of a genuine dispute of material fact. While Defendant denies that Plaintiff Moses was terminated at all, they also assert that—had they terminated him—the decision would have been legitimate insofar as his performance was poor and he fell asleep during a sales meeting. (Def.'s Brief 12). Plaintiff Moses, on the other hand, flatly denies having fallen asleep, and notes that no Ashley employee ever approached him about his purportedly poor performance. The only documentary evidence offered by Defendant regarding Mr. Moses's performance actually only applies to the six-day period between his demotion and termination. (Pls. Counter-Stmt. ¶¶ 31, 63). The lack of documentary evidence essentially reduces this fundamental factual dispute to a swearing match. Especially when considered in conjunction with the temporal proximity between Plaintiff Moses's protected complaint and termination—a matter of days—this dispute must therefore be fatal to Defendant's motion.

Defendant's proffered legitimate reason for the termination of Plaintiff Mansour is likewise unsupported by documentary evidence and contradicted by the sworn testimony of Plaintiff Mansour. Defendant's stated reason is moreover defeated by its own internal inconsistency. Crucially, the evidence of theft upon which Defendant relies so heavily—in particular the indictment and subsequent

guilty plea—was not discovered by Defendant until the day *after* Plaintiff

Mansour's termination. (Pls. Counter-Stmt. ¶¶ 4-7). Plaintiff Mansour was, in fact,

terminated for a purported violation of a Company policy which had never been

reduced to writing and which Ashley's own District Manager cannot confirm even

exists. (Pls. Counter-Stmt. ¶¶ 4, 6). These inconsistencies and shifting

explanations—together with the temporal proximity between Plaintiff Mansour's

repeated complaints and his ultimate termination and Ashley's demonstrated

indifference to Plaintiff Mansour's complaints—are sufficient to defeat

Defendant's motion with respect to Plaintiff Mansour's retaliation claims.[7]

Based on these and other facts in the record—as set forth above and more

fully in the accompanying Counter-Statement of Material Facts—a reasonable jury

could easily determine that Plaintiffs engaged in protected activity, were

subsequently terminated, and that a causal connection exists between the protected

activity and the terminations. Moreover, a jury could readily disregard the

purported non-retaliatory "performance problems" and misconduct Defendant

invokes as the basis for terminating Plaintiffs, because the existence and import of

those events are all in dispute. (Pls. Counter-Stmt. ¶¶ 4-8, 28-29, 31-33). Finally,

---

[7]     It bears mention that the after-acquired evidence of theft is entirely irrelevant
to Defendant's liability, but instead only impacts Plaintiff Mansour's ability to
recover a narrow category of economic damages; namely, front pay in lieu of
reinstatement. *See Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072, 1074 n.3 (3d
Cir. 1995) (noting that this rule is so fundamental that bifurcation of trials may
sometimes be appropriate to "insure that after-acquired evidence not be improperly
used during the liability phase").

Defendant's attempt to insulate itself from liability by asserting that Plaintiffs did

not suffer any adverse action but in fact resigned from their positions likewise fails,

not only because it is directly contradicted by the sworn testimony of both

Plaintiffs, but also because the testimony of the very same decision-makers is

contradictory and implausible on its face, thereby itself creating material disputes

of fact. (Pls. Counter-Stmt. ¶¶ 8, 35, 37).

## IV.   SUMMARY JUDGMENT ON PLAINTIFFS' DISCRIMINATORY DISCHARGE CLAIMS MUST BE DENIED

In addition to establishing discrimination under federal and state law by

offering evidence of a hostile work environment, (*see supra* Section II), Plaintiffs

can also support their discrimination claims by establishing that they were in fact

terminated because of their membership in protected classes. When analyzing

claims of discriminatory discharge under Title VII, Section 1981 and the NJLAD,

courts apply the same *McDonnell Douglas* burden-shifting standard that governs

Plaintiffs' retaliation claims. *Watkins v. Nabisco Biscuit Co.*, 224 F. Supp. 2d 852,

873-74 (D.N.J. 2002). Once Plaintiffs have established a prima facie case of

discrimination, the burden shifts to Defendant to present a non-retaliatory reason

for the challenged employment decisions. *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802 (1973). The burden then shifts back to Plaintiffs to prove by a

preponderance of the evidence that the employer's articulated reasons are pretexts

for discrimination. *See id.* at 804.

29

To establish a prima facie case of discriminatory discharge under state and federal law, Plaintiffs must prove that (1) they are members of a protected class; (2) they were qualified for the positions they sought to retain; (3) they suffered adverse employment actions; and (4) the actions occurred under circumstances that give rise to an unlawful inference of discrimination. *Funayama v. Nichia Am. Corp.*, 482 F. App'x 723, 726 (3d Cir. 2012). "Establishment of a *prima facie* case gives rise to a presumption that the employer unlawfully discriminated against the employee." *Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 955 (N.J. 1999). Here, element (1)—namely, that Plaintiffs are both members of protected classes— is undisputed. (Pls. Counter-Stmt. ¶¶ 40, 64). Element (4)—that the circumstances of Plaintiffs' terminations give rise to an inference of discrimination—is likewise satisfied by the analysis above regarding the temporal proximity between the racial, ethnic and religious harassment endured by Plaintiffs, their subsequent complaints, and their ultimate terminations. (*See supra* Sections II-III).[8]

The record also demonstrates that Plaintiffs were in fact terminated by Defendant, (*see supra* Section III.B.1), and were otherwise well-qualified for the positions for which they were hired. Plaintiff Mansour, for instance, had continued in his position with no disciplinary or performance problems for over eighteen

---

[8]     Plaintiff Moses also asserts that he was replaced by a Caucasian male, which independently satisfies element (4). *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999) (noting that circumstances giving rise to an unlawful inference of discrimination might occur, for instance, "when the position is filled by a person not of the protected class").

months at the time of his termination. (Pls. Counter-Stmt. ¶¶ 64). Likewise, as demonstrated above, the stated reasons for Plaintiff Moses's termination—poor performance and purportedly falling asleep at a team meeting—are entirely pretextual. (*See supra* Section III.B.2). There is no evidence to support the contention that Plaintiff Moses would not have satisfied the job requirements had he been given the opportunity to continue in employment. Defendant is therefore not entitled to summary judgment on Plaintiffs' discriminatory discharge claims.

## V.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' DAMAGES BECAUSE THE AFTER-ACQUIRED EVIDENCE OF THEFT IS ONLY RELEVANT TO PLAINTIFF MANSOUR'S CLAIM FOR FRONT PAY

Plaintiff Mansour does not dispute that he cannot recover front pay in lieu of reinstatement from January 18, 2012, the date Ashley discovered the conduct underlying the criminal charges against him. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360 (1995). Defendant, however, baldly and incorrectly suggests that they are entitled to summary judgment on *all* damages claims of *both* Plaintiffs.

In the first place, Defendant offers no basis for extending the *McKennon* analysis to Plaintiff Moses, for whom no evidence of any misconduct whatsoever has been proffered. Defendant's argument with respect to Mr. Moses in fact consists entirely of a single sentence: "Likewise Moses has failed to establish any damages." (Def.'s Brief 14). That declaration of course cannot support Defendant's

motion for summary judgment, and Plaintiff Moses is accordingly entitled to the full panoply of damages provided for by state and federal law.

It is moreover well-established that the after-acquired evidence of theft is wholly irrelevant to Ashley's underlying liability, as it does not absolve Defendant from having acted with discriminatory and retaliatory intent. *See  Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524, 537 (3d Cir. 2007) (quoting *McKennon*, 513 U.S. at 360) (pointing out that an employer "could not have been motivated by knowledge [they] did not have").  Indeed, the after-acquired evidence does not even absolutely preclude Plaintiff Mansour from recovering other damages for Defendant's violations, but rather only forecloses a narrow category of economic damages; namely, front pay in lieu of reinstatement. *Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072, 1074 (3d Cir. 1995). Plaintiff Mansour is still entitled to compensatory and punitive damages resulting from his discrimination and retaliation claims, as well as attorneys' fees and costs, to the extent such damages are provided for by the statutes. *See, e.g.*, *Miller v. Beneficial Mgmt. Corp.*, 855 F. Supp. 691, 717 (D.N.J. 1994) ("There appears to be no principled basis . . . for the application of the after-acquired evidence defense in this case to bar compensatory relief for emotional suffering under the NJLAD.").

Accordingly, although Plaintiff Mansour is not entitled to front pay after January 18, 2012, Defendant's motion for summary judgment on Plaintiffs' claims for damages should otherwise be denied.

## VI.   THE INTERESTS OF JUDICIAL ECONOMY AND EXPEDIENCY WOULD BE FRUSTRATED BY SEVERING PLAINTIFFS' CLAIMS

Defendant's final argument, that judicial economy and expediency would be best served by severing Plaintiffs' claims pursuant to Fed. R. Civ. P. 42(b), does not withstand serious scrutiny. Defendant's suggestion that the Plaintiffs' claims should now be "separate" because "Moses suffered from poor performance and resigned" while "Mansour stole from Defendant[] and resigned" not only begs the central questions underlying Defendant's entire motion—and consequently ignores the profound factual disputes behind those facile assertions—it also wholly disregards the vast common ground between Plaintiffs' claims and Ashley's defenses.

It is undisputed that Plaintiffs assert the same legal claims against the same Defendant and that their claims involve many of the same factual allegations and witnesses, including both Plaintiffs, Mr. Sciarrino, Ms. Bautista, Mr. Cook and Mr. Chrinian. (*See, e.g.*, Pls. Counter-Stmt. ¶¶ 52-53, 61-62, 70-71). To sever Plaintiffs' claims would not only unnecessarily tax this Court's resources and impose additional costs and delays on both Plaintiffs, but would also subject each of those witnesses to the burden and inconvenience of testifying at trial twice. This is precisely the opposite of the "convenience," "expediency" and "economy" envisioned by Rule 46(b). *See In re Unisys Sav. Plan Litig.*, No. 91-cv-3067, 1997 WL 299425, at *2 (E.D. Pa. May 29, 1997) (quoting Manual for Complex

Litigation § 21.632 (3d ed. 1995)) (reiterating the Manual's admonition that any advantage of separate trials pursuant to Rule 42(b) must "be balanced against the potential for increased cost, delay (including delay in reaching settlement) and inconvenience, particularly if the same witnesses may be needed to testify at both trials, and the unfairness if the result is to prevent a litigant from presenting a coherent picture to the trial of fact."). Accordingly Defendant's motion to sever Plaintiffs' claims should be denied.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court (i) deny Defendant's motion for summary judgment, (ii) deny Defendant's motion to sever Plaintiffs' claims pursuant to Rule 42(b), and (iii) grant such other and further relief as the Court deems just and proper.

Dated: February 27, 2015
    New York, New York        Respectfully submitted,

**THE OTTINGER FIRM, P.C.**

By:   /s/ Denise Rubin Glatter_____
       Denise Rubin Glatter
       George D. Vallas (PHV)
       Ariel Y. Graff (PHV)
401 Park Avenue South
New York, New York 10016
Telephone: (212) 571-2000
denise@ottingerlaw.com
george@ottingerlaw.com
ari@ottingerlaw.com

*COUNSEL FOR PLAINTIFFS*