**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MOHAMMAD MANSOUR and MARK MOSES,<br><br>Plaintiffs,<br><br>v.<br><br>FACTORY DIRECT OF SECAUCUS, LLC<br>d/b/a ASHLEY FURNITURE HOMESTORE,<br><br>Defendant. | No. 13 Civ. 2443 (SDW)(MCA) |

### PLAINTIFFS' RULE 56.1 COUNTER-STATEMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 56.1, Plaintiffs Mark Moses and Mohammad Mansour respectfully submit the following Counter-Statement of Disputed and Undisputed Material Facts Material Facts and Separate Statement of Disputed and Undisputed Material Facts in opposition to the Motion for Summary Judgment of Defendant Factory Direct of Secaucus, LLC d/b/a Ashley Furniture HomeStore ("Ashley" or the "Company"), which demonstrates that there are genuine triable issues of material facts as to each of Plaintiffs' causes of action.

### PLAINTIFFS' COUNTER-STATEMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS

| | Defendant's Statement of "Undisputed" Facts and Alleged Supporting Evidence | Plaintiff's Response and Supporting Evidence |
|---|---|---|
| 1. | Defendant hired Mohammad Mansour ("Mansour") to work at its new furniture store in Paramus, New Jersey, as a full time products specialist.<br><br>• Horn Dec. Ex. 19 at 51:11- 13 | Disputed to the extent this statement of fact is incomplete. Mr. Mansour was hired as a Product Specialist on March 1, 2010. Glatter Decl. Ex. A ("Mansour Dep.") at 51:11-18;  Glatter Decl. Ex. G ("Mansour Aff") at ¶ 3. |
| 2. | Defendant promoted Mansour to the | Disputed to the extent this statement of fact is incomplete. Mr. Mansour was promoted to |

1

| | | |
|---|---|---|
| | position of sales manager.<br><br>• Horn Dec. Ex. 19 at 51:14-18 | the position of sales manager in August 2010 after five months of exemplary performance as a Product Specialist. Glatter Decl. Ex. A (Mansour Dep.), at 51:14-52:8. |
| 3. | Mansour remained in this position until he left working for Defendant.<br><br>• Horn Dec. Ex. 15 at 29:1-3. | Disputed to the extent this purported statement of facts is ambiguous and misleading to the extent it implies Mr. Mansour resigned from Ashley.<br><br>• Mr. Mansour's employment at Ashley was in fact terminated by Jerry Cook, a District Manager at Ashley. Glatter Decl. Ex. A (Mansour Dep.), at Glatter Decl. Ex. C ("Chrinian Dep"), at 47:10-15; 49:15-23. |
| 4. | Defendant discovered that Mansour was stealing.<br><br>• Horn Dec. Ex. 15 at 57:11- 58:3. | Disputed to the extent this purported statement of fact is ambiguous and misleading to the extent it implies that Ashley terminated Mr. Mansour for theft:<br><br>• Mr. Mansour was not terminated for theft but was—by Defendant's own admission, terminated for violations of company policy. Glatter Ex. I ¶ 6; Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 12, 17-18.<br><br>• At the time of Mr. Mansour's termination on January 17, 2012, Ashley had no evidence of the theft that was the subject of the subsequent indictment of Mr. Mansour, which only reported on January 18, 2012—one day after Mr. Mansour's termination. Undisputed Material Facts 8-9; Glatter Decl. Ex G (Mansour Aff.), at ¶ 36.<br><br>• Mr. Mansour was in fact told that he had been terminated for purportedly violating company policies regarding the approval of delivering merchandise directly to the store, despite the fact that no such policy has been identified. Glatter Decl. Ex. D ("Cook Dep."), at |

<table>
<tr>
<td></td>
<td></td>
<td>

61:11-62:3; Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 17-18.

- Ashley filed a civil complaint against Mr. Mansour in the Chancery Division of the New Jersey Superior Court, Hudson County, No. HUD-C-61-12, which was verified on April 24, 2012 by Eugene Chrinian, the CEO of Ashley (the "Defamation Complaint"), which states that Mr. Mansour was in fact terminated for "*violations of company policies and procedures regarding the handling of money and store pick-up of furniture items by customers.*"   Glatter Decl. Ex I ¶ 6.

- The Defamation Complaint further states that Ashley learned of the theft that was the subject of subsequent criminal proceedings on January 18, 2012—the day *after* Mr. Mansour was terminated.  Glatter Decl. Ex I ¶¶ 7-8.

- Additionally, no police report was filed in regard to the incident that purportedly prompted Mr. Mansour's termination, despite the fact that a police report was filed three days later on January 20, 2012—after Mr. Mansour's termination—in regard to the separate incident. Glatter Decl. Ex. F ("Bautista Dep) 67:12-68:19; Glatter Decl. Ex. J.

</td>
</tr>
<tr>
<td>5,</td>
<td>

On January 16, 2012, Defendant became aware that a number of pieces of furniture were missing from the store's Clearance Department, where Mansour was known to spend most of his time.

- Horn Dec. Ex. 13.

</td>
<td>

Disputed to the extent that this statement of facts is ambiguous and misleading, as it implies that Mr. Mansour was responsible for misconduct with respect to the purportedly missing furniture.

- Mr. Mansour was not terminated for theft but was—by Defendant's own admission, terminated for violations of company policy. Glatter Ex. I ¶ 6; Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 12, 17-18.

</td>
</tr>
</table>

| | | |
|---|---|---|
| | | • Mr. Mansour was told that he had been terminated for purportedly violating company policies regarding the approval of delivering merchandise directly to the store, despite the fact that no such policy has been identified. Glatter Decl. Ex I ¶ 6; Glatter Decl. Ex. D (Cook Dep.), at 61:11-62:3; Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 17-18.<br><br>• On January 17, 2012, at a meeting between Mr. Mansour, Aazel Bautista, Ashley's HR Manager, Tamer Tanious, a Merchandising Manager at Ashley, and Jerry Cook, Ashley's Director of Sales, Mr. Cook terminated Mr. Mansour for violating a purported company policy by ordering Ms. Arias's furniture directly to the store rather than to her residence.  Glatter Decl. Ex I ¶ 6; Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 16-24.<br><br>• No police report was filed about theft or any other allegation of criminal conduct regarding the Arias Incident despite the fact that a police report was filed on January 20, 2012—three days after Mr. Mansour's termination—in regard to an unrelated allegation of theft. Glatter Decl. Ex. F ("Bautista Dep") 67:12-68:19. |
| 6. | On January 17, 2012, Mansour was called into a meeting regarding the missing pieces of furniture.<br><br>• Horn Dec. Ex. 13. | Disputed.<br><br>• Mr. Mansour was called into a meeting regarding a purported violation of company policy because he authorized the delivery of merchandise purchased by a customer named Ramona Arias directly to the store so that she could pick it up herself and thereby avoid the delivery fee ("The Arias Incident.") Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 16-17. |

|  |  | • On January 17, 2012, at a meeting between Mr. Mansour, Aazel Bautista, Ashley's HR Manager, Tamer Tanious, the Merchandising Manager at Ashley, and Jerry Cook, Ashley's Director of Sales, Mr. Cook terminated Mr. Mansour for violating a purported company policy by ordering Ms. Arias's furniture directly to the store rather than to her residence; despite the fact that no such policy has been identified. Glatter Decl. Ex. D (Cook Dep.), at 61:11-62:3; Glatter Decl. Ex I ¶ 6; Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 16-24. |
|---|---|---|
|  |  | • Mr. Mansour was never confronted with evidence that either furniture or money was actually missing, and Mr. Cook never contacted Ms. Arias to inquire about the transaction. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 19, 23. |
|  |  | • At the meeting, Mr. Tanious asked Mr. Cook why Ashley was raising an issue if the merchandise had been paid for. Glatter Decl. Ex G (Mansour Aff.), at ¶ 19. |
|  |  | • The footage that purportedly shows Mr. Mansour engaged in theft in fact shows him supervising Mr. Arias's representative loading her furniture onto his truck to ensure the correct items were taken. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 14-15. |
|  |  | • Although Mr. Cook contacted Maj Awad—a delivery driver utilized by Ashley for local deliveries—at that meeting, he did so despite Mr. Mansour telling him that the call would be futile because Mr. Awad was not involved with the delivery at all, but instead Ms. Arias had arranged the delivery herself. The conversation with Mr. Awad lasted |

5

| | | |
|---|---|---|
| | | less than one minute. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 20-22. |
| | | • Following Mr. Cook's futile call to Mr. Awad, Mr. Mansour attempted to leave the office, stating: "*I'm going back to work, you conclude this investigation and let me know what the result is.*" Glatter Decl. Ex G (Mansour Aff.), at ¶ 24. |
| | | • Mr. Cook responded by saying, "*No, you're terminated.*" Mr. Mansour asked Ms. Bautista whether she was a witness to my termination, and she said "*Yes.*" Glatter Decl. Ex G (Mansour Aff.), at ¶ 24. |
| | | • At that time, Mr. Mansour turned over the keys to the store and walked out. Glatter Decl. Ex G (Mansour Aff.), at ¶ 24. |
| | | • No police report was filed about theft or any other allegation of criminal conduct regarding the Arias Incident despite the fact that a police report was filed on January 20, 2012—three days after Mr. Mansour's termination—in regard to an unrelated allegation of theft. Glatter Decl. Ex F (Bautista Dep.), at 67:12-68:19. |
| 7. | Defendant had footage on a security camera of Mansour stealing merchandise out of the back of Defendant's warehouse and loading it onto trucks.<br><br>• Horn Dec. Ex 16 at 43:11- 44:7. | Disputed.<br><br>• Mr. Mansour was not terminated for theft but was—by Defendant's own admission, terminated for violations of company policy. Glatter Ex. I ¶ 6; Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 12, 17-18.<br><br>• The footage that purportedly shows Mr. Mansour engaged in theft in fact shows him supervising Mr. Arias's representative loading her furniture onto |

6

|   |   |   |
|---|---|---|
|   |   | his truck to ensure the correct items were taken. Glatter Decl. Ex G (Mansour Aff.), at ¶ 13 & 14 <br><br> • No police report was filed about theft or any other allegation of criminal conduct regarding the Arias Incident despite the fact that a police report was filed on January 20, 2012—three days after Mr. Mansour's termination—in regard to an unrelated allegation of theft. Glatter Decl. Ex F (Bautista Dep.), at 67:12-68:19. |
| 8. | On January 17, 2012, after being confronted with evidence of theft, Mansour resigned from his position with Defendant. <br><br> • Horn Dec. Exs. 13 and 16 at 41:24-42:4. | Disputed. <br><br> • Mr. Mansour was not terminated for theft but was—by Defendant's own admission, terminated for violations of company policy. Glatter Ex. I ¶ 6; Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 12, 17-18. <br><br> • Mr. Mansour did not resign but was—by Defendant's own admission—terminated. Chrinian Depo. 47:10-47:15; Glatter Ex. I ¶ 6; Glatter Decl. Ex G (Mansour Aff.), at ¶ 24. <br><br> • Mr. Mansour did not resign following this meeting, but was terminated. Chrinian Depo. 47:10-47:15 |
| 9. | On January 18, 2012, Robyn Brown, a customer care representative employed by Defendants, received a telephone call from Ms. Dina Yousef ("Yousef"), a customer of Defendant. <br><br> • Horn Dec. Ex. 13. | Disputed: <br><br> • Ms. Yousef made a complaint in person in the store after being informed that Mr. Mansour had already been terminated for theft. Glatter Decl. Ex. C (Chrinian Dep.), at 58:17-58:21; Glatter Decl. Ex. E ("Sciarrino Dep.") 31:4-10; Glatter Decl. Ex G (Mansour Aff.), at ¶ 34. |
| 10. | Yousef purchased furniture through Mansour making two cash installment payments to Mansour, one on January 2, 2012 for $500 and another on | Disputed. <br><br> • Because of a personal relationship with Ms. Yousef's son, Mr. Mansour offered |

| | | |
|---|---|---|
| | January 7, 2012 for $3,009.48, for a total of $3,509.48.<br><br>• Horn Dec. Ex. 5 at 6:11-25; Ex. 13. | to procure certain furniture items for Ms. Dina Yousef from a competitor, where they could be obtained within her budget, by providing Ms. Yousef with the phone number of that competitor. (the "Yousef Incident"). Mr. Mansour had no further involvement in the transaction. Glatter Decl. Ex G (Mansour Aff.), at ¶ 29.<br><br>• Mr. Mansour ran the transaction in an attempt to obtain Mr. Cook's approval for a "price match" which was denied. He never wrote "*paid in full*" on the invoice and the handwriting is not consistent with his handwriting. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 27-35.<br><br>• Mr. Mansour never received any payments for Ms. Yousef and was not involved with any subsequent promises regarding the delivery of furniture. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 25-35.<br><br>• Despite maintaining his innocence, Mr. Mansour ultimately decided to plead guilty to the charge of theft arising out of the Yousef Incident on the advice of counsel to avoid the potential of a harsh sentence. Glatter Decl. Ex G (Mansour Aff.), at ¶ 37. |
| 11 | In exchange for these cash payments, Mansour printed out a receipt for Youssef and wrote on it "paid in full" and she gave him the money in cash.<br><br>• Horn Dec. Ex. 5 at 7:1-8; Ex. 13. | Disputed.<br><br>• Mr. Mansour ran the transaction in an attempt to obtain Mr. Cook's approval for a "price match" which was denied. He never wrote "*paid in full*" on the invoice and the handwriting is not consistent with his handwriting. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 27-35.<br><br>• Mr. Mansour never received any payments for Ms. Yousef and was not |

| | | |
|---|---|---|
| | | involved with any subsequent promises regarding the delivery of furniture. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 25-35.<br><br>• Despite maintaining his innocence, Mr. Mansour ultimately decided to plead guilty to the charge of theft arising out of the Yousef Incident on the advice of counsel to avoid the potential of a harsh sentence. Glatter Decl. Ex G (Mansour Aff.), at ¶ 37. |
| 12. | The cash payment was never put into the payroll system in the computer because Mansour physically took the money, and then in the computer system withdrew those items from the computer as though they did not exist.<br><br>• Horn Dec. Ex. 5 at 7:10-18. | Disputed:<br><br>• Mr. Mansour ran the transaction in an attempt to obtain Mr. Cook's approval for a "price match" which was denied. He never wrote "*paid in full*" on the invoice and the handwriting is not consistent with his handwriting. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 27-35.<br><br>• Mr. Mansour never received any payments for Ms. Yousef and was not involved with any subsequent promises regarding the delivery of furniture. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 25-35.<br><br>• Despite maintaining his innocence, Mr. Mansour ultimately decided to plead guilty to the charge of theft arising out of the Yousef Incident on the advice of counsel to avoid the potential of a harsh sentence. Glatter Decl. Ex G (Mansour Aff.), at ¶ 37. |
| 13. | Mansour then told Yousef that she would be getting the delivery on January 21, 2012.<br><br>• Horn Dec. Ex. 5 at 7:19-22. | Disputed.<br><br>• Another financial retailer told Ms. Yousef that she would receive the delivery on January 21, 2012. Glatter Decl. Ex G (Mansour Aff.), at ¶ 30.<br><br>• Mr. Mansour was not involved in the |

| | | |
|---|---|---|
| | | transaction between Ms. Yousef and the other retailer.   Glatter Decl. Ex G (Mansour Aff.), at ¶ 25-35. |
| 14. | This delivery never took place because no such delivery was in the computer system and had been deleted from the system.<br><br>• Horn Dec. Ex. 5 at 7:23-8:10. | Disputed to the extent this purported statement of fact is ambiguous and potentially misleading:<br><br>• Because of a personal relationship with Ms. Yousef's son, Mr. Mansour offered to procure certain furniture items for Ms. Dina Yousef from a competitor, where they could be obtained within her budget, by providing Ms. Yousef with the phone number of that competitor. (the "Yousef Incident"). Mr. Mansour had no further involvement in the transaction. Glatter Decl. Ex G (Mansour Aff.), at ¶ 29.<br><br>• Mr. Mansour ran the transaction in an attempt to obtain Mr. Cook's approval for a "price match" which was denied. He never wrote "*paid in full*" on the invoice and the handwriting is not consistent with his handwriting. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 27-35.<br><br>• Mr. Mansour never received any payments for Ms. Yousef and was not involved with any subsequent promises regarding the delivery of furniture. Glatter Decl. Ex G (Mansour Aff.), at ¶¶ 25-35.<br><br>• Despite maintaining his innocence, Mr. Mansour ultimately decided plead guilty to the charge of theft arising out of the Yousef Incident on the advice of counsel to avoid the potential of a harsh sentence.  Glatter Decl. Ex G (Mansour Aff.), at ¶ 37. |
| 15. | On January 18, 2012, the police were dispatched to the Defendant's store | Undisputed for the purposes of Defendant's Motion for Summary Judgment. |

| | | |
|---|---|---|
| | regarding a report of theft by Mansour regarding an incident with Yousef.<br><br>• Horn Dec. Ex. 5 at 4:23-5:22. | |
| 16. | Following his separation of employment, Mansour began publishing false and defamatory statement about Defendant, its management, and its business on his personal "linkedin.com" webpage.<br><br>• Horn Dec. Ex. 7. | Disputed:<br><br>• Following his termination by Ashley, Mansour published statements on his LinkedIn page that were true and honest statements of fact or opinion regarding the harassment and discrimination he experienced working for the Defendants, together invitation to Ashley employees with similar experiences to follow his example and file a complaint with the EEOC. Glatter Decl. Ex. K; Glatter Decl. Ex G (Mansour Aff.), at ¶ 5. |
| 17. | On April 24, 2012, Defendant filed a complaint against Mansour related to Mansour's publishing false and defamatory statement about Defendant, its management, and its business on his personal "linkedin.com" webpage.<br><br>• Horn Dec. Ex. 8. | Undisputed for purposes of Defendant's Motion for Summary Judgment. |
| 18. | On May 7, 2012, Mansour filed a charge with the EEOC.<br><br>• Horn Dec. Ex. | Disputed to the extent this purported statement of fact is potentially misleading:<br><br>• Mr. Mansour began the process of filing a Charge of Discrimination by contacting the EEOC by telephone in early January 2012, prior to his termination by Ashley. Glatter Decl. Ex G (Mansour Aff.), at ¶ 5. |
| 19. | Subsequent to working for Defendant, Mansour became employed as a store manager at Huffman Koos.<br><br>• Horn Dec. Ex. 19 at 10:11-15. | Undisputed for purposes of Defendant's Motion for Summary Judgment. |

| | | |
|---|---|---|
| 20. | Mansour was charged with theft related to his manipulation of the computer system as Hoffman Koos.<br><br>• Horn Dec. Ex. 4. | Undisputed for purposes of Defendant's Motion for Summary Judgment. |
| 21. | On July 12, 2012, there was a grand jury proceeding regarding Mansour's theft from Defendant, with respect to which Mansour was indicted.<br><br>• Horn Dec. Ex 5. | Undisputed for purposes of Defendant's Motion for Summary Judgment. |
| 22. | Mansour pleaded guilty to the theft charges.<br><br>• Horn Ex. 6. | Disputed to the extent that this purported statement of fact is ambiguous and potentially misleading.<br><br>• Although Mr. Mansour maintains his innocence of any theft or other criminal activity arising out of the Yousef Incident, he nevertheless decided to plead guilty to the charges contained in the indictment on the advice of counsel to avoid the potential of a harsh sentence. Glatter Decl. Ex G (Mansour Aff.), at ¶ 36. |
| 23. | On July 27, 2012, the Honorable Hector R. Velazquez granted an Order Enforcing Litigants Rights ordering that Mansour remove the postings from his personal "linkedin.com" webpage.<br><br>• Horn Dec. Ex. 9. | Disputed to the extent that this purported statement of fact is ambiguous and potentially misleading.<br><br>• Following his termination by Ashley, Mansour published statements on his LinkedIn page that were true and honest statements of fact or opinion regarding the harassment and discrimination he experienced working for the Defendants, together invitation to Ashley employees with similar experiences to follow his example and file a complaint with the EEOC. Glatter Decl. Ex G (Mansour Aff.), at ¶ 42-43; Glatter Decl. Ex. K.<br><br>• The Order in the Defamation Case was entered upon a default by Mr. Mansour |

| | | |
|---|---|---|
| | | because he was unable to afford an attorney to defend himself against Ashley's litigation. Glatter Decl. Ex G (Mansour Aff.), at ¶ 5 |
| 24. | Following his resignation, Mansour filed a charge with the EEOC. On January 31, 2013, the EEOC determined that based on its investigation, the EEOC was unable to conclude that information obtained establishes a violation of federal law on the part of Defendant regarding Mansour's separation from employment.<br><br>• Horn Dec. Ex. 20. | Disputed to the extent this purported statement of fact is ambiguous and potentially misleading.<br><br>• Mr. Mansour began the process of filing a Charge of Discrimination by calling the EEOC by telephone in early January 2012, prior to his termination by Ashley.<br><br>• The EEOC explicitly declined to make a finding about either Mr. Mansour's claims or Ashley's defenses, noting that "*there is reasonable cause to believe that [Ashley] has discriminated against [Mr. Mansour] due to national origin and religion*," and accordingly issuing a right to sue.  Glatter Decl. Ex. M. |
| 25. | Mark Moses ("Moses") was trained by Defendant to be a Sales Manager from June 28, 2011 through July 28, 2011.<br><br>• Horn Dec. Ex. 18 at 45:11-16; Ex. 14. | Undisputed for the purposes of Defendant's Motion for Summary Judgment |
| 26. | Mansour was the manager of the department where Moses worked.<br><br>• Horn Dec. Ex. 15 at 22:22-23:4. | Undisputed for the purposes of Defendant's Motion for Summary Judgment |
| 27. | Moses never complained of discriminatory or offensive statements in the workplace to Jerry Cook, who was director of sales for Defendant.<br><br>• Horn Dec. Ex. 16 at 22:5-8. | Disputed:<br><br>• On or around July 28, 2011, Mr. Moses met with Jerry Cook, a District Manager at Ashley and Mr. Moses's supervisor, and complained about the constant stream of bigoted, discriminatory and offensive statements directed at him by Mr. Salvatore Sciarrino, a Sales Manager at Ashley's Secaucus location. Glatter Decl. Ex. B ("Moses Dep"), at |

13

| | | |
|---|---|---|
| | | 56:12-57:17; Glatter Decl. Ex. 10 ("Moses Aff") ¶ 11. |
| | | • During that same meeting Mr. Cook informed Mr. Moses that he was being demoted from his position as a Sales Manager to the position of Product Specialist because the Company wanted "*other managers*" and was "*going in a different direction.*" Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17 |
| | | • Plaintiff Moses also complained about Mr. Sciarrino to Ms. Aazel Bautista, a human resources representative at Ashley, on August 3, 2012, the date of his termination from Ashley. Glatter Decl. Ex. B (Moses Dep.), at 42:18-43:9; 60:17-20; 62:10-63:3. |
| 28. | Moses was demoted from his role as Sales Manager in training and was offered a position as a Product Specialist.<br><br>• Horn Dec. Ex 15 at 22:16-19; Ex. 14. | Disputed to the extent this purported statement of fact is incomplete and potentially misleading:<br><br>• The demotion occurred immediately after Mr. Moses complained to Mr. Cook, about the constant stream of bigoted, discriminatory and offensive statements directed at him by Mr. Sciarrino. Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17.<br><br>• During the same meeting that Mr. Moses made these complaints, Mr. Cook informed him that he was being demoted from his position as a Sales Manager to the position of Product Specialist because the Company wanted "*other managers*" and was "*going in a different direction.*" Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17<br><br>• Mr. Moses informed at the meeting that if he did not accept his demotion to Product Specialist he would be terminated. Glatter Decl. Ex. B (Moses |

| | | |
|---|---|---|
| | | Dep.), at 57:7-8.<br><br>• Additionally, Mr. Moses was subsequently replaced by a Caucasian man. Moses' Dep. 64:23-65:1. |
| 29 | Moses was demoted because he was not able to meet his sales goals.<br><br>• Horn Dec. Ex. 15:3-12; Ex. 21. | Disputed.<br><br>• The document relied upon by Defendant in support of this contention—the "Monthly Productivity by Product Specialist" Report, in fact tracks Mr. Moses's performance *after he was demoted* to Product Specialist, a position in which he served for six days.  Glatter Decl. Ex H (Moses Aff.), at ¶¶ 21.<br><br>• Mr. Moses had never been contacted by Mr. Sciarrino, Mr. Cook or any other employee at Ashley about performance problems prior to his demotion. Glatter Decl. Ex H (Moses Aff.), at ¶ 13.<br><br>• Mr. Moses had only been working in the Secaucus location for approximately two weeks at the time of his demotion, and was training during that entire time to ultimately become manager of a different Ashley location in Fairfield, New Jersey.  Glatter Decl. Ex H (Moses Aff.), at ¶ 13.<br><br>• Mr. Moses had no performance problems at any of the three previous Ashley locations he had trained at prior to being assigned to the Secaucus location.  Glatter Decl. Ex H (Moses Aff.), at ¶¶ 5-7.<br><br>• The demotion occurred immediately after Mr. Moses complained to Mr. Cook, about the constant stream of bigoted, discriminatory and offensive statements directed at him by Mr. Sciarrino. Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17. |

| | | |
|---|---|---|
| | | • During the same meeting that Mr. Moses made these complaints, Mr. Cook informed him that he was being demoted from his position as a Sales Manager to the position of Product Specialist because the Company wanted "*other managers*" and was "*going in a different direction.*" Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17

• Mr. Moses informed at the meeting that if he did not accept his demotion to Product Specialist he would be terminated. Glatter Decl. Ex. B (Moses Dep.), at 57:7-8.

• Additionally, Mr. Moses was subsequently replaced by a Caucasian man who had been hired prior to the demotion. Moses' Dep. 64:23-65:1. |
| 30. | No employee or representative of Defendant ever told Moses that his demotion was due to race, religion, or national origin.

• Horn Dec. Ex. 18 at 64:2-9. | Disputed to the extent that this purported statement of fact is ambiguous and potentially misleading insofar as it implies that Ashley was not motivated by Mr. Moses' race, and religion in deciding to demote him.

• The demotion occurred immediately after Mr. Moses complained to Mr. Cook, about the constant stream of bigoted, discriminatory and offensive statements directed at him by Mr. Sciarrino. Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17.

• During the same meeting that Mr. Moses made these complaints, Mr. Cook informed him that he was being demoted from his position as a Sales Manager to the position of Product Specialist because the Company wanted "*other managers*" and was "*going in a different direction.*" Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17. |

<table>
<tr><td></td><td></td><td>

- Mr. Moses had never been contacted by Mr. Sciarrino, Mr. Cook or any other employee at Ashley about performance problems prior to his demotion. Glatter Decl. Ex H (Moses Aff.), at ¶ 15.

- Mr. Moses had only been working in the Secaucus location for approximately two weeks at the time of his demotion, and was training during that entire time to ultimately become manager of a different Ashley location in Fairfield, New Jersey.  Glatter Decl. Ex H (Moses Aff.), at ¶ 15.

- Mr. Moses had no performance problems at any of the three previous Ashley locations he had trained at prior to being assigned to the Secaucus location.  Glatter Decl. Ex H (Moses Aff.), at ¶¶ 5 -7.

- Mr. Moses informed at the meeting that if he did not accept his demotion to Product Specialist he would be terminated. Glatter Decl. Ex. B (Moses Dep.), at 57:7-8.

- Additionally, Mr. Moses was subsequently replaced by a Caucasian man who had been hired prior to the demotion. Glatter Decl. Ex. B (Moses Dep.), at 64:23-65:1.

</td></tr>
<tr><td>31.</td><td>

Moses non-performance problems were known to Defendant's management.

- Horn Dec. Ex. 17 at 42:16-24.

</td><td>

Disputed to the extent that this purported statement of fact is ambiguous and potentially misleading, insofar as it implies that Mr. Moses was terminated for performance problems.

- Plaintiff Moses was only a product specialist for two days and, as a result Plaintiff Moses was not given an opportunity to demonstrate improved performance in that role. Glatter Decl.

</td></tr>
</table>

17

| | | |
|---|---|---|
| | | Ex. B (Moses Dep.), at 60:3-4; Glatter Decl. Ex H (Moses Aff.), at ¶ 20. |
| 32. | Defendant provided Moses with training in an effort to help his performance.<br><br>• Horn Dec. Ex. 16 at 23:22-24:22. | Disputed.<br><br>• No employee of Defendant ever contacted Mr. Moses about performance problems or offered to help him improve his performance prior to his demotion. Glatter Decl. Ex H (Moses Aff.), at ¶ 15.<br><br>• No performance problems were noted at any of the other locations where Moses was sent for training. Glatter Decl. Ex H (Moses Aff.), at ¶¶ 5-7.<br><br>• Mr. Cook, upon whose testimony Defendant's rely entirely in support of this purported statement of material fact, was unable to remember the names of the employees he suggested Mr. Mansour train with, the date of the conversation, and never reduced the purported improvement plan to writing. Cook Dep. 24:6-25:7. |
| 33. | Moses told Jerry Cook that the expectations of the job were more than he was capable of doing.<br><br>• Horn Dec. Ex 16 at 26:2-17. | Disputed:<br><br>• Mr. Moses did not state that the "*expectations of the job were more than he was capable of doing.*" Glatter Decl. Ex H (Moses Aff.), at ¶ 13.<br><br>• Instead, Mr. Cook told Mr. Moses that they were terminating him because they were "*going in a different direction,*" and that entailed making him a product specialist. Glatter Decl. Ex. B (Moses Dep.), at 56:23-57:12. |
| 34. | Moses fell asleep during an employee meeting.<br><br>• Horn Dec. Ex. 17 at 44:20- 45:15. | Disputed:<br><br>• Mr. Moses did not fall asleep but instead "*wiped his face*" at one point during a sales meeting while he was fasting during the month of Ramadan. Glatter |

| | | |
|---|---|---|
| | | Decl. Ex. B (Moses Dep.), at 62:10-63:3. |
| 35. | After falling asleep at the meeting, Salvatore Sciarrino, a sales manager, sent Moses home.<br><br>• Horn Dec. Ex. 17 at 44:20-46:16. | Disputed to the extent that this purported statement of facts is ambiguous and potentially misleading:<br><br>• Mr. Moses did not fall asleep during the meeting. Glatter Decl. Ex. B (Moses Dep.), at 62:10-63:3.<br><br>• Mr. Sciarrino terminated Mr. Moses for purportedly falling asleep. Glatter Decl. Ex. B (Moses Dep.), at 61:4-15.<br><br>• Mr. Sciarrino was not authorized to send Mr. Moses home and to tell him not to return. Cook Dep. 29:8-11. |
| 36. | Moses was told that if his performance improved, that he would be considered for other store manager positions in the future.<br><br>• Horn Dec. Ex. 18 at 60:7-11. | Undisputed for purposes of Defendant's Motion for Summary Judgment. |
| 37. | On August 3, 2011, Moses expressed his dissatisfaction with his job to Aazel Bautista, who was employed in Defendant's Human Resources Department, and Moses and Ms. Bautista agreed that the best thing would be for Moses and Defendant to part ways and then Moses resigned from his employment with Defendant.<br><br>• Horn Dec. Ex. 14. | Disputed to the extent that this statement is misleading and incomplete:<br><br>• Ms. Bautista informed Mr. Moses on August 3, 2011 that it was the Company's position that it would be best if Mr. Moses parted ways with the company. Glatter Decl. Ex. B (Moses Dep.), at 62:10-63:3.<br><br>• Ms. Bautista said this immediately after Mr. Moses complained to her about Mr. Sciarrino's constant discriminatory and harassing statements. Glatter Decl. Ex. B (Moses Dep.), at 62:10-63:3.<br><br>• Mr. Moses did not resign but was in fact terminated. Glatter Decl. Ex. B (Moses Dep.), at 62:10-63:3; Glatter Decl. Ex H (Moses Aff.), at ¶¶ 18-19. |

| 38. | No employee or representative of Defendant ever told Moses that his separation of employment was due to race, religion or national origin.<br><br>• Horn Dec. Ex. 18 at 65:15-22. | Disputed to the extent that this purported statement of fact is ambiguous and potentially misleading, insofar as it implies that Mr. Moses was terminated for performance problems.<br><br>• Plaintiff Moses was terminated six days after the meeting in which he was demoted, which occurred immediately after having informed his supervisor Mr. Cook of Mr. Sciarrino's discriminatory and harassing conduct. Glatter Decl. Ex. B (Moses Dep.), at 56:23-57:12; Glatter Decl. Ex H (Moses Aff.), at ¶ 18.<br><br>• The stated basis for Ashley's decision to terminate Mr. Moses—that he fell asleep at a meeting—was false. Glatter Decl. Ex. B (Moses Dep.), at 62:10-63:3.<br><br>• Mr. Moses was replaced as a Sales Manager by a Caucasian man. Moses' Dep. 64:23-65:1. |
| --- | --- | --- |
| 39. | Following his resignation, Moses filed a charge with the EEOC. On January 18, 2012, the EEOC determined that based on its investigation, the EEOC was unable to conclude that information obtained establishes a violation of federal law on the part of Defendant regarding Moses' separation from employment.<br><br>• Horn Dec. Ex. 18. | Disputed to the extent this purported statement of fact is ambiguous and potentially misleading.<br><br>• The EEOC explicitly declined to make a finding about either Mr. Moses's claims or Ashley's defenses, stating that its issuance of a right to sue "*does not certify that [Ashley] is in compliance with the statutes. No finding is made to any other issue that might be construed as having been raised by this charge.*" Glatter Decl. Ex. M. |

<u>PLAINTIFFS' SEPARATE STATEMENT OF DISPUTED AND UNDISPUTED</u>
<u>MATERIAL FACTS</u>

<u>Mr. Moses is Subjected to a Hostile Work Environment</u>

40.     Mr. Moses, an African-American Muslim, was hired in June 2011 as a Sales Manager at the Company's Fairfield store. Glatter Decl. Ex. B (Moses Dep.), at 45:11-16.

41.     Beginning June 28, 2011, Mr. Moses reported to the Ashley location in Fairfield for approximately three days, getting to know staff and completing the onboarding process. While at Fairfield, Mr. Moses interacted with Mr. Cook about two times. And had no performance problems. Glatter Decl. Ex H (Moses Aff.), at ¶¶ 4-5.

42.     On or about Monday, July 5, 2011 Mr. Cook requested that Mr. Moses meet him Ashley's warehouse and headquarters in Edison, New Jersey to learn the warehouse aspect of the business. Mr. Moses spent approximately two days at the Edison location. Other than a brief ten minute meeting with Mr. Cook in the morning of July 9, he had no in-person interactions with Mr. Cook and had no performance problems at the Edison location. Glatter Decl. Ex H (Moses Aff.), at ¶ 6.

43.     On approximately July 9, 2011, Mr. Moses was told by Jerry Cook that he would be sent to the Ashley Furniture in Nanuet, New York to learn the sales techniques and store processes. Mr. Moses was told to observe the store managers and assist in running the store. Mr. Moses never interacted with Mr. Cook and had no performance issues while at the Nanuet location. Glatter Decl. Ex H (Moses Aff.), at ¶ 7.

44.     On or about July 11, 2011, Mr. Moses was told by Mr. Cook to report to the Secaucus location "*to learn from Sal [Sciarrino] and Mohammed [Mansour]*" the Store Managers there. Mr. Moses was supposed to be in the Secaucus store for about

three to four days, similar to my training at Edison and Nanuet, before returning to Ashley's Fairfield location to run the store as he was initially hired to do. However, he was never reassigned to the Fairfield store. Glatter Decl. Ex H (Moses Aff.), at ¶ 8.

45.     During his entire time at Ashley's Secaucus location, Mr. Moses interacted with Mr. Cook approximately three times. Glatter Decl. Ex H (Moses Aff.), at ¶ 9.

46.     When Mr. Moses's supervisor, Mr. Cook, introduced him to Mr. Mansour, he stated to Mr. Mansour that Mr. Moses is "one of your people" in reference to the religious faith of Mr. Moses and Mr. Mansour. Glatter Decl. Ex. A (Mansour Dep.), at 52:13-53:16.

47.     Roughly one week into his training at the Company's Secaucus location, on or around July 12, 2011, Mr. Moses greeted Plaintiff Mohammed Mansour (who had just returned from a vacation) in Arabic on the Company's sales floor in the presence of Mr. Sciarrino. Upon recognizing that Mr. Moses speaks Arabic and is Muslim, Mr. Sciarrino responded with evident disdain, stating scornfully to Mr. Moses, "*Oh, you are one of those Muslims.*" Glatter Decl. Ex. B (Moses Dep.), at 46:6-25.

48.     Beginning that same day, and continuing throughout the duration of Mr. Moses' employment at the Company, Mr. Sciarrino directed an unrelenting barrage of discriminatory and offensive racist and bigoted comments toward Mr. Moses on the basis of his religion and race, typically on multiple occasions each day, both on the sales floor and in the manager's office.  Glatter Decl. Ex. B (Moses Dep.), at 47:12-48:21; Glatter Decl. Ex H (Moses Aff.), at ¶¶ 10-11.

49.     By way of examples only, Mr. Sciarrino frequently insinuated that Mr. Moses was a terrorist and enemy of the United States, demanding to know, for example, if Mr. Moses was carrying "a *bomb*" in his bag, or if he and Mr. Mansour were conspiring to wage "*jihad*," or "*making bombs*" as part of a terrorist plot, or, when Mr. Moses left the bathroom, comments such as "*I don't have to go back in the restroom and check, do I? There's no bombs in there?*" Glatter Decl. Ex. B (Moses Dep.), at 49:5-10.

50.     Mr. Sciarrino would also make regular comments about Mr. Moses's race, such as, for example, when ordering lunch, "*I'm ordering sandwiches. Let me make sure I put pork in it for you Muslims. But you're black. You eat chicken. Right?*" Glatter Decl. Ex. B (Moses Dep.), at 48:22-49:4.

51.     In addition, on the sales floor, Mr. Sciarrino had just gotten into an argument with an African-American co-worker and, in the presence of Mr. Moses, referred to the co-worker as an "*angry nigger*." When Mr. Moses objected, Mr. Sciarrino stated that he was being "*uppity*." Glatter Decl. Ex. B (Moses Dep.), at 51:8-24.

**Mr. Moses is Terminated by Ashley in Retaliation for his Protected Complaints**

52.     Mr. Moses frequently objected to Mr. Sciarrino and requested that he refrain from using offensive religious and racial slurs in the workplace. In response, Mr. Sciarrino would simply state that, "*on the streets*" he was referred to as "*Sal the Bull*." Glatter Decl. Ex. B (Moses Dep.), at 54:21-55:18.

53.     On or around July 28, 2011, Mr. Moses met with his supervisor District manager Jerry Cook and complained about Mr. Sciarrino's constant stream of bigoted, discriminatory and offensive statements to him in the workplace, telling Mr. Cook that "*you have to talk to Sal because he's always making, you know, racist and bigoted*

*comments towards me and towards other workers*." In response, Mr. Cook simply stated that "*Sal just jokes like that.*" Glatter Decl. Ex. B (Moses Dep.), at 56:12-24.

54.     During that same meeting, however, Mr. Cook told Mr. Moses that he was being demoted from his position as a Sales Manager to instead become a Sales Representative at the Company. Glatter Decl. Ex. B (Moses Dep.), at 56:24-57:8. This demotion—together with the reduction in earning potential and diminishment in responsibilities—was extremely visible and humiliating for Mr. Moses. Glatter Decl. Ex H (Moses Aff.), at ¶ 14.

55.     Mr. Moses was told that the demotion was due to the fact that the Company wanted "*other managers*" and was "*going in a different direction.*" Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17

56.     At no time prior to his demotion did any employee of Ashley, including Mr. Mansour, Mr. Sciarrino, or Mr. Cook, ever contact Mr. Moses about his purportedly poor performance. Glatter Decl. Ex H (Moses Aff.), at ¶ 15.

57.     Mr. Mansour was not informed of Mr. Moses's purportedly poor performance, despite the fact that he was involved in training Mr. Moses while he was at the Secaucus location. Glatter Decl. Ex G (Mansour Aff.), at ¶ 8.

58.     In fact, on the one occasion when Mr. Moses was entrusted with running the Secaucus location as a Sales Manager, on or about July 25, 2011, he and his team achieved Ashley's sales target, for which he was congratulated by both Mr. Sciarrino and Mr. Mansour. Glatter Decl. Ex H (Moses Aff.), at ¶ 16.

59.     Moreover, on the same day that Mr. Moses complained about Mr. Sciarrino's harassment to Mr. Cook and was subsequently demoted—July 28—Mr.

Moses was informed by a sales agent that a Caucasian man whom Mr. Moses witnessed walking into a meeting with Mr. Chrinian and other Ashley senior management staff in Ashley's Secaucus location, was his replacement as the Store Manager of Ashley's Fairfield location, indicating that his replacement had already been hired at the time of my demotion. Glatter Decl. Ex H (Moses Aff.), at ¶ 17.

60.     Less than one week later, on or around August 3, 2011, Mr. Sciarrino abruptly confronted Mr. Moses and falsely accused him of purportedly "falling asleep" in a meeting ordering Mr. Moses to "go home and don't come back." Glatter Decl. Ex. B (Moses Dep.), at 61:4-15.

61.     Mr. Moses contacted Ms. Bautista that day to discuss Mr. Sciarrino's decision to terminate him and complained that "*I can't work around Sal because he's always making racist comments and jokes, and, you know, I want to report the matter to Jerry*." Glatter Decl. Ex. B (Moses Dep.), at 62:10-24.

62.     Rather than inquire further about Mr. Moses' complaint of harassment and discrimination, Ms. Bautista stated, "*If you have an attitude and you think it's going to be some tension . . . I think it's best that you part ways with the company.*" Glatter Decl. Ex. B (Moses Dep.), at 62:25-63:3.

63.     Mr. Moses's performance as a Product Specialist was not only in-line with other similarly situated employees, but he also achieved that level of performance after enduring the humiliation of being demoted immediately after having complained of enduring racial and religious discrimination and harassment. Moses Aff ¶ 20.

**Mr. Mansour is Subjected to a Hostile Work Environment**

64.    Mr. Mansour, a Palestinian/Arab Muslim, was hired on March 1, 2010 as a Sales Associate at the Company's Secaucus, New Jersey location where, after approximately six months of exemplary performance as a Sales Associate, he was promoted to a Sales Manager position in or around August 2010, in which position he served until his termination in January 2012. Glatter Decl. Ex. A (Mansour Dep.), at 51:14-52:8.

65.    In or around July 2011, Mr. Moses began managerial training at the Company's Secaucus location, where Mr. Mansour was one of two Sales Managers. As noted above, Mr. Cook, a District Manager at the Company, introduced Mr. Moses to Mr. Mansour, by stating to Mr. Mansour that "*he [Mr. Moses] is one of your people.*" Glatter Decl. Ex. A (Mansour Dep.), at 52:13-53:16.

66.    Moreover, when Mr. Cook told Mr. Sciarrino, the second (and more senior) Sales Manager at the Secaucus location, that Messrs. Mansour and Moses were both Muslim, Mr. Sciarrino expressed dismay, stating, "*Uh, oh, we should get a metal detector now*" in the presence of Mr. Mansour. Glatter Decl. Ex. A (Mansour Dep.), at 54:3-16.

67.    Throughout Mr. Mansour's employment, Mr. Sciarrino directed an unrelenting barrage of discriminatory and offensive racist and bigoted comments toward Mr. Mansour on the basis of his religion, national origin and race, typically on multiple occasions each day. Glatter Decl. Ex. A (Mansour Dep.), at 60:9-16.

68.    By way of examples only, Mr. Sciarrino's discriminatory and offensive statements to Mr. Mansour included the following:

a. "*The Taliban is here* [when referring to Mr. Mansour]." Glatter
   Decl. Ex. A (Mansour Dep.), at 60:5-61:7; Glatter Decl. Ex F
   (Bautista Dep.), at 95:17-21;

b. "*We need to place a metal detector at the door to check you for
   bombs.*" Glatter Decl. Ex. A (Mansour Dep.), at 61:8-25;

c. "*Are you carrying bombs in your bag?*" Glatter Decl. Ex. A
   (Mansour Dep.), at 62:1-14;

d. "*Are you mad today because we captured Bin Laden?*" Glatter
   Decl. Ex. A (Mansour Dep.), at 62:15-63-3;

e. "*I have not met a Muslim who is not a terrorist.*" Glatter Decl. Ex.
   A (Mansour Dep.), at 63:8-16;

f. "*Are you part of a hidden Muslim terrorist cell in New Jersey?*"
   Glatter Decl. Ex. A (Mansour Dep.), at 63:17-64:7;

g. "*Can you give me heads up when they're going to blow the tunnel
   so I won't drive through that day?*" Glatter Decl. Ex. A (Mansour
   Dep.), at 64:9-23;

h. "*If you don't give Muslims discounts they will blow up the store.*"
   Glatter Decl. Ex. A (Mansour Dep.), at 64:24-65:10;

i. "*We cannot hire anymore Muslims here; this place is turning to be
   Afghanistan.*" Glatter Decl. Ex. A (Mansour Dep.), at 65:11-18;

j. "*We destroyed Islam and Muslims.*" Glatter Decl. Ex. A (Mansour
   Dep.), at 65:19-25.

k. "*Niggers accept Islam because we don't accept them in our
   society.*" Glatter Decl. Ex. A (Mansour Dep.), at 66:1-9.

69.     On another occasion, Mr. Mansour was informed that Mr. Sciarrino had

wrapped a rag around his head at a sales meeting and stated that "*he is Mohammad today

and that if anybody does not listen to him, he is going to act like Mohammed.*" Glatter

Decl. Ex. A (Mansour Dep.), at 56:19-57:2.

70.     Mr. Mansour asked Mr. Sciarrino to cease making hostile and discriminatory comments on at least ten occasions, to no avail. Glatter Decl. Ex. A (Mansour Dep.), at 74:6-21.

71.     In addition to the hostile and discriminatory comments set forth above, Mr. Mansour was also subjected to constant harassment about his religious faith and attempts to convert him to Christianity by the owner and CEO of Ashley. Glatter Decl. Ex. A (Mansour Dep.), at 71:7-12.

72.     In or around mid-November 2011, for example, Eugene Chrinian, the Company's CEO, approached Mr. Mansour on the floor of the Company's Secaucus showroom and asked him whether he "*believe[d] in Jesus Christ*" or "considered the Christian faith." Glatter Decl. Ex. A (Mansour Dep.), at 66:16-23.

73.     When Mr. Mansour said no, Mr. Chrinian went to his car and returned with a Bible and another book entitled *The Man in the Mirror*—which has overtly Christian themes—and exhorted Mr. Mansour to read them. Glatter Decl. Ex. A (Mansour Dep.), at 66:23-67:3; Glatter Decl. Ex F (Bautista Dep.), at 90:3-24.

74.     Mr. Chrinian again approached Mr. Mansour at the Company's Secaucus store approximately one month later and asked him whether he had read the books Mr. Chrinian had provided. When Mr. Mansour responded that he had not, Mr. Chrinian nevertheless continued to preach about his religious beliefs. Glatter Decl. Ex. A (Mansour Dep.), at 68:13-69:1.

75.     When Mr. Mansour again responded that he was not interested in conversion, Mr. Chrinian replied by stating to Mr. Mansour that he will "*burn in Hell*

*unless [he] accepts Jesus as [his] Lord and Savior.*" Glatter Decl. Ex. A (Mansour Dep.),
at 70:18-71:12.

76.    Mr. Mansour would regularly respond to these comments by asking Mr.
Chrinian to "stop approaching [him] on the sale floor with issues that are not related to
the business," at which Mr. Chrinian would get upset. Glatter Decl. Ex. A (Mansour
Dep.), at 71:9:-15.

### Mr. Mansour Complains About the Harassment and Hostile Work Environment

77.    When his requests to Mr. Sciarrino to desist from his constant racial and
religious harassment and commentary, Mr. Mansour complained about their conduct in a
meeting with Aazel Bautista, the Company's Human Resources manager, in or around
September 2011. Glatter Decl. Ex. A (Mansour Dep.), at 77:4-13.

78.    Ms. Bautista responded by assuring Mr. Mansour that she would look into
the matter. Glatter Decl. Ex. A (Mansour Dep.), at 77:14-16.

79.    Two weeks later, Mr. Mansour complained again to Ms. Bautista
regarding Mr. Sciarrino's behavior and inquired as to the status of her investigation into
his prior complaint.  At that time, Ms. Bautista told Mr. Mansour that she was very busy,
and would look into the issue when she had time.  Glatter Decl. Ex. A (Mansour Dep.), at
78:11-18.

80.    Mr. Mansour made further complaints to Ms. Bautista regarding the
ongoing discrimination and harassment by Mr. Sciarrino and, additionally, the conversion
attempts by Mr. Chrinian that began in November 2011, on at least six different
occasions, with his final such complaint being raised with her or around January 3, 2012
Glatter Decl. Ex. A (Mansour Dep.), at 72:17-73:5; 79:6-80:19.

81.     The Company never investigated Mr. Mansour's repeated complaints of discrimination and harassment, and no employee or executive at the Company has been subject to meaningful discipline in connection with his mistreatment. Glatter Decl. Ex G (Mansour Aff.), at ¶ 5.

## Mr. Mansour Complains About the Inadequate Investigation of a Sexual Harassment Complaint

82.     In or around November 2011, an employee of Ashley under the supervision of Mr. Mansour complained to Mr. Mansour that she had been sexually harassed by another Ashley employee on the sales floor. Mr. Mansour in turn immediately passed this complaint on to Ms. Bautista and Mr. Cook for investigation. Glatter Decl. Ex. A (Mansour Dep.), at 81:17-22; Glatter Decl. Ex. N.

83.     In December 2011 Mr. Mansour followed up with Ms. Bautista about the complaint and she informed him that she had investigated it, interviewed witnesses and found the claim to be without merit. Glatter Decl. Ex G (Mansour Aff.), at ¶ 6. Mr. Mansour subsequently discovered through conversations with coworkers that Ms. Bautista actually never spoke with the individuals whom she claimed to have interviewed. Glatter Decl. Ex G (Mansour Aff.), at ¶ 6. When he confronted her with this fact on January 3, 2012, when Mr. Mansour followed up with Ms. Bautista about the status of the co-worker's complaint, she informed him that "*Per Eugene* [Chrinian], *the case has closed*" and that it was "*beyond her control*." Glatter Decl. Ex. A (Mansour Dep.), at 81:23-82:8; Glatter Decl. Ex G (Mansour Aff.), at ¶ 6.

84.     Mr. Mansour told Ms. Bautista that he had been contacted by the female employee who had reported being sexually harassed to serve as a witness in connection with a charge of discrimination that she was planning to file with the EEOC after the

Company failed to investigate or take action in response to her complaint. Glatter Decl.

Ex. A (Mansour Dep.), at 82:18-20.

85.      Mr. Mansour also informed Ms. Bautista that he had been contacted with

a similar request by Mr. Moses to serve as a witness in connection with a charge of

discrimination that he had filed with the EEOC in connection with his employment and

termination by the Company. Glatter Decl. Ex. A (Mansour Dep.), at 82:22-25.

86.      Ms. Bautista responded to the revelation that Mr. Moses had contacted Mr.

Mansour to be a witness in the EEOC proceedings by informing him she would speak to

Eugene and get back to him, which she never did. Glatter Decl. Ex. A (Mansour Dep.), at

25:19-27:10; 83:18-19.

87.      At the January 3, 2012 meeting, Mr. Mansour also inquired about the

status of Ms. Bautista's investigation into harassment by Mr. Sciarrino and Mr. Chrinian,

and Ms. Bautista stated that she was still looking into it. Glatter Decl. Ex. A (Mansour

Dep.), at 83:20-23.

88.     Later that month, in January 2012, Mr. Mansour himself contacted the

EEOC to begin the process of filing a Charge of Discrimination on his own behalf in

connection with the discriminatory actions of Ms. Sciarrino and Mr. Chrinian, which

were continuing unabated despite his half-dozen or more complaints to Ms. Bautista.

Glatter Decl. Ex G (Mansour Aff.), at ¶ 5.

Dated: February 27, 2015
        New York, New York                   Respectfully submitted,

                                             **THE OTTINGER FIRM, P.C.**

                                             By:     /s/ Denise Rubin Glatter____
                                                     Denise Rubin Glatter
                                                     George D. Vallas (PHV)
                                                     Ariel Y. Graff (PHV)

                                                     401 Park Avenue South
                                                     New York, New York 10016
                                                     Telephone: (212) 571-2000
                                                     Facsimile: (212) 571-0505
                                                     denise@ottingerlaw.com
                                                     george@ottingerlaw.com
                                                     ari@ottingerlaw.com

                                                     *COUNSEL FOR PLAINTIFFS*