<u>**EXHIBIT G**</u>

**Affidavit of Mohammed Mansour**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MOHAMMAD MANSOUR and MARK MOSES,

        Plaintiffs,

    v.

FACTORY DIRECT OF SECAUCUS, LLC
d/b/a ASHLEY FURNITURE HOMESTORE,

        Defendant.

No. 13 Civ. 24433 (SDW)(MCA)

## AFFIDAVIT OF MOHAMMED MANSOUR

STATE OF NEW YORK    ) ss.:
COUNTY OF NEW YORK  )

    I, Mohammed Mansour, of full age, being duly sworn according to law, deposes and says:

    1.    I am one of the Plaintiffs in the above-captioned matter against Factory Direct of Secaucus, LLC d/b/a Ashley Furniture Homestore ("Ashley").

    2.    I am a Muslim and also an Israeli citizen of Palestinian descent.

    3.    I was employed by Ashley as a Product Specialist at Ashley's Secaucus location between March 1, 2010 and August 2010, when I was promoted to Sales Manager, in which position I served until my termination on January 17, 2012.

    4.    While employed by Ashley, I was subjected to a constant barrage of harassment and discrimination on the basis of my religion and national origin/ethnicity by Salvatore Sciarrino, a Sales Manager at the Ashley Secaucus location, as well as repeated attempts by Eugene Chrinian, the CEO of Ashley, to convert me to Christianity, despite my requests that he cease.

1

5.    In early January 2012, while still employed by Ashley and after my repeated complaints to both Mr. Chrinian and Mr. Sciarrino, as well as to Aazel Bautista, the Human Resources Manager at Ashley, were ignored, I contacted the EEOC by telephone to make a complaint about the harassment and discrimination I was subjected to by Mr. Sciarrino and Mr. Chrinian. I followed up this initial contact with a letter sent in March 2012 following my termination.

6.    I also contacted Ms. Bautista about a sexual harassment complaint that a subordinate of mine had submitted to me and that I had forwarded to her. Ms. Bautista told me in December 2011 that she had investigated the claims, interviewed witnesses and found them to be without merit. Subsequently, I discovered by talking to coworkers that people Ms. Bautista had never spoken with people she claimed to have interviewed. When I confronted her with this information on January 3, 2012, she told me that the case was closed "*per Eugene* [Chrinian]" and that there was "*nothing she could do.*"

7.    Together with Mr. Sciarrino, I supervised Mark Moses in July 2012 while he was undergoing management training in the Secaucus store before his anticipated assignment to Fairfield.

8.    Neither Mr. Sciarrino nor Jerry Cook, the Director of Sales at Ashley— nor, indeed, any other employee at Ashley—ever raised issues with Mr. Moses' performance to me.

### The Ramona Arias Incident

9.    Ms. Romana Arias, a customer of Ashley, purchased a sofa, loveseat and chair from Ashley in early January 2012. I handled the sale.

10.    I had the furniture purchased by Ms. Arias delivered directly to the store rather than to her home because Ms. Arias wanted to avoid the delivery charge and instead pick up the furniture from the store.

11.    Ordering furniture directly to the store is a routine practice at Ashley, and is left to the manager's discretion to preserve a sale when the customer is unwilling to pay delivery charges.

12.    I am unaware of any written policy prohibiting ordering merchandise to the store, and have done so myself on a number of occasions without incident. I am also aware of other managers following this practice.

13.    The furniture ordered by Ms. Arias arrived about a week later, on or about January 16, 2012, and an individual arrived to pick up the furniture on behalf of Ms. Arias and to make the payment in cash to Jacqueline Wright, a customer service representative at Ashley.

14.    I was at the Paramus store when an individual arrived to pick up Ms. Arias' furniture on or about January 16, but was called back to the Secaucus location by Mr. Sciarrino when Ms. Arias arrived, because Mr. Sciarrino was not sure which pieces were to be picked up.

15.    When I arrived at the Secaucus location, I identified the furniture belonging to Ms. Arias and released it to her representative because he had the invoice, which had been paid. I supervised Ms. Arias's representative while he loaded the truck to ensure that the correct pieces were being loaded.

16.    On January 17, 2012 Mr. Cook asked me to step into his office together with Tamer Tanious, the Merchandising Manager at Ashley, and Ms. Bautista.

3

17.     At the meeting, Mr. Cook demanded to know why the merchandise for Ms. Arias was ordered to the store rather than delivered to the customer's home. When I explained that the customer did not want to pay the delivery charge and, in accordance with standard practice I ordered the merchandise to the store in an attempt to persevere the sale, Mr. Cook stated that I had violated Company policy.

18.     I told Mr. Cook that, as he was aware, it was standard practice to order merchandise to the store if a customer insisted and asked him to identify the written policy I had violated by doing so. He said he would get back to me but never did.

19.     At that time, Mr. Tanious asked Mr. Cook whether the money was there for the sale, to which Mr. Cook did not respond. Mr. Tanious then asked why Ashley was raising an issue if the merchandise was paid for, to which Mr. Cook again did not respond.

20.     Mr. Cook then placed a phone call to an individual named Maj Awad, the owner of a third-party delivery company that Ashley uses to make local deliveries, to inquire whether Mr. Awad had picked up the furniture in question.

21.     I informed Mr. Cook that there was no reason to call Mr. Awad as he was not involved with the delivery at all, but instead Ms. Arias had arranged the delivery herself. The conversation with Mr. Awad lasted less than one minute.

22.     Although I told Mr. Cook before he made the call to Mr. Awad, that there was no point in doing so, Mr. Cook did not respond to my insistence that Mr. Awad was not involved.

23.     Mr. Cook at no time during this meeting called Ms. Arias.

4

24.     Following Mr. Cook's futile call to Mr. Awad, I attempted to leave the office, stating: "*I'm going back to work, you conclude this investigation and let me know what the result is.*" Mr. Cook responded by saying, "*No, you're terminated.*" I asked Ms. Bautista whether she was a witness to my termination, and she said "*Yes.*" At that time, I turned over the keys to the store and walked out.

## The Dina Yousef Incident

25.     On or about January 2, 2012, Dina Yousef came into the store to buy a living room set for her son, whom I know personally, and who was getting married at the time. At Ashley, the set—which consisted of two loveseats, two sofas, two chairs, a coffee table and two side tables—amounted to $8,500. However, Ms. Yousef was unwilling to spend more than $3,500.

26.     Because of my personal relationship with Ms. Yousef's son, I attempted to get approval for the sale according to Ashley's price match policy, pursuant to which Ashley will match a competitor's price for the same or similar furniture. Approval of the Director of Sales is necessary to offer a price match.

27.     I entered the sale into Ashley's system and attempted to get approval from Mr. Cook to price match and make the sale at approximately $3,500. In order to get this approval, however, the sale had to be entered into the system.

28.     When I called Mr. Cook asking for approval, Mr. Cook reviewed the terms and said that Ashley could not offer the discount.

29.     I then informed Ms. Yousef that Ashley could not do the sale at her desired price, but suggested that she try a local competitor, Furniture Warehouse, located

5

a few blocks away from Ashley. I provided Ms. Yousef with the number of the owner, whom I know professionally from having price shopped at his store in the past.

30.    Ms. Yousef called Furniture while she was still in the store and the owner agreed to make the sale at the price Ms. Yousef suggested and promised that the merchandise would be available by January 21, 2012.

31.    The owner of Furniture Warehouse arrived at Ashley a few minutes later to meet Ms. Yousef and to collect a $500 deposit for the furniture.

32.    The owner of Furniture Warehouse subsequently informed me that, approximately one week later, on or about January 7, 2012, Ms. Yousef paid the balance—approximately $3,000—to him at the Furniture Warehouse location.

33.    I was subsequently informed by Ms. Jacqueline Wright, a customer service representative at Ashley, that on January 18, 2012, Ms. Yousef came to the Ashley store to show her cousin the set that she had purchased from Furniture Warehouse, and was falsely informed by Mr. Sciarrino that I had been terminated for theft.

34.    Ms. Yousef at that time informed Mr. Sciarrino that I had facilitated a purchase between her and Furniture Warehouse. Based on the false allegations that I had been terminated for theft, Ms. Yousef was convinced that she would not receive a delivery from Furniture Warehouse. Accordingly, Ashley arranged to have the pieces delivered to Ms. Yousef from their warehouse.

35.    As I informed the police in the criminal report, the receipts that show a handwritten notation reading "*Paid $500.00 cash*" and "*Paid in full*" were in fact entered

6

to obtain approval from Mr. Cook for a price match. I never wrote: "*Paid $500.00 cash*" or "*Paid in full*" on the receipts and the writing is not consistent with my handwriting.

36.     I was contacted by the Secaucus Police Department in late January about Ashley's report and given a court date.

37.     I was subsequently indicted for theft and ultimately accepted a plea deal on the advice of my attorney, because I did not have sufficient funds to take the case to trial and was accordingly advised that the cheapest and safest solution was to accept a plea deal and probation for a period of three years.

38.     After leaving Ashley, I accepted employment as a Store Manager of a Huffman Koos retailer located next to Ashley's Paramus, New Jersey location.

39.     I was subsequently informed by the territory manager of Huffman Koos, that as soon as Mr. Chrinian, the CEO of Ashley, discovered that I was working at Huffman Koos, he contacted Anthony Mehran, the owner of the Huffman Koos location, and falsely informed him that I had been terminated by Ashley for theft.

40.     In July 2012, I was told by my manager via email to mark down a mattress originally priced at $899 to $499, at which price I made a sale. A few days later, I was asked by the owner, Anthony Mehran, why the mattress had been marked down. Although I told him that I had received an email from my manager asking us to do so, he nevertheless informed me that I was responsible for the difference. I paid Mr. Mehran the $400 difference and resigned from my position.

41.     Approximately one week later, Huffman Koos filed a police report about that incident, although they did not seek reimbursement, as I had already paid the difference. Although I denied wrongdoing to the police, I ultimately pleaded guilty to a

minor charge and small fine on the advice of my attorney because I did not have the resources to defend myself in Court.

42.     On or about April 24, 2012, Ashley filed a lawsuit against me alleging, among other things, that I had made defamatory statements against them. I initially defended myself pro se because of a lack of funds, but was advised by the Court to hire an attorney.

43.     Although I initially hired an attorney, he subsequently moved to be withdrawn from the case. I then missed a hearing that I was not aware of, and Judgment was entered against me because of my default. I only became aware of the judgment when Ashley's attorneys' mailed it to me.

MOHAMMED MANSOUR

Sworn to and subscribed before me
This 27th day of February, 2015

Notary Public

GEORGE VALLAS
Notary Public - State of New York
NO. 02VA6270257
Qualified in Westchester County
My Commission Expires October 15, 2016

8