EXHIBIT 1

[Page 1]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------x

MOHAMMAD MANSOUR and MARK MOSES,

                                   Civil Action No.

                              13-cv-2443(SRC-CLW)

        Plaintiffs,

    vs.

FACTORY DIRECT OF SECAUCUS, LLC d/b/a ASHLEY

FURNITURE HOMESTORE,

        Defendant.

-------------------------------------------------x

        Video-Deposition of AAZEL BAUTISTA, taken

by Defendants, pursuant to notice, by and before

MICHAEL WILLIAMS, A Registered Professional Court

Reporter and Notary Public within and for the

State of New Jersey, held at the offices of

ARCHER & GREINER, P.C., 21 Main Street;

Hackensack, New Jersey on Thursday, November 13,

2014 commencing at 5:49 p.m.

APPEARANCES:

FOR THE PLAINTIFFS:

THE OTTINGER FIRM, PC
401 Park Avenue
New York, New York 10016
BY: GEORGE D. VALLAS, ESQ.

FOR THE DEFENDANT:
ARCHER & GREINER, PC
21 Main Street
Hackensack, New Jersey 07601
BY: DANIEL C. RITSON, ESQ.

ALSO PRESENT:
Brian Durborow - Videographer
Mohammad Mansour

[Page 2]

INDEX

WITNESS        EXAMINATION BY        PAGE
Aazel Bautista   George Vallas        6, 94
          Daniel Ritson        92, 99

EXHIBITS
DEFENDANTS        DESCRIPTION        PAGE
1        Employee Resource Guide   13
2        Series of e-mails        28
        dated 10/18/11

3        One-page e-mail        33
        dated 11/23/11
4        One-page e-mail        44
        dated 12/2/11

5        Affidavit of Aazel        63
        Bautista

[Page 4]

FEDERAL STIPULATION

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties hereto, that the filing, sealing, and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before this court.

[Page 3]

THE VIDEOGRAPHER: This is the videotape deposition of Aazel Bautista taken by the plaintiff in the matter of Mansour versus Ashley Furniture in the United States District Court for the District of New Jersey, Civil Action No. 13-CV-2443(SRC-CLW).

This deposition is being held at Archer and Greiner. It is 11/13/2014. My name is Brian Durborow from U.S. Legal Support and I'm the video specialist. The court reporter today is Mikael Williams, also, from U.S. Legal Support, and we're going on the record at 5:49 p.m., and counsel will now state their appearances for the record.

MR. VALLAS: George Vallas of the Ottinger Firm for plaintiffs Moses Mansour, excuse me, Mark Moses and Mohommad Mansour.

MR. RITSON: Daniel Ritson of Archer and Greiner for the defendant Factory Direct of Secaucus, LLC doing business as Ashley Furniture Home Store and also providing legal representation to the deponent, Aazel Bautista.

THE VIDEOGRAPHER: The certified court reporter will now swear the witness and all counsel may proceed.

[Page 5]

[2]  (Pages 2 to 5)

**[Page 6]**

1    AAZEL BAUTISTA,
2  called as a witness, having been first duly
3  sworn, testified as follows:
4        EXAMINATION
5  BY MR. VALLAS:
6        Q.   Good evening, Miss Bautista.  We met
7  a moment ago.  My name is George Vallas, and I
8  represent Mohammad Mansour and Mark Moses in a
9  lawsuit that they filed against Factory Direct of
10  Secaucus doing business as Ashley Furniture.
11        For convenience throughout today's
12  deposition, I'm going to refer to Factory Direct
13  as Ashley Furniture; is that okay?
14        A.   That's fine.
15        Q.   I just want to ask you some
16  background questions.
17        Have you ever been deposed before?
18        A.   No.
19        Q.   Do you understand that you've just
20  been sworn in and that you're testifying under
21  oath?
22        A.   Yes.
23        Q.   Even though this is somewhat more of
24  an informal setting, the testimony that you give
25  is subject to the same penalties of perjury as if

**[Page 8]**

1  there's a pending question, before you take a
2  break, you answer it before we break unless it's
3  a question about privilege that you would like to
4  discuss with your attorney.
5        A.   Okay.
6        Q.   Are you on any medications today,
7  Miss Bautista, that might affect your ability to
8  testify truthfully?
9        A.   No.
10        Q.   Are you sick at all today?
11        A.   No.
12        Q.   Can you think of any other reason
13  why you might not be able to answer my questions
14  fully and truthfully?
15        A.   No.
16        Q.   Is it your understanding that you
17  are represented by an attorney in connection with
18  tonight's deposition?
19        A.   Yes.
20        Q.   And is your attorney sitting next to
21  you, Mr. Ritson?
22        A.   Yes.
23        Q.   I don't want you to tell me anything
24  you discussed with any of your attorneys, but I
25  would like to know what, if anything, you did to

**[Page 7]**

1  you had been testifying in a courtroom.
2        A.   Yes.
3        Q.   So I'm going to ask you questions
4  and you'll answer.  I just ask that you allow me
5  to finish my question completely for the sake of
6  the court reporter before giving your answer.
7        A.   Okay.
8        Q.   Also, I ask that you answer the
9  questions verbally as the court reporter can't
10  really transcribe a nod of the head or shake of
11  the head.
12        A.   Okay.
13        Q.   If you answer a question, I'm going
14  to assume you understood it, but if you don't
15  hear or you don't understand a question, please
16  feel free to ask me to rephrase it.
17        A.   Sure.
18        Q.   At any time today if you want to
19  correct a deposition that you had given previous,
20  excuse me, testimony that you had given
21  previously, please feel free to do so.
22        A.   Okay.
23        Q.   And we can take as many breaks for
24  as long as you like.
25        The only thing is I do ask that if

**[Page 9]**

1  prepare for today's deposition.
2        A.   Just the information that was on my
3  affidavit.
4        Q.   You reviewed your affidavit; is that
5  correct?
6        A.   No, I didn't review it.  Just that
7  was the information that we would be discussing
8  today.
9        Q.   Did you review any documents?
10        A.   No.
11        Q.   Miss Bautista, what is the highest
12  level of education?
13        A.   Masters degree.
14        Q.   And where did you receive your
15  masters degree?
16        A.   Chatman University.
17        Q.   And what, what is the degree in?
18        A.   Human resources.
19        Q.   And when did you obtain that degree?
20        A.   2009.
21        Q.   Did you graduate from college?
22        A.   Yes.
23        Q.   Where did you go to school?
24        A.   University of Phoenix.
25        Q.   And what did you study?

**[3]   (Pages 6 to 9)**

| | |
|---|---|
| 1 | A.   Business administration. |
| 2 | Q.   And did you obtain a degree? |
| 3 | A.   Yes. |
| 4 | Q.   And what was that degree? |
| 5 | A.   Bachelors. |
| 6 | Q.   And what year was that? |
| 7 | A.   I couldn't remember right now. |
| 8 | Shortly before my Masters. |
| 9 | Q.   Were you employed by Ashley |
| 10 | Furniture? |
| 11 | A.   Yes. |
| 12 | Q.   And what were the years of your |
| 13 | employment? |
| 14 | A.   2010 through 2012. |
| 15 | Q.   What was your title at Ashley? |
| 16 | A.   HR manager. |
| 17 | Q.   Did you hold that title throughout |
| 18 | your employment? |
| 19 | A.   Yes. |
| 20 | Q.   Prior to joining Ashley in 2010, |
| 21 | what was your previous position? |
| 22 | A.   HR manager. |
| 23 | Q.   And where was that? |
| 24 | A.   GCE Industries. |
| 25 | Q.   And how long did you hold that |

[Page 10]

1   wage per hour was within the state regulations.
2       Q.   Did you supervise any employees?
3       A.   Yes. People in my department.
4       Q.   How many people were in your
5   department?
6       A.   At the time, three.
7       Q.   Do you remember their names?
8       A.   Liz and the recruiter.
9       Q.   Do you remember Liz's full name?
10      A.   Povanelli.
11      Q.   And do you remember the recruiter's
12  name?
13      A.   No. I want to say it but no, I
14  don't remember it as much. Christine.
15      Q.   Did you receive any training in
16  connection with your position as HR manager at
17  Ashley Direct?
18      A.   No.
19          MR. VALLAS:  I'd like to ask the
20  court reporter to mark this as Bautista 1.
21          MR. RITSON:  Just to clarify, did
22  you mean did she receive training at Ashley or
23  did she have training generally at Ashley?
24          MR. VALLAS:  Thank you for that.
25  No, I meant at Ashley specifically.

[Page 12]

1   position?
2       A.   Two years.
3       Q.   How did you come to work with
4   Factory Direct?
5       A.   I applied.
6       Q.   Who interviewed you?
7       A.   The recruiter at the time.
8       Q.   Do you remember who that was?
9       A.   Can't remember her name at the time,
10  and Eugene.
11      Q.   By Eugene are you referring to
12  Eugene Crinion?
13      A.   Yes.
14      Q.   And is he the owner of Ashley
15  Furniture?
16      A.   Yes.
17      Q.   Prior to interviewing at Ashley
18  Furniture, did you know Mr. Crinion?
19      A.   No.
20      Q.   What were your responsibilities as
21  HR manager?
22      A.   I overseed everything that had to do
23  with recruiting, benefits, payroll, compliance.
24      Q.   What do you mean by "compliance"?
25      A.   Labor posters. Making sure that our

[Page 11]

1       MR. RITSON:  Okay. Does that change
2   your answer?
3           THE WITNESS:  I guess the question I
4   have -- that's kind of a vague question.
5       Q.   I can rephrase. Before we pay
6   attention to that, actually, I will take that one
7   back. The court reporter is going to pass you
8   these. Thank you so much.
9           Miss Bautista, did anyone at Ashley
10  Furniture provide you with training on HR
11  policies?
12      A.   No, they gave me the handbook.
13          MR. VALLAS:  If you could mark that
14  now that would be terrific.
15          (Bautista Exhibit 1 marked for
16  identification.)
17      Q.   Miss Bautista, is that the employee
18  handbook that you were referencing?
19      A.   Yes, looks like the handbook.
20      Q.   Just take a quick moment to review
21  it. My questions are going to be specifically
22  having to do with the first five pages.
23      A.   Okay.
24      Q.   Are you -- strike that.
25          Did you have any role in drafting

[Page 13]

[4]   (Pages 10 to 13)

1  this handbook, Miss Bautista?
2      A.   No.
3      Q.   Are you aware of whether or not it's
4  been revised?
5          MR. RITSON:  Since when, George?
6      Q.   Thank you.  Actually, Miss Bautista,
7  I may ask you some questions from time to time.
8  Unless I specify otherwise, I'm referring to the
9  time period between 2010 and 2012.
10     A.   Okay.
11     Q.   In that time period, are you aware
12  of if this handbook was revised?
13     A.   I'm not aware of it.
14     Q.   I'd like to direct your attention
15  specifically to page 6 marked D120.  Down at the
16  bottom it defines sexual harassment under
17  definitions as "Unwelcome sexual advances,
18  requests for sexual favors, and other verbal and
19  physical conduct of a sexual nature" and
20  specifies certain circumstances.
21         Are you familiar with that
22  definition?
23     A.   Yes.
24     Q.   On the next page it defines
25  harassment as "Verbal or physical conduct that

[Page 14]

1  the training, and we would go through the
2  handbook, and going through the handbook we would
3  do all the new hire paperwork, and then the next
4  day they would go on to training.
5      Q.   Your HR administrator, was that Liz
6  Povanelli?
7      A.   Correct.
8      Q.   The paragraph beneath harassment is
9  entitled "Reporting Harassment Investigation."
10         On the second line in particular it
11  says, "If you believe you're being harassed or
12  observed harassment, you should promptly inform
13  human resources or any senior member of
14  management."
15     A.   Correct.
16     Q.   Can you describe for me the
17  reporting process, for instance, of harassment?
18     A.   It could be either they would
19  personally come into my office, have a
20  conversation with me, put something in writing or
21  they would go to their immediate manager.
22     Q.   I want to take that second scenario
23  first.
24         What would happen if they went to
25  their immediate manager?

[Page 16]

1  denigrates or shows hostility or aversion toward
2  an individual because of" a number of factors.
3         Are you familiar with that
4  definition?
5      A.   Yes.
6      Q.   Did anyone at Ashley Furniture at
7  any time provide any training with respect to the
8  definitions of harassment or sexual harassment?
9      A.   Yes.
10     Q.   And who was that?
11     A.   All of the new hires.
12     Q.   Let me clarify, did anyone provide
13  you with any training on those definitions?
14     A.   No.
15     Q.   But you would have a role in
16  training new hires?
17     A.   Yes.
18     Q.   And what was that role?
19     A.   The orientation.
20     Q.   How would that process work?
21     A.   We would have the sales associates
22  come into a room for at least about I think it
23  was a week or two of training.
24         And the first day usually it was the
25  recruiter, myself or my HR administrator who did

[Page 15]

1      A.   Then that manager is supposed to
2  come to me.
3      Q.   If they came to you directly?
4      A.   Then we sat down and we talked about
5  what actually occurred.
6          MR. RITSON:  To clarify, George,
7  you're asking what generally would occur,
8  correct?
9          MR. VALLAS:  Precisely, correct.
10  I'm talking about matter of policies here.
11     A.   Right.
12     Q.   And, as a matter of practice and
13  policy, what would be the next step for you in
14  response to a report of harassment?
15     A.   We would then start the
16  investigation.
17     Q.   Is there a standard procedure for
18  that investigation?
19     A.   Well, one, I would also tell the
20  owner and the COO of anything that was coming,
21  and then I would start the investigation and
22  speak to those people who were involved or might
23  have witnessed.  If there was video, try to pull
24  the video because that's always the easiest way
25  and just follow the leads.

[Page 17]

[5]  (Pages 14 to 17)

| | |
|---|---|
| 1    Q.    Would you inform the owner, | 1    that name. |
| 2    Mr. Crinion, of every instance, every report of | 2         A.    I kind of figured. |
| 3    harassment? | 3         Q.    Thank you for bearing with me. |
| 4         A.    Yes. | 4         A.    Not a problem. |
| 5         Q.    And the COO, who is that? | 5         Q.    Are you aware that Mr. Sciarrino was |
| 6         A.    Mark Scott. | 6    an employee of Ashley Direct, Ashley Furniture? |
| 7         Q.    Would you inform Mr. Scott of every | 7         A.    Yes. |
| 8    form of harassment? | 8         Q.    Did you ever receive any complaints |
| 9         A.    Yes, I would inform them both. | 9    from any Ashley Furniture employee about |
| 10        Q.    When you completed your | 10   Mr. Sciarrino? |
| 11   investigation, would you generate a report or | 11        A.    No. |
| 12   some sort of document reflecting your findings? | 12        Q.    Do you know what Mr. Sciarrino's job |
| 13        A.    I would send an e-mail or I would | 13   title was? |
| 14   sit with the owner or the COO to give them the | 14        A.    Store manager. |
| 15   information that I collected. | 15        Q.    Are you familiar with someone by the |
| 16        Q.    Would you have the authority to take | 16   name of Mark Moses? |
| 17   any action? | 17        A.    Yes. |
| 18        A.    No, I would not take action. | 18        Q.    And are you familiar with the fact |
| 19        Q.    Whose decision would it be to take | 19   that he was employed by Ashley Furniture? |
| 20   any adverse action against the employee? | 20        A.    Yes. |
| 21        A.    At the end, obviously, the owner or | 21        Q.    Did Mr. Moses ever complain to you |
| 22   the COO. | 22   about any employee of Ashley Furniture? |
| 23        Q.    In order to trigger this | 23        A.    No, not during his employment. |
| 24   investigation process, would an employee | 24        Q.    Did he ever, during his employment, |
| 25   reporting of harassment have to make a written | 25   make an informal complaint to you about any |
| [Page 18] | [Page 20] |

| | |
|---|---|
| 1    complaint? | 1    employee of Ashley Furniture? |
| 2         A.    A written complaint or a formal | 2         A.    No. |
| 3    complaint. | 3         Q.    Subsequent to his employment, did he |
| 4         Q.    And what is the definition of a | 4    ever complain to you? |
| 5    formal complaint? | 5         A.    You mean thereafter? |
| 6         A.    That the employee is stating to me I | 6         Q.    That's correct. |
| 7    am making a formal complaint regarding this | 7         A.    Yes. |
| 8    individual. | 8         Q.    And when was that? |
| 9         Q.    So if an employee complained to you | 9         A.    Shortly after our conversation that |
| 10   about an incident of harassment without stating | 10   he was no longer going to be with the company. |
| 11   that it was a formal complaint, would you do | 11        Q.    Let's back up just a moment. |
| 12   anything in response to that? | 12   Mr. Moses was terminated; is that correct? |
| 13        A.    I respond to it right away. | 13        A.    He was not terminated.  Mr. Moses |
| 14        Q.    And how would you respond to an | 14   was unhappy. |
| 15   informal complaint? | 15        Q.    Why was he unhappy? |
| 16        A.    "Are you telling me that you're | 16        A.    Mr. Moses was unhappy because he |
| 17   having a problem with this individual?" | 17   went from a sales manager position or store |
| 18        Q.    Would you ask the employee whether | 18   manager position to a sales associate position. |
| 19   they would like to make a formal complaint? | 19        Q.    Do you know who made that decision? |
| 20        A.    Yes. | 20        A.    I believe it was Mr. Cook. |
| 21        Q.    Are you familiar with a person by | 21        Q.    Do you know why? |
| 22   the name of Salvatore Sciarrino? | 22        A.    I have no idea. |
| 23        A.    Yes. | 23        Q.    Excuse me? |
| 24            MR. RITSON:  Sciarrino. | 24            THE VIDEOGRAPHER:  I'm sorry, |
| 25        Q.    You have to excuse me for butchering | 25   counselor.  Can we just go off the video for one |
| [Page 19] | [Page 21] |

```
 1   second.
 2        MR. VALLAS:  Of course.
 3        THE VIDEOGRAPHER:  At 6:10 going off
 4   the video record.
 5        (A break was taken from the record.)
 6        THE VIDEOGRAPHER:  At 6:11 p.m. we
 7   are back on the video record.
 8        MR. VALLAS:  Can I ask you to read
 9   back the last question and answer.
10        (The record was read.)
11        MR. VALLAS:  Terrific.  I'm actually
12   going to hold on to this for a while.
13     Q.   How did you know Mr. Moses was
14   unhappy?
15     A.   Because he told me he was unhappy.
16     Q.   When did he tell you?
17     A.   Right when I came back from a leave
18   of absence.
19     Q.   Do you remember approximately when
20   that was?
21     A.   Sometime in July of 2013.  Wait.
22   No.  2012.  I had two surgeries that's why.
23   2012.  No.  I -- it had to be the year before.  I
24   can't remember.
25        It was when I came back from

                                    [Page 22]
```

```
 1   surgery, and my surgery, I had one in 2010.  I
 2   had one in 2012 or 11.  I can't remember but it
 3   was shortly before.
 4     Q.   How long was your leave of absence?
 5     A.   About six weeks, I believe.
 6     Q.   Is it possible that that was July,
 7   2011?
 8     A.   Yes.  That's better.
 9     Q.   And what did he tell you when he
10   mentioned that he's unhappy?
11     A.   He was unhappy because he was
12   removed from being a store manager or sales
13   manager, like I said earlier, or to a sales
14   associate and he couldn't feed his family with
15   that money.
16     Q.   Did Mr. Moses tell you this while he
17   was still an employee of Ashley Furniture?
18     A.   Yes.
19     Q.   Did he give you any other reason why
20   he was unhappy?
21     A.   No.
22     Q.   Did he make any complaints about any
23   employees?
24     A.   No.
25     Q.   Did he make any complaints about the

                                    [Page 23]
```

```
 1   basis for the decision to change his title?
 2     A.   He said he didn't know why.
 3     Q.   Did he tell you who was responsible
 4   for that decision?
 5     A.   I don't remember.
 6     Q.   Did, withdraw.
 7        You testified a moment ago that
 8   Mr. Moses was not terminated by Ashley Furniture.
 9        Did he resign?
10     A.   The conversation with Moses happened
11   when he called to tell me that he was upset.  It
12   was the same thing.
13        I had tried to have several
14   conversations with him and, at that point, it
15   seemed as if there was no making him happy.
16        So specifically what I said to him,
17   "Maybe this is the time that we should shake
18   hands and part ways.  Do you agree?"
19        We were already on the phone for
20   some time and there was nothing that I could do
21   to appease Mr. Moses.
22     Q.   You say this was in July of 2011?
23     A.   I don't remember when.  It was,
24   again, I was on a leave of absence.  I literally
25   walked into that.

                                    [Page 24]
```

```
 1     Q.   Are you aware of whether or not
 2   Mr. Moses complained to anyone else in the human
 3   resources department?
 4     A.   No.
 5     Q.   Sorry?
 6     A.   No, not aware.
 7     Q.   No, you're not aware.
 8        I believe you said you had multiple
 9   conversation with Mr. Moses about his
10   unhappiness?
11     A.   A few, a few.
12     Q.   Was that over the course of several
13   days?
14     A.   Yes.
15     Q.   Do you remember about how many
16   conversations you had with him?
17     A.   I can't remember.
18     Q.   Were they in person or by telephone?
19     A.   In person.
20     Q.   Were they in the HR office?
21     A.   No, they were in the sales manager
22   office.
23     Q.   Do you remember about how much time
24   elapsed between the first and the last
25   conversation?

                                    [Page 25]
```

[7]  (Pages 22 to 25)

1     A.   No, I don't.
2     Q.   Are you aware of anyone making an
3   allegation -- withdraw.
4        Are you aware of any employee of
5   Ashley Furniture making an allegation that
6   Mr. Moses fell asleep during a team meeting?
7     A.   Yes.
8     Q.   Do you remember who made that
9   allegation?
10    A.   I do not recall the associate who
11   made the allegation.
12    Q.   How did you become aware of that?
13    A.   Through the sales manager,
14   Mr. Sciarrino.
15    Q.   Do you remember when that was?
16    A.   No.
17    Q.   And what did Mr. Sciarrino say to
18   you about that?
19    A.   That he was told that, actually, in
20   regards to Mark Moses falling asleep, that he had
21   actually seen him fall asleep and it was during a
22   meeting.
23    Q.   And did Mr. Sciarrino, excuse me,
24   did Mr. Sciarrino say that he was going to take
25   any action against Mr. Moses for falling asleep?

[Page 26]

1     A.   No.
2     Q.   Did he say that he would terminate
3   Mr. Moses for falling asleep?
4     A.   No.
5     Q.   Moving back to that final
6   conversation you had, I believe you testified
7   that you asked him if you should part ways?
8     A.   Right.
9     Q.   How did he respond?
10    A.   He agreed with me, obviously,
11   because, again, like I said, there was nothing
12   that I could do at that time to appease
13   Mr. Moses.
14        That's why I said to him, there's
15   nothing I could do for you at this point. I
16   understand that you're not happy, but we're
17   continuing to have the same conversation over and
18   over again. This may be the time where we shake
19   hands and part ways.
20    Q.   When you say there was nothing you
21   could do to appease Mr. Moses, what was he
22   seeking?
23    A.   He want to be, he wanted to be put
24   back in his position of a sales manager.
25        MR. VALLAS:  Can I ask you now to

[Page 27]

1   mark this Bautista 2.
2        (Bautista Exhibit 2 marked for
3   identification.)
4     Q.   Miss Bautista, I passed you a series
5   of documents.
6        I would like to ask you, do you
7   recognize these documents?
8     A.   No.
9     Q.   Do you see up at the top of each
10   page it looks like your name?
11    A.   Yup.  Yes, I do.
12    Q.   Have you ever seen these before?
13    A.   No.
14    Q.   If we look at the very first page,
15   it looks like it says from 8607707449 at
16   messaging dot Sprint PCS dot com to A. Bautista
17   at Ashley NE dot com.
18        Is A. Bautista at Ashley dot com
19   your e-mail address?
20    A.   Yes, it was.
21    Q.   Do you remember receiving these
22   messages?
23    A.   I'm looking at them now.  I remember
24   some of them, yes.
25    Q.   Were these messages sent directly to

[Page 28]

1   you or were they forwarded to you?
2     A.   Looks like they were forwarded to
3   me.
4     Q.   Do you know who forwarded them to
5   you?
6     A.   I can't remember.
7     Q.   And do you know who sent them
8   originally?
9     A.   No.
10    Q.   If you look at the page marked D20,
11   it's the, I'll also point out these are all
12   double-sided, so it would be the fifth page.
13        It says "FWD Jerry, this is Mark M.
14   Just to let you know there are no hard feelings
15   business is about progress."
16    A.   Okay.
17    Q.   Does that refresh your memory about
18   who sent these messages?
19    A.   I'm assuming Jerry.  Not Jerry.  It
20   was Mark.
21    Q.   Did Mr. Cook forward you this
22   message?
23    A.   It's possible, yes.
24    Q.   Do you remember why?
25    A.   No.

[Page 29]

[8]  (Pages 26 to 29)

**[Page 30]**

1    Q.   Did you do anything in response to
2    receive these messages?
3        A.   I don't remember.
4        MR. RITSON:  Just for the record, in
5    response to counsel's question, do you remember
6    who sent these, you said it looked like Mark.
7    Mark who?
8        THE WITNESS:  Mark Moses.
9        MR. VALLAS:  Thank you for that
10   clarification.
11       MR. RITSON:  Just because there is
12   that other Mark.
13       A.   Oh, yes.  I'm sorry.
14       Q.   Miss Bautista, you testified a
15   moment ago that Mr. Sciarrino saw Mr. Moses fall
16   asleep at a team meeting?
17       A.   Yes.
18       Q.   Are you aware of whether Mr. Moses
19   continued to work at Ashley Furniture after that
20   incident?
21       A.   I don't remember.
22       Q.   Was that before your final
23   conversation with him or after?
24       A.   It had -- I have to say that it had
25   to be -- the falling asleep?

**[Page 31]**

1    Q.   That's right.
2        A.   It had to be before.
3        Q.   Do you remember about how long
4    before?
5        MR. RITSON:  Is that a no?
6        A.   I'm sorry.  No.
7        Q.   We do have a video camera.
8        A.   I have to say no.
9        Q.   You're doing very well so far.  Most
10   of the time we have to interrupt this more often.
11       Moving away from Mr. Moses, are you
12   aware of any complaints about Mr. Sciarrino
13   brought by Mr. Mansour?
14       A.   No.
15       Q.   Are you aware of any complaints
16   brought by Mr. Mansour about anybody?
17       A.   No.
18       Q.   Any employee of Ashley Furniture?
19       A.   No.
20       Q.   Did you ever meet with Mr. Mansour
21   and Mary Rusee about complaints regarding Mr.
22   Sciarrino?
23       A.   I don't remember.
24       Q.   Are you familiar with an employee
25   named Mindy Hoang?

**[Page 32]**

1    A.   Hoang.
2        Q.   Hoang?
3        A.   Yes.
4        MR. VALLAS:  For the court reporter,
5    that's H-O-A-N-G.
6        Q.   Who is Miss Hoang?
7        A.   She was a sales associate.
8        Q.   Are you aware of a complaint of
9    harassment that was brought by Miss Hoang?
10       A.   Yes.
11       Q.   And when was that brought?
12       A.   While I was on vacation.
13       Q.   Do you remember the date?
14       A.   No.
15       Q.   Do you remember the year?
16       A.   It had to be 2012.
17       Q.   Is it possible it was in the winter
18   of 2011?
19       A.   Yes.
20       Q.   You say you were on vacation when it
21   was brought?
22       A.   Yes.  Sorry.
23       Q.   Do you remember who brought that
24   complaint?
25       A.   I believe it was Mr., it was -- she

**[Page 33]**

1    did to the sales managers at the time and then I
2    got an e-mail.
3        Q.   Who was the sales manager to whom
4    she complained?
5        A.   I believe it was to Mr. Mansour and
6    to Mr. Sciarrino.
7        Q.   And you received an e-mail from
8    Mr. Mansour and Mr. Sciarrino?
9        A.   Yes.
10       Q.   And you received that e-mail while
11   you were on vacation?
12       A.   I believe so.
13       Q.   I don't know if you answer e-mails
14   while you're on vacation, but I assume you didn't
15   do anything until you returned?
16       A.   Um-hum.
17       Q.   About how long after?
18       A.   I don't remember.
19       MR. VALLAS:  If I could ask the
20   court reporter to mark this Bautista 3.  Thank
21   you.
22       (Bautista Exhibit 3 marked for
23   identification.)
24       THE VIDEOGRAPHER:  At 6:26 p.m. we
25   are off the record.

[9]  (Pages 30 to 33)

```
 1        (Off the record.)
 2        THE VIDEOGRAPHER:  At 6:37 p.m.
 3   back on the video record.
 4        Q.   Miss Bautista, before we turn our
 5   attention to the document marked Bautista 3, I'd
 6   like to turn your attention back to the document
 7   that was marked Bautista 2.
 8        A.   Okay.
 9        Q.   On the very first page the message
10   said "Good luck and God bless fello Rhino."
11        Do you know what that means?
12        A.   Rhino comes to me because Jerry was
13   into reading, you know, self-motivational books.
14   He had given him a book.
15        Q.   When you say him?
16        A.   Jerry had given Mark Moses a book to
17   read.
18        Q.   Do you know what that book was?
19        A.   I don't know the title of it.  All I
20   know it's about rhinos.
21        Q.   What is the significance of rhino?
22        A.   I think it is some type of a, for
23   lack of a better word, just someone to be
24   empowered, you know, just -- to have a business
25   sense.  To help you have a business sense.  It is
```

[Page 34]

```
 1   just to motivate you.
 2        Q.   Do you know if that book had any
 3   religious significance?
 4        A.   No, I didn't read it.
 5        Q.   Did Mr. Crinion ever pass out books
 6   to employees or recommend books to employees?
 7        A.   Yes.
 8        Q.   Do you know if those books had any
 9   religious significance?
10        A.   No, I don't know.
11        Q.   Did Mr. Crinion ever discuss his
12   religion with you?
13        A.   Yes.
14        Q.   Did Mr. Crinion ever discuss his
15   religion with other employees?
16        A.   I don't know.  Well, actually, I
17   believe he has.
18        Q.   And what -- strike that.
19        Do you know with whom specifically
20   he would discuss his religion?
21        A.   I believe he had conversations with
22   Mr. Mansour.
23        Q.   And do you know what the content of
24   those conversations were?
25        A.   No, I don't know.
```

[Page 35]

```
 1        Q.   Do you know if Mr. Crinion ever
 2   tried to convert Mr. Mansour?
 3        A.   No, I don't know.
 4        Q.   Do you know if Mr. Crinion ever
 5   tried to convert anyone else at Ashley Furniture?
 6        A.   No.
 7        Q.   Mr. Crinion is a Christian; is that
 8   correct?
 9        A.   Correct.
10        Q.   We can put that document aside.
11        If I could turn your attention to
12   Bautista 3.  This is a two-page document.
13        Do you recognize this e-mail?
14        A.   Yes.
15        Q.   Is this the complaint that we
16   discussed before we break -- broke made by Miss
17   Hoang's managers?
18        A.   Correct.  The e-mail that was sent
19   to me.
20        Q.   Up at the top it says it was sent
21   Tuesday, November 29, 2011.
22        Does that refresh your memory about
23   when this occurred?
24        A.   It had to be about that time.  I
25   honestly don't recollect.
```

[Page 36]

```
 1        Q.   Do you remember about how long after
 2   this e-mail was sent that you returned from
 3   vacation?
 4        A.   Days I believe.  I'm not sure.  I
 5   couldn't give you a number.
 6        Q.   What was the substance of Miss
 7   Hoang's complaint?
 8        A.   According, if I recollect, it was
 9   Mr. -- it was Raz, I don't remember his last
10   name, had taken her head and placed it in between
11   his crotch area, and he had said something to her
12   but I just don't know verbatim what he said to
13   her.
14        Q.   If you look at the second page of
15   the e-mail, down at the very bottom it says "On
16   11/28/11 Mindy Hoang wrote."
17        Could you just take a minute to
18   review that.
19        A.   It's very hard to read it.
20        Q.   I do apologize.  The resolution is a
21   little bit low but I could read it into the
22   record.
23        It says, "Today November 28, 2011 I
24   was standing at the greeters station talking to
25   Robin when Raz came up to me and grabbed my head
```

[Page 37]

1    and pulled it down towards his crotch and told me
2    to 'suck his cock' in the store while not only in
3    front of my coworkers but also with customers in
4    your store."
5         Does that refresh your recollection
6    about the content of her complaint?
7    A.   Yes.
8    Q.   What did you do when you returned
9    from vacation in response to this complaint?
10   A.   I don't remember if what I did I
11   spoke first to Mr. Mansour and Sciarrino or I
12   went straight to Mindy. Either way I spoke to
13   both parties separately.
14   Q.   Did you notify Mr. Crinion?
15   A.   Mr. Crinion already know.
16   Q.   How did Mr. Crinion know?
17   A.   I believe that Mr. Sciarrino and
18   Mr. Mansour had notified him.
19   Q.   And how do you know that
20   Mr. Sciarrino was aware of the incident? Strike
21   that.
22        How did you know that Mr. Crinion
23   was aware of the incident?
24   A.   I don't remember.
25   Q.   Did you inform Mr. Scott?

[Page 38]

1    Q.   And was that about the same time you
2    had a conversation with Mr. Scott?
3    A.   Yes, it's usually -- they usually
4    coincide with one another.
5    Q.   Do you remember what Mr. Crinion
6    said?
7    A.   I don't remember.
8    Q.   When you met with Miss Hoang, was
9    that in person?
10   A.   Yes.
11   Q.   And what were the -- what happened
12   during that meeting?
13   A.   I gave her the floor to tell me
14   exactly what happened.
15   Q.   And what did she tell you?
16   A.   She told me exactly what was put in
17   her e-mail, and I proceeded to ask who was her
18   witnesses, which is what you would do in an
19   investigation, and just to get more details,
20   obviously, who saw it, what time, et cetera.
21   Q.   And did she give you that
22   information?
23   A.   She did.
24   Q.   Do you remember if she had any
25   witnesses?

[Page 40]

1    A.   Yes.
2    Q.   And how soon after you returned --
3    A.   The minute -- that was the first
4    thing I was handed. The first thing I handled
5    when I came in.
6         MR. RITSON: Make sure that George
7    finishes his question before you answer.
8    A.   I'm sorry.
9         MR. RITSON: Only because we want to
10   make sure that you know what you're answering.
11        MR. VALLAS: Also, the court
12   reporter it can be difficult to transcribe
13   talking over one another.
14   Q.   How did you tell Mr. Scott about
15   that complaint?
16   A.   I don't remember if I called or
17   e-mailed.
18   Q.   Do you remember what Mr. Scott said
19   in response?
20   A.   No, I don't remember.
21   Q.   Do you remember having a
22   conversation with Mr. Crinion about this
23   complaint?
24   A.   Yes, I did have a conversation with
25   him.

[Page 39]

1    A.   According to the information she
2    gave me, yes, she did give me some witnesses.
3    Q.   Do you remember who they were?
4    A.   Robin was one of them.
5    Q.   Do you know Robin's full name?
6    A.   No.
7    Q.   Do you remember any other witnesses?
8    A.   Off the top of my head, I can't
9    remember.
10   Q.   Do you remember about how many there
11   were?
12   A.   She gave me I think, if I'm right,
13   three.
14   Q.   And does that include Raz?
15   A.   Raz is one.
16   Q.   And, just to be clear, who is Raz?
17   A.   Raz was also another sales
18   associate.
19   Q.   Do you remember his full name?
20   A.   No.
21        MR. VALLAS: For the court reporter,
22   that's R-A-Z.
23   Q.   When you met with Mr. Mansour and
24   Mr. Sciarrino, was that at the same time or did
25   you meet with them separately?

[Page 41]

1    A.   I don't remember.
2    Q.   And do you remember what the
3    substance of that meeting was?
4    A.   It had to do with Mindy.
5    Q.   Do you remember what Mr. Mansour
6    said about the incident?
7    A.   I don't remember the details of the
8    conversation.
9    Q.   Do you remember what Mr. Sciarrino
10   said?
11   A.   No.
12   Q.   Did you take notes during these
13   meetings?
14   A.   I usually do.
15   Q.   Do you remember if you specifically
16   took notes during the meeting with Mr. Mansour
17   and Mr. Sciarrino?
18   A.   I don't remember.
19   Q.   Do you remember if you took notes
20   during the meeting with Miss Hoang?
21   A.   I believe I did.
22   Q.   Do you know what happened to those
23   notes?
24   A.   I believe I handed them over.  They
25   were in my files when I left.

[Page 42]

1    Q.   When you say handed them over?
2    A.   I didn't just hand them over.  They
3    were in my files when I left.  They were in my
4    office.
5    Q.   After having met with Miss Hoang and
6    Mr. Sciarrino and Mr. Mansour, what was your next
7    step in this investigation?
8    A.   Well, the next step was --
9         MR. RITSON:  Object to form.  You
10   can answer.
11   A.   Oh, okay.  The next step was trying
12   to validate the information.
13   Q.   How did you go about doing that?
14   A.   I asked our IT team, our retail
15   specialist, that was his title at the time, to
16   pull any video, see if we can find any video on
17   what happened.  Unfortunately, there was no video
18   to validate.
19        I spoke to all of the witnesses that
20   she had given me and also spoke to the associates
21   who might have been on the clock at the time or
22   around the time that that happened.  And,
23   unfortunately, nobody was able to validate what
24   occurred.
25   Q.   I just want to take that one step at

[Page 43]

1    a time.
2         Do you remember who the retail
3    specialist was?
4    A.   Ted.
5    Q.   Do you remember his last name?
6    A.   It's a really long last name.  I
7    know it.  I can't even pronounce it if I tried.
8    Q.   Do you remember when you spoke with
9    Ted?
10   A.   That was probably one of the first
11   calls I made.
12   Q.   Do you remember about how long it
13   was after you returned that you made that call?
14   A.   Probably immediately after I read
15   all the information.
16        MR. VALLAS:  I'd like to ask the
17   court reporter to mark this Bautista -- we're up
18   to 4.  Thank you.
19        (Bautista Exhibit 4 marked for
20   identification.)
21   Q.   You could take just a moment to
22   review that, Miss Bautista.
23        Do you recognize this document?
24   A.   Yes, I do now.
25   Q.   Do you remember receiving this

[Page 44]

1    e-mail?
2    A.   Yeah, yes.
3    Q.   I'll note that it looks like it was
4    sent December 2, 2011?
5    A.   Right.
6    Q.   On the second paragraph the first
7    line reads, "My opinion would be to suspend both
8    of them until Aazel comes back."
9         Does that refresh your memory about
10   the timing of your vacation?
11   A.   Just about.
12   Q.   Do you remember when it was that you
13   came back after this e-mail was sent?
14   A.   No, I don't.
15   Q.   Mr. Mansour here expresses his
16   opinion would be "To suspend both of them until
17   Aazel comes back and she conducts an
18   investigation.  This will eliminate any further
19   contact between them and/or conflict that might
20   lead to legal action against the company."
21        Do you know if that recommendation
22   was adopted by the company?
23   A.   To suspend them both?
24   Q.   Yes.
25   A.   No.

[Page 45]

[12]  (Pages 42 to 45)

1    Q.  No, you don't know or no, it wasn't?

2    A.  I don't recall suspending anyone.

3    Q.  Would you have the power to do so?

4    A.  No, I would have to have that

5 conversation with the owner, with Eugene, and

6 with Mark.

7    Q.  Did you make that recommendation to

8 Mr. Crinion?

9    A.  No because if you suspend someone

10 who's making an allegation, it would seem that

11 she'd be lying; and if you suspend someone who's

12 being accused of something then, obviously, you

13 are putting that person in the position.

14    So what I had recommended was to

15 have them work opposite schedules for the time

16 being and I believe Mindy was given an option, if

17 she wanted, to transfer to Paramus.

18    Q.  Did you make that recommendation

19 during your first conversation with Mr. Crinion?

20    A.  No, this conversation, well, the

21 different schedules, yes.

22    The later on moving to Paramus that

23 came with further investigation.

24    Q.  We'll get to that last in a moment,

25 but did Mr. Crinion adopt your recommendation

[Page 46]

1    A.  I don't know.  Don't remember.

2    Q.  Was it more than 10?

3    A.  I don't remember.

4    Q.  About how long did this

5 investigation take place -- withdrawn.

6    About how long did this

7 investigation take?

8    A.  I don't remember but we do try to

9 close things out rather quickly.

10    Q.  Were these interviews conducted in

11 person?

12    A.  Yes.  One was conducted over the

13 phone.

14    Q.  Do you remember who that was?

15    A.  I want to say it was Robin.

16    Q.  Would the investigation have lasted

17 longer than one week?

18    MR. RITSON:  Are you asking if it

19 did?

20    MR. VALLAS:  Yes.

21    A.  I don't remember.

22    Q.  Did it last longer than a month?

23    A.  I don't believe it lasted longer

24 than a month.

25    Q.  While the investigation was ongoing,

[Page 48]

1 after that first conversation?  Let me rephrase.

2    Did Mr. Crinion move Miss Hoang and

3 Raz to different schedules?

4    A.  I don't remember.

5    MR. RITSON:  Object to form.

6    A.  I don't remember.

7    MR. RITSON:  You can answer.

8    A.  I don't remember, to be honest with

9 you.

10    Q.  So moving back to your

11 investigation, do you remember how many people

12 you interviewed?

13    A.  I interviewed every person she

14 mentioned, including those that were on the time

15 clock during that time period.

16    Q.  So I think you testified a moment

17 ago she herself had mentioned three people?

18    A.  She had mentioned three people.

19    Q.  Do you remember how many people in

20 addition to those three people you interviewed?

21    A.  Those were on the clock at the time.

22    Q.  Do you remember approximately how

23 many that was?

24    A.  Couldn't tell you.  I'm sorry.

25    Q.  Was it more than five?

[Page 47]

1 were you in touch with Mr. Crinion?

2    A.  Yes.

3    Q.  Do you remember about how many

4 conversations you had with him?

5    A.  I don't.

6    Q.  During the investigation?

7    A.  I don't remember.

8    Q.  And why were you in touch with him?

9    A.  Because he was the owner of the

10 business.

11    Q.  Did he request that you keep him

12 informed of the progress of the investigation?

13    A.  Of course.

14    Q.  Did he make any recommendations to

15 you as the investigation was ongoing?

16    A.  I don't remember.

17    Q.  Did he ask you questions about what

18 you were discovering during your investigation?

19    A.  Yes.

20    Q.  Do you remember what sort of

21 questions he asked?

22    A.  No.

23    Q.  Do you remember about when it was

24 that you concluded your investigation?

25    A.  I don't remember.

[Page 49]

[13]  (Pages 46 to 49)

1    Q.   When you concluded your
2  investigation, did you generate a report?
3    A.   I don't remember generating a
4  report.
5    Q.   Did you generate any -- strike that.
6      Did you reduce your findings to
7  writing in any form?
8    A.   I believe I closed out the case in
9  the file just stating that, what the solution
10  was.
11    Q.   So when you say the file, did you
12  create a file for this complaint?
13    A.   I created -- all statements were in
14  that file.
15    Q.   And those statements were taken by
16  you?
17    A.   The employee filled out a piece of
18  paper on, you know, a blank piece of paper.
19  Those who are willing, and those who weren't I
20  have my notes.
21    Q.   So when you say the employees, are
22  you referring to the people you interviewed?
23    A.   Right.
24    Q.   And you would ask them to fill out
25  --

[Page 50]

1    A.   If they would fill out, you know,
2  and give me in your words what you saw and what
3  you did not see based on the conversation that
4  we're having.
5    Q.   Is that a standard form?
6    A.   Usually just a blank piece of paper,
7  like the notebook you're writing on.
8    Q.   And do you remember how many
9  employees were unwilling to fill out a statement?
10    A.   I don't remember.
11    Q.   For those employees you took notes
12  of the conversation?
13    A.   Um-hum.
14    Q.   And would you put those notes in the
15  file?
16    A.   Correct.
17    Q.   When you say that you put an
18  indication in the file that you were closing it,
19  do you remember what form that took?
20    A.   Probably a transfer form, like a
21  personal action form.
22    Q.   And do you remember what the
23  substance of that was?
24    A.   Just that we're transferring Mindy.
25    Q.   And who made that decision?

[Page 51]

1    A.   That was one of the suggestions I
2  made to Nathan, I mean, to Eugene because
3  originally Mindy had been wanting to go to
4  Paramus for quite sometime.
5    Q.   Before we get to that, I just want
6  to back up for a moment.
7      What were the findings of your
8  investigation?
9    A.   I could not collaborate anyone
10  validating that Raz had behaved in that manner or
11  did what he was being accused of doing.
12    Q.   Did Raz himself deny it?
13    A.   Yes.
14    Q.   Did you recommend that any action
15  other than the transfer be taken against either
16  Raz or Miss Hoang?
17    MR. RITSON:  Objection to form.  You
18  can answer.
19    A.   Well, there was a stern
20  conversation, obviously, with both of them.
21      Any type of written or corrective
22  was not in play at that point because I could not
23  validate either one of them.  Just that if there
24  was any false statements made that it could lead
25  to termination.

[Page 52]

1    Q.   Were you in charge of having that
2  stern conversation?
3    A.   Yes, I had the conversation with
4  both of them.
5    Q.   Did you have it with them together
6  or separate?
7    A.   Separate.
8    Q.   Was it in person?
9    A.   Yes.
10    Q.   Was anyone else present?
11    A.   Not that I remember, no.
12    Q.   Did you have that conversation at
13  anyone's direction?
14    A.   In terms of?
15    Q.   I'll rephrase.
16      Did anyone instruct you to have that
17  conversation with Miss Hoang and Raz?
18    A.   In terms of the -- making false
19  accusations?  That was a conversation that I --
20  it's a practice I have.
21    Q.   Did you inform Mr. Crinion at any
22  time that you couldn't corroborate Ms. Hoang's
23  allegations?
24    A.   Yes, I did.
25    Q.   Do you remember approximately when

[Page 53]

[14]  (Pages 50 to 53)

| | |
|---|---|
| 1  that was? | 1     A.  They were together on the phone.  It |
| 2     A.  No, I do not remember. | 2  was a conference call. |
| 3     Q.  Did you inform him by telephone or | 3     Q.  Subsequent to you informing |
| 4  by e-mail? | 4  Mr. Sciarrino and Mr. Mansour that you were |
| 5     A.  It might have been by telephone. | 5  taking over, did you keep them informed of the |
| 6     Q.  And do you remember what he said in | 6  progress of your investigation? |
| 7  response? | 7     A.  I don't remember if I did or didn't, |
| 8     A.  I don't remember. | 8  but I did have a final conversation with them |
| 9     Q.  When was it that you made the | 9  before it was closed. |
| 10  recommendation that Miss Hoang transfer to | 10     Q.  Before we get to the final |
| 11  Paramus? | 11  conversation, let's take Mr. Sciarrino first. |
| 12     A.  I can't remember.  You know, when | 12     Did Mr. Sciarrino ever ask you any |
| 13  you're making final decisions like that, it's | 13  questions about how the investigation was |
| 14  because you are coming to the end and you, | 14  proceeding? |
| 15  obviously, can't corroborate or you don't have | 15     A.  Don't remember. |
| 16  substantial information to state that somebody | 16     Q.  Did Mr. Mansour ever ask you any |
| 17  did something incorrect. | 17  questions about how the -- |
| 18     Q.  Was that your recommendation or was | 18     A.  I don't remember. |
| 19  that something suggested by Miss Hoang herself? | 19     Q.  Do you remember telling Mr. Mansour |
| 20     A.  You know, I don't remember, but I | 20  that you had interviewed all the witnesses? |
| 21  remember that Paramus was a store she had been | 21     A.  I -- I don't remember. |
| 22  wanting to go to for a very long time. | 22     Q.  Do you remember Mr. Mansour telling |
| 23     Q.  Do you know why? | 23  you that he had spoken with the witnesses and |
| 24     A.  I don't know.  I think maybe because | 24  they had never been interviewed? |
| 25  of the, again, this is my thought, is because of | 25     A.  No. |
| [Page 54] | [Page 56] |
| 1  the area. | 1     Q.  Do you remember telling Mr. Mansour |
| 2     MR. RITSON:  Either you know or you | 2  that you were simply following Mr. Crinion's |
| 3  don't.  If you don't know, don't guess. | 3  instructions? |
| 4     A.  Okay.  Then I don't know. | 4     A.  No. |
| 5     Q.  And that's, Miss Bautista, going to | 5     Q.  Would it surprise you that those are |
| 6  be true throughout today's deposition.  I don't | 6  the allegations made in connection with this |
| 7  want you to guess at any of the answers you give | 7  proceeding? |
| 8  today. | 8     A.  Yes. |
| 9     A.  Then I don't know.  All I know she | 9     Q.  Do you remember when it was that you |
| 10  was adamant that she wanted to go to that store. | 10  had the final conversation with Mr. Mansour and |
| 11     Q.  Did you ever follow-up with | 11  Mr. Sciarrino? |
| 12  Mr. Sciarrino about your investigation? | 12     A.  I have no idea. |
| 13     A.  I believe I followed-up with both | 13     Q.  Was that in-person conversation or |
| 14  Mr. Mansour and Mr. Sciarrino. | 14  by phone? |
| 15     At one point I do remember having a | 15     A.  I don't remember. |
| 16  conversation with them on the phone telling then | 16     Q.  And do you remember the substance of |
| 17  they were to remove themselves at that point.  I | 17  that conversation? |
| 18  was taking over. | 18     A.  That the case was being closed and |
| 19     Q.  Do you remember when that was? | 19  that Mindy was being moved. |
| 20     A.  No. | 20     Q.  Did you tell them what your findings |
| 21     Q.  Was that toward the beginning of | 21  were? |
| 22  your investigation? | 22     A.  I was not able to validate that Raz |
| 23     A.  Right, when I came back. | 23  actually acted inappropriate. |
| 24     Q.  Did you have the call with them | 24     Q.  Did you inform them of that? |
| 25  together or separate? | 25     A.  Yes. |
| [Page 55] | [Page 57] |

[15]  (Pages 54 to 57)

**[Page 58]**

1   Q.  And was Miss Hoang actually moved?
2   A.  Yes.
3   Q.  Do you remember when?
4   A.  No, I do not remember.
5   Q.  Would it have been shortly after the
6 conclusion of your investigation?
7   A.  Yes.
8   Q.  You said you don't believe your
9 investigation took one month, I think; is that
10 correct?
11   A.  I don't believe it did.
12   Q.  Did it take two months?
13   A.  I don't remember.
14   Q.  Do you remember if it took three
15 months?
16   A.  I don't remember.
17   Q.  Do you remember having a meeting
18 with Mr. Mansour in January?
19   MR. RITSON: Of what year?
20   Q.  Of 2000, oh, sorry.
21   Do you remember having a meeting
22 with Mr. Mansour in January of 2012 about
23 allegations of theft?
24   A.  I did not have a meeting. I was
25 called into the meeting.

**[Page 59]**

1   MR. RITSON: Are you done?
2   THE WITNESS: Yes.
3   MR. RITSON: Okay. I just want to
4 note, for the record, before we move on from
5 Mindy Hoang that I've been very liberal with
6 letting that line of questioning go on, basically
7 limited objections for both depositions; but just
8 note, for the record, Miss Hoang's claims are not
9 an issue in the case and they were, in fact,
10 dismissed by the EEOC when she attempted to make
11 a formal complaint.
12   MR. VALLAS: That is noted and,
13 also, I would just note, we will memorialize this
14 in writing, but we will make calls for the
15 production of the investigation file and witness
16 statements. That can be memorialized
17 subsequently.
18   MR. RITSON: For the record, we will
19 likely object to that. I don't see the relevance
20 to this case and Miss Hoang's claims are not at
21 issue here.
22   MR. VALLAS: No need to litigate
23 this right now.
24   Q.  Moving back to this meeting in
25 January, you say you were called into it?

**[Page 60]**

1   A.  Yes.
2   Q.  Who called you into it?
3   A.  Don't remember.
4   Q.  Do you remember who was
5 participating in that meeting?
6   A.  When I walked in, Jerry was there.
7 Ted was there. Tamer and Mark.
8   Q.  Jerry Cook?
9   A.  Yes.
10   Q.  Do you remember Mr. Cook's title?
11   A.  Director of sales.
12   Q.  Is Ted the same IT specialist that
13 you mentioned earlier?
14   A.  Correct.
15   Q.  And do you remember Tamer's full
16 name?
17   A.  No.
18   Q.  And what was his title?
19   A.  He was, I think, director of
20 merchandising.
21   Q.  And Mark, are you referring to Mark
22 Scott?
23   A.  Yes, I'm referring to Mark Scott.
24   Q.  And was Mr. Mansour there himself?
25   A.  Yes, he was.

**[Page 61]**

1   Q.  Do you remember what the allegations
2 were?
3   A.  They were allegations of items that
4 were missing in the clearance.
5   Q.  Do you know how this came to the
6 attention of Ashley Furniture?
7   A.  Don't know the full scheme but, no,
8 because I came in at the end, like I said.
9   Q.  As a matter of policy, what is your
10 role in investigating allegations of theft at
11 Ashley Furniture?
12   A.  It depends what type of theft. I'm
13 not always involved in that, in the
14 investigations.
15   Q.  So what type of theft would you be
16 involved with?
17   A.  I've been involved with money. Like
18 in my current position, I can be involved with
19 people taking clothes from work or wearing --
20   MR. RITSON: I think Mr. Vallas is
21 just asking about Ashley Furniture.
22   Q.  Specifically just Ashley Furniture?
23   A.  I've been involved predominantly
24 with money.
25   Q.  As opposed to merchandise?

**[16] (Pages 58 to 61)**

| | |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  Is that division of responsibility |
| 3 | outlined in any document? |
| 4 | A.  No. |
| 5 | Q.  How did you become aware of your |
| 6 | responsibility with respect to theft of money as |
| 7 | opposed to theft of merchandise? |
| 8 | A.  Because I got called in to do it.  I |
| 9 | was given that to do. |
| 10 | Q.  Who would assign that to do? |
| 11 | A.  Eugene. |
| 12 | Q.  Mr. Crinion would charge you with |
| 13 | investigating certain thefts? |
| 14 | A.  Yes, like, if there was money |
| 15 | missing or a deposit that didn't happen, they |
| 16 | would ask me to look at time records. |
| 17 | Q.  Did anyone ask you to investigate |
| 18 | this particular theft involving Mr. Mansour about |
| 19 | which -- withdraw that question. |
| 20 | The theft that was being discussed |
| 21 | in this January meeting, were you asked to |
| 22 | investigate that? |
| 23 | A.  Not me in particularly.  We were -- |
| 24 | I was asked to look at the items that were pulled |
| 25 | up out of the computer. |

[Page 62]

| | |
|---|---|
| 1 | Q.  Can I direct your attention to page |
| 2 | 6. |
| 3 | A.  Okay. |
| 4 | Q.  Is that your signature? |
| 5 | A.  Yes, it is. |
| 6 | Q.  And you signed that in front of a |
| 7 | notary public? |
| 8 | A.  Yes. |
| 9 | Q.  And on paragraph 21 it says, "I |
| 10 | hereby declare that the foregoing statements made |
| 11 | by me are true, to the best of my knowledge"? |
| 12 | A.  Correct. |
| 13 | Q.  Do you understand that you were |
| 14 | swearing to the truth of those -- |
| 15 | A.  Yes. |
| 16 | Q.  -- statements? |
| 17 | If I could refer your attention, |
| 18 | Miss Bautista, to paragraphs 2 through 5 of your |
| 19 | affidavit, on pages 1 and 2. |
| 20 | A.  Okay. |
| 21 | Q.  Does that refresh your recollection |
| 22 | about the substance of the allegations made |
| 23 | during that meeting? |
| 24 | A.  Yes. |
| 25 | Q.  Do you remember who investigated |

[Page 64]

| | |
|---|---|
| 1 | Q.  And who asked you to do that? |
| 2 | A.  I don't remember. |
| 3 | Q.  And when were you asked to do that? |
| 4 | A.  Shortly after. |
| 5 | Q.  After the meeting? |
| 6 | A.  After that meeting when they found |
| 7 | that there were items and pieces missing. |
| 8 | Q.  Do you know when they found that |
| 9 | there were items and pieces missing? |
| 10 | A.  I don't know. |
| 11 | MR. VALLAS:  I'm going to ask the |
| 12 | court reporter to mark this document.  I believe |
| 13 | we're up to five, Bautista 5. |
| 14 | (Bautista Exhibit 5 marked for |
| 15 | identification.) |
| 16 | MR. RITSON:  You made it |
| 17 | double-sided. |
| 18 | MR. VALLAS:  I'm trying to save |
| 19 | trees. |
| 20 | Q.  Do you recognize that document, |
| 21 | Miss Bautista? |
| 22 | A.  Yes. |
| 23 | Q.  Can you tell me what it is? |
| 24 | A.  It's an affidavit of information |
| 25 | that I had given sometime ago. |

[Page 63]

| | |
|---|---|
| 1 | these allegations? |
| 2 | A.  I believe it was Tamer, Mark and Ted |
| 3 | and Jerry.  That was the first piece of the |
| 4 | allegation, when they found the information. |
| 5 | Q.  When you say the first piece of the |
| 6 | allegation? |
| 7 | A.  When they found that something was |
| 8 | wrong in clearance. |
| 9 | Q.  And what exactly was it that was |
| 10 | wrong in clearance? |
| 11 | A.  There were pieces missing. |
| 12 | Q.  Were those pieces paid for? |
| 13 | A.  Don't know. |
| 14 | Q.  Do you know if there was any record |
| 15 | of payment being made for those pieces? |
| 16 | A.  Don't know. |
| 17 | Q.  Were you asked to look into that? |
| 18 | A.  Yes. |
| 19 | Q.  By whom? |
| 20 | A.  By Mark. |
| 21 | Q.  And did you do so? |
| 22 | A.  And Jerry.  Yes. |
| 23 | Q.  Did you at one time know whether |
| 24 | there was a record of a payment for those pieces? |
| 25 | A.  I don't believe we were ever able to |

[Page 65]

[17]  (Pages 62 to 65)

1  find anything.
2     Q.  Does Miss Arias, Miss Ramona Arias,
3  referenced in paragraph 3 ever claim that she not
4  receive the pieces of furniture?
5     A.  That conversation was had with
6  Jerry.
7     Q.  Were you present when he had that
8  conversation?
9     A.  I was present in the room, yes.
10    Q.  Do you know whether or not she
11  claimed not to have received the pieces of
12  furniture?
13    A.  She claimed that she did not receive
14  them.
15    Q.  At this time, did Ashley Furniture
16  consider those pieces of furniture to have been
17  stolen?
18    A.  Yes.
19    Q.  At some stage you contacted the
20  police about Mr. Mansour; is that correct?
21    A.  Correct.
22    Q.  If I could actually refer your
23  attention to Exhibit D of your affidavit. The
24  page isn't numbered.
25       Do you recognize that document,

[Page 66]

1  Miss Bautista?
2    A.  Yes.
3    Q.  Can you describe what it is?
4    A.  It was a statement that was made by
5  me on behalf of a company that I was instructed
6  to file a complaint.
7    Q.  And the date on it is February 20,
8  2012; is that correct?
9    A.  Correct.
10    Q.  Is there anywhere in this complaint
11  -- withdraw that question.
12      Did you reference in this complaint
13  the theft of furniture that was discussed at the
14  January 17th meeting with Mr. Mansour?
15    A.  I don't remember. I'd have to read
16  it. I don't believe it's on here. I don't
17  believe we ever -- regarding the Miss Arias?
18    Q.  That's correct.
19    A.  I don't believe it's on here.
20    Q.  Do you know why not?
21    A.  I don't know.
22    Q.  Was it your decision to omit that
23  information?
24    A.  No.
25    Q.  Do you know whose decision it was?

[Page 67]

1      MR. RITSON:  Objection to form.  You
2  can answer.
3    A.  I believe that this was specifically
4  on something else.  This statement was
5  specifically heading to something else.  It had
6  nothing to do with the information regarding
7  Miss Ariasias.
8    Q.  Is it the practice of Ashley
9  Furniture to contact the police in response to
10  every allegation of theft?
11    A.  Yes.  If it's over a certain amount,
12  yes.
13    Q.  Do you know why the police weren't
14  contacted in response to the allegation of theft
15  involving Miss Arias?
16    A.  I don't know.
17    Q.  Was that your decision not to
18  contact the police?
19    A.  No.
20      THE VIDEOGRAPHER:  I'm sorry to
21  interrupt.  I have about five minutes left on my
22  DVD.
23      MR. VALLAS:  Why don't we take a
24  break now.
25      THE VIDEOGRAPHER:  This will be the

[Page 68]

1  end of DVD number 1 at 7:15 p.m.  We're going off
2  the video record.
3      (A break from the record was taken.)
4      THE VIDEOGRAPHER:  This will be the
5  beginning of DVD number 2 in Aazel Bautista's
6  videotape deposition at 7:28 p.m.  We're back on
7  video.
8      MR. VALLAS:  Can you read back the
9  last question and answer.
10      (The record was read.)
11    Q.  I believe before we went off the
12  record, Miss Bautista, you said that it's the
13  policy of Ashley Furniture to report all thefts
14  to the police over a certain amount?
15    A.  That's what I understand.
16    Q.  Do you know what that amount is?
17    A.  No, I do not.
18    Q.  Is that policy reflected in any
19  writing that you're aware of?
20    A.  Not that I'm aware of.
21    Q.  How are you aware of -- withdraw
22  that.
23      What do you base your understanding
24  of that policy on?
25    A.  Because I'm directed by the owner or

[Page 69]

[18]  (Pages 66 to 69)

```
1   the COO when they want to move forward with
2   filing a report.
3       Q.   Who was it who directed you to move
4   forward filing a police report in Exhibit D?
5       A.   I don't remember specifically.
6       Q.   Would it have been your decision?
7       A.   No.
8       Q.   If we could take a look at paragraph
9   3 of your affidavit.
10          In the second line you say that, or
11  excuse me, in the first line you say, "Mr. Cook
12  was telephoning an Ashley customer and an outside
13  vendor in an effort to corroborate certain claims
14  made by Mr. Mansour in an attempt to defend
15  himself against evidence of theft by him from
16  Ashley."
17          Do you know what specifically that
18  evidence of theft was?
19      A.   I believe it was the pieces that
20  they were discussing earlier that they were
21  missing.
22      Q.   Was that the only evidence of theft
23  against Mr. Mansour?
24      A.   I don't know.  I'm assuming that it
25  was.

                                    [Page 70]
```

```
1   allegation was?
2       A.   If I recall correctly, in my
3   affidavit, there was a couple that came in for
4   furniture, which they subsequently did not
5   receive, and they were looking to get their, the
6   goods.
7       Q.   Do you remember when they had
8   initially come in for the furniture?
9       A.   I was not there.  They saw two other
10  people.
11      Q.   Do you know who that was?
12      A.   That was Jackie and Sal.
13      Q.   Is that Jacqueline Wright?
14      A.   Yes.
15      Q.   Was Jacqueline Wright an employee in
16  the human resources department?
17      A.   No.
18          When were you informed of the
19  Yousef's complaint?
20      A.   I don't remember.
21      Q.   Do you remember who informed you?
22      A.   I believe -- I don't remember.  It
23  could have been either two people, either Jerry
24  or Sal.  I don't remember.
25      Q.   Mr. Cook?

                                    [Page 72]
```

```
1       Q.   In paragraph 4, at the end, you
2   state that Mr. Mansour -- "I understood
3   Mr. Mansour's statement to mean that he was
4   resigning from his employment with Ashley"; is
5   that correct?
6       A.   Correct.
7       Q.   As you sit here today, do you -- is
8   it your understanding that Mr. Mansour resigned
9   from Ashley?
10      A.   That's how I understand it.
11      Q.   Did you inform anybody -- strike
12  that.
13          Did you inform Mr. Crinion of the
14  results of this meeting?
15      A.   I believe Jerry did or Mark did.
16      Q.   Do you know if Mr. Crinion was told
17  that Mr. Mansour had resigned?
18      A.   I don't know.
19      Q.   Would it surprise you to know that
20  Mr. Crinion testified that Mr. Mansour was
21  terminated?
22      A.   Yes.
23      Q.   If we move forward to the next
24  allegation involving Mr. and Mrs Yousef, can you
25  describe to me what the substance of that

                                    [Page 71]
```

```
1       A.   Yes, Mr. Cook.
2       Q.   Do you know how Mr. Cook would have
3   known?
4       A.   Through Sal.
5       Q.   If you look on paragraph 6, it says,
6   "On January 19, 2012, Mr. Cook and I met at the
7   Secaucus store with an Ashley customer named Dina
8   Yousef"?
9       A.   Correct.
10      Q.   At the end of that paragraph, it
11  says, "Mr. Sciarrino had advised Mr. Cook and me
12  of the events of the January 18, 2012 meeting."
13          Does that refresh your recollection
14  of when you were informed of the allegations of
15  theft?
16      A.   It had to be within that time frame.
17      Q.   Prior to meeting with the Yousefs,
18  did you investigate their allegations at all?
19      A.   Prior to meeting with the actual
20  couple?
21      Q.   That's right.
22      A.   We were given an invoice by the
23  couple.  I think the couple gave it to Sal, and
24  we really didn't have much to go on until they
25  gave us the information, which were the invoice

                                    [Page 73]
```

[19]  (Pages 70 to 73)

1   that they had.
2       Q.   Do you know if anyone investigated
3   the claims before the January 19th meeting?
4       A.   Possibly, no, I don't believe so,
5   because we didn't know anything about it. Well,
6   not to the detail we found out when we met with
7   them.
8       Q.   What was said at that meeting with
9   the Yousefs on January 19th?
10      A.   Well, Jerry really was the lead on
11  it. I was there just pretty much listening.
12          They were just very upset that they
13  didn't get their furniture. They called to find
14  about their furniture and found out that Mr.
15  Mansour was no longer with us and wanted to know
16  what was going to happen.
17      Q.   And what did you tell them in
18  response?
19      A.   I didn't tell them anything. Jerry
20  was the one that lead the investigation.
21      Q.   Do you remember what Mr. Cook said
22  in response?
23      A.   I believe Jerry tried to appease
24  them, had the conversation with them and I believe
25  that we were going to look into it and I believe

[Page 74]

1   given us. And so we tried to find it in the
2   system. I didn't try to find it in the system.
3   Someone else, our controller at the time, pulled
4   up the information.
5       Q.   Are you aware of whether Ashley
6   Furniture offers a price match?
7       A.   I believe they do.
8       Q.   Do you know what's involved with
9   that?
10      A.   No, I don't.
11      Q.   Do you know whether sales associates
12  require approval in order to offer that price
13  match?
14      A.   I believe they do.
15      Q.   Do you know how they obtained that
16  approval?
17      A.   I don't remember.
18      Q.   Did you know at one time?
19      A.   I'm sure I did at one time.
20      Q.   Do you know whether sales associates
21  obtain approval to offer the price match by
22  generating an invoice and then cancelling it?
23      A.   That I don't know.
24      Q.   Did anyone raise that possibility in
25  connection with these invoices?

[Page 76]

1   he partnered up with, evidently, the owner,
2   Eugene and Mark.
3       Q.   When you say partnered up?
4       A.   Mark Scott has to partner up with
5   the owner and the COO in terms of this is what's
6   was going on, what should we do, what are our
7   next steps.
8       Q.   You mean he informed them?
9       A.   Yes.
10      Q.   When you say partnered up, are you
11  referring to an investigation that took place?
12      A.   Yes.
13      Q.   Did Mr. Crinion participate in that
14  investigation?
15      A.   I don't know.
16      Q.   Did Mr. Scott?
17      A.   I don't know.
18      Q.   Did you participate in that
19  investigation?
20      A.   I did with looking at some of the
21  invoices.
22      Q.   What was it specifically that you
23  looked at?
24      A.   I looked at some sale orders based
25  on what the couple had given us, the Yousefs had

[Page 75]

1       A.   I don't remember.
2       Q.   Did Mr. Cook ever mention that
3   Mr. Mansour had sought his approval of a price
4   match for the Yousefs?
5       A.   No.
6       Q.   Did Mr. Cook ever mention that he
7   was aware of the sale that was made to the
8   Yousefs prior to January 18th?
9       A.   No.
10      Q.   Did anyone else at Ashley mention
11  that they were aware of the sales of the Yousefs
12  prior to January 18th?
13      A.   No.
14      Q.   I'd like to direct your attention to
15  Exhibit 12. Oh, excuse me. I'm sorry. To
16  paragraph 12 of the affidavit, on page 4.
17          It says, "To be clear, what Exhibit
18  'A' and 'B' show are that on each of two
19  different days, Mr. Mansour created a sales
20  invoice, took the Yousefs' money, and then
21  immediately deleted the sales invoice from
22  Ashley's internal sales system."
23          Was that your conclusion?
24      A.   There was our conclusion.
25      Q.   And what was that conclusion based

[Page 77]

[20]  (Pages 74 to 77)

1  on?
2      A.    Based on the information that was
3  actually gathered and put together from Jerry and
4  the controller at the time.
5      Q.    Who was the controller?
6      A.    Mary Rusee.
7      Q.    Mary Rusee was involved in the
8  investigation?
9      A.    She pulled up the information.  I
10 don't have access to pull this type of
11     Q.    So is it fair to say that Miss Rusee
12 and Mr. Cook were involved in actually gathering
13 information regarding these allegations?
14         MR. RITSON:  Objection to the form.
15 You can answer.
16     A.    It could be more people.  I'm not
17 sure, but I know that I worked with them in order
18 to look at this.
19     Q.    Were you involved in gathering
20 information or did you simply analyze the
21 information?
22     A.    I simply analyzed the information
23 thereafter.
24     Q.    Did you ever speak to Mr. Mansour
25 about these allegations?

[Page 78]

1      Q.    Now, just to get the chronology
2  straight, on January 17th nobody at Ashley
3  Furniture was aware of the Yousefs; is that
4  correct?
5      A.    Right, we didn't know at that time
6  -- hold on.  Let me look at the dates real quick.
7  You're trying to jog a memory.
8      Q.    No, no.  Please, take your time and
9  take as much time as you need to review the
10 affidavit as you'd like.
11     A.    Yes, when the first conversation
12 occurred with Mr. Mansour no one knew about the
13 Yousefs.
14     Q.    So what were you trying to text Mr.
15 Mansour about on the 17th shortly after he left
16 the building?
17         MR. RITSON:  Objection to form.  You
18 can answer.
19     A.    Just help me help you.
20     Q.    What does that mean specifically?
21     A.    Just tell me what happened.
22     Q.    And this is in reference to the
23 Ramona Arias incident; is that correct?
24     A.    That was to the incident of him
25 walking out which subsequently was because of the

[Page 80]

1      A.    No, I really did not speak with him.
2      Q.    Did you attempt to speak with him?
3      A.    We attempted, yes.
4      Q.    How did you attempt?
5      A.    Via text.
6      Q.    And when did you text -- strike
7  that.
8          Did you text Mr. Mansour?
9      A.    I don't remember.
10     Q.    Do you remember when Mr. Mansour was
11 texted?
12     A.    I don't remember.  It was shortly
13 thereafter.
14     Q.    Was it prior to the filing of the
15 police report?
16     A.    Yes.
17     Q.    Just to refresh your recollection,
18 the police report I believe was filed on
19 February 20, 2012?
20     A.    Yes.  The text message, if I
21 remember, we attempted to speak shortly after he
22 departed the building, not after the Yousefs.
23     Q.    Shortly after he departed the
24 building on January 17th?
25     A.    On the 17th, correct.

[Page 79]

1  conversation that was occurring in the room prior
2  to me coming in.
3      Q.    So is it your testimony that
4  Mr. Mansour was texted to determine why he left
5  the meeting?
6      A.    I don't know what in detail, whether
7  he texted me first or I texted him, but it was
8  just to get down to why, what's going on.
9      Q.    And what was the substance of those
10 text messages?
11     A.    Like I said just, what, what's going
12 on.
13     Q.    Do you know what Mr. Mansour said in
14 response?
15     A.    He never really answered the
16 question.  Just that he takes care of his people.
17 I can only remember that part.
18     Q.    He takes care of his people.  Did
19 you understand -- strike that.
20         What did you understand that to
21 mean?
22     A.    I don't know.
23     Q.    Did you ask Mr. Mansour to clarify?
24     A.    I told him, well, I'm trying to take
25 care of you.

[Page 81]

[21]  (Pages 78 to 81)

1    Q.   Were you using a company phone at
2  that time, Miss Bautista?
3    A.   No.
4    Q.   You were using your personal phone?
5    A.   Yes, but it was also a company phone
6  because I was -- we were paid for our company
7  phone. I mean, we were paid for a portion as per
8  my employment.
9    Q.   Is it correct to say that you were
10  given an allowance towards your phone bill?
11    A.   Yes.
12    Q.   But your phone bill would be in your
13  own name?
14    A.   Correct.
15    Q.   Do you still have that number?
16    A.   Yes.
17    Q.   And that same account?
18    A.   Yes.
19    Q.   Subsequently, during your
20  investigation of the complaint raised by the
21  Yousefs, did you ever attempt to contact
22  Mr. Mansour about those allegations?
23    A.   I did not speak to him. Actually, I
24  don't remember, to be honest with you.
25    Q.   Did you try?

[Page 82]

1    A.   I don't remember trying.
2    Q.   Do you know if anyone else spoke
3  with Mr. Mansour?
4    A.   I believe Mark Scott might have.
5    Q.   Do you know if Mr. Scott spoke with
6  Mr. Mansour prior to the police report having
7  been filed?
8    A.   I don't remember.
9    Q.   Did Mr. Scott inform you of the
10  substance of his discussion with Mr. Mansour, the
11    A.   Didn't go much into the details that
12  he did speak to him.
13    Q.   Did you ask him what Mr. Mansour
14  said?
15    A.   I believe I might have asked him but
16  I didn't get any real details as to the
17  conversation.
18    Q.   Did you think that Mr. Mansour's
19  discussion of his discussion with Mr. Scott was relevant to your
20  investigation to the complaint?
21    A.   I don't know. I didn't know what
22  their conversation was about.
23    Q.   Did you think that it was important
24  to speak with Mr. Yousef in connection with this
25  investigation -- withdraw that question.

[Page 83]

1    Did you think that it was important
2  to speak with Mr. Mansour in connection with this
3  investigation?
4    A.   It would have been to try to get the
5  details on his side but, at that point, he was no
6  longer with the company.
7    Q.   Were you aware of any reason why you
8  would not have been allowed to speak with Mr.
9  Mansour even though he wasn't with the company?
10    A.   No.
11    Q.   Other than the invoices, is there
12  any other basis for the conclusion you express in
13  paragraph 12 that Mr. Mansour created a sales
14  invoice, took the Yousefs money and then
15  immediately deleted the sales invoice from
16  Ashley's internal sales system?
17    A.   That was a final conclusion that
18  they, that Ashley came up with, based on the
19  information that we all looked at.
20    Q.   And other than the sales invoices,
21  what information would that have been?
22    A.   The sales invoices that the Yousefs
23  came to show us and the ones we could not find
24  and found that there was a trail that they were
25  deleted from the system.

[Page 84]

1    Q.   And when you say that was the
2  conclusion that we came to --
3    A.   Right.
4    Q.   Who are you referring to?
5    A.   The people who looked it over.
6  Everyone from Jerry; I looked at it. Mary looked
7  at it. I believe Mark Scott might have looked at
8  it. I'm not, I don't know if anyone else did.
9    Q.   This will be my last question on
10  this, but to clarify your testimony, the only
11  evidence that forms the basis of the conclusion
12  expressed in paragraph 12 are the two invoices
13  that are in paragraphs A and B, are, excuse me,
14  that are in Exhibits A and B and the missing
15  payments from the Ashley record?
16    A.   Right. There's an invoice. There
17  was an actual invoice that was generated and
18  that's how we were able to get these numbers, and
19  we were then able to go into the system, well,
20  actually, I didn't go into the system. I don't
21  remember if it was Mary or Jerry, but one of them
22  went into the system and was able to find that
23  there was a list. You could see where it is and
24  then it's not.
25    MR. RITSON:  Just note for the

[Page 85]

[22]  (Pages 82 to 85)

```
 1    record, the witness is pointing to Exhibit, is it
 2    A or B?
 3           THE WITNESS:  Hold on.  This is A.
 4           MR. RITSON:  While speaking just
 5    now.
 6      Q.    Thank you for that, actually.
 7           Can you actually, Miss Bautista,
 8    refer me specifically on Exhibit A to what you're
 9    referencing?
10      A.    Right in the middle.  The bottom
11    where it says sales changes.  My vision is very
12    bad so you're going to have to excuse me.
13      Q.    It's okay.  The resolution is a
14    little bit poor.
15      A.    It shows, this is the only
16    recollection because I haven't seen these in a
17    while and I don't --
18      Q.    Please take your time.
19      A.    There was an invoice generated.
20    Then it was changed and then it was deleted.  And
21    it's, there's a trail of, you know, 138, 139 it
22    looks like.  Four actually.  I can't even read.
23      Q.    It does look like five, I believe.
24      A.    No.  It's four.
25      Q.    4:39 p.m.?
```

                                    [Page 86]

```
 1      A.    Exhibit A it's four.  But there's a
 2    line item here where it shows on 430, I'm not
 3    sure if it is 439 or 438, that it was deleted.
 4    The invoice 4200383 I believe it was, yeah, 830,
 5    830, it's very hard to see this.  It's really
 6    bad, but it shows that it was deleted.
 7      Q.    When you were conducting this
 8    investigation, did you consider any other
 9    explanations for why that invoice might have been
10    deleted?
11      A.    No.
12      Q.    As you sit here today, could you
13    think of any other explanations for why that
14    invoice had been deleted?
15      A.    No.
16      Q.    Well, were you familiar with the
17    protocol for entering sales into the system?
18      A.    No.
19      Q.    Were you familiar with the protocol
20    for deleting sales from the system?
21      A.    No.
22      Q.    So did you feel that you had
23    sufficient information to make that conclusion?
24      A.    Again, I didn't make the conclusion
25    on my own.  I was the last party to come in and
```

                                    [Page 87]

```
 1    look at what everybody was already looking at.
 2    To kind of validate it I had to walk through it
 3    to understand what I was looking at.
 4      Q.    And so the inferences that were
 5    drawn were drawn by those with more information?
 6      A.    Based on this, based on the invoices
 7    that we had.  It was there and then it wasn't
 8    there.
 9      Q.    But, ultimately, it would have been
10    the other people participating in the
11    investigations who made these conclusions; is
12    that correct?
13      A.    Because it was a team effort,
14    correct.
15      Q.    Okay.
16           Do you still work for Ashley
17    Furniture, Miss Bautista?
18      A.    No.
19      Q.    And when did you leave?
20      A.    August, 2012.
21      Q.    Did you resign?
22      A.    Yes.
23      Q.    I'm just coming up to the end now.
24           At the time of your resignation --
25    strike that.
```

                                    [Page 88]

```
 1           Were you presented by Mr. Scott with
 2    the option to either resign or be terminated?
 3      A.    No.
 4      Q.    Are you aware -- I withdraw that
 5    question.
 6           Would it surprise you to hear that
 7    Mr. Scott contacted Mr. Mansour in August about
 8    allegations of theft regarding you?
 9      A.    Yes.
10      Q.    Would it surprise you to hear that
11    Mr. Scott informed Mr. Mansour that you had been
12    given the option to either resign or be
13    terminated?
14      A.    Yes, I'm surprised.
15           MR. VALLAS:  Can we go off the
16    record for a moment?
17           THE VIDEOGRAPHER:  Sure.  At
18    7:50 p.m we're going off the video record.
19           (A break from the record.)
20           THE VIDEOGRAPHER:  At 7:57 p.m.
21    we're back on the video record.
22      Q.    Miss Bautista, I just have one more
23    question.
24           I believe you testified earlier that
25    Mr. Crinion would sometimes make book
```

                                    [Page 89]

**[23]  (Pages 86 to 89)**

1  recommendations to employees?
2      A.   Yes.
3      Q.   Did Mr. Crinion ever recommend the
4  Bible to employees?
5      A.   No, that I don't remember.
6      Q.   Did he ever recommend Christian
7  literature to employees?
8      A.   I believe one book was.
9      Q.   Do you remember what that book was?
10     A.   The Man in the Mirror.
11     Q.   Can you tell me what The Man in the
12 Mirror is?
13     A.   I don't know.  I didn't read it.
14     Q.   But is it your testimony that The
15 Man in the Mirror is a book with Christian
16 themes?
17     A.   I believe it has, again, I didn't
18 read it.  This is just what I've heard.
19     Q.   Where did you hear it?
20     A.   I believe I heard -- Eugene once
21 mentioned it to me.
22     Q.   Mentioned that the book had
23 Christian themes?
24     A.   Right.
25     Q.   Did you ever tell Mr. Crinion that

[Page 90]

1  he shouldn't distribute religious literature?
2      MR. RITSON:  Objection to form.  You
3  can answer.
4      A.   Just to be careful who his
5  conversations were with.
6      Q.   And what did you mean by that?
7      A.   What I mean by that, I'm Christian.
8  He can have a conversation with me and I'm not
9  uncomfortable.  He may have a conversation with
10 someone else of another religious belief and not
11 feel comfortable and he is the owner.
12     Q.   Did you make that remark to
13 Mr. Crinion in response to any complaint?
14     A.   No.
15     Q.   Do you remember when that
16 conversation with Mr. Crinion took place?
17     A.   I don't remember.
18     Q.   Did -- withdraw.
19          Are you aware of any complaints that
20 were raised about Mr. Crinion's --
21     A.   No.
22     MR. VALLAS:  No further questions
23 pending a follow up to Mr. Ritson's questions, if
24 any.
25          EXAMINATION

[Page 91]

1  BY MR. RITSON:
2      Q.   I'll be really quick.
3          Miss Bautista, did you interview
4  Mark Moses?
5      A.   Phone screen.
6      Q.   Okay.
7          And what, if anything, was your
8  impression of him based on that phone screen?
9      A.   He had some good experience.  If
10 anything I recommended for him to come on board
11 as a sales associate.
12     Q.   Why was that?
13     A.   I didn't feel he had the experience
14 for a sales manager.
15     Q.   Ultimately he did come on board as a
16 sales manager, correct?
17     A.   Correct.
18     Q.   And how was it that that came to be
19 despite your feeling?
20     A.   Jerry, Jerry saw something in him
21 that he felt he's definitely able to work with,
22 and he would definitely be able to grow and
23 nurture and mentor into a fabulous sales manager.
24     Q.   Is this Jerry Cook?
25     A.   Yes, Jerry Cook.

[Page 92]

1      Q.   Okay.
2          With respect to Mr. Mansour and Sal
3  Sciarrino, do you have any knowledge with respect
4  to the relationship between them while both men
5  were employed by Ashley?
6      A.   Oh, yeah.  They were good friends.
7  They were always bantering back and forth.  They
8  went out after work.  They would go out to
9  dinner.  They were, they had a very good working
10 and outside-of-work relationship.
11     Q.   Do you know where they would go
12 after work?
13     A.   I know at times they had been to
14 hookah lounges and they would have meals
15 together.  I mean, they were really close.  They
16 were very, very close.
17     Q.   Did you ever go with them?
18     A.   No.
19     Q.   Did they ask you to go with them?
20     A.   Yes.
21     Q.   Who asked you?
22     A.   Mr. Mansour and Sal.
23     Q.   Earlier there was some testimony
24 regarding an individual named Raz.
25          Do you recall his last name?

[Page 93]

[24]  (Pages 90 to 93)

```
1     A.   No, I don't.
2     Q.   Do you know what Raz's religion was
3   at the time of your employment at Ashley?
4     A.   Yes, he was Muslim.
5        MR. RITSON:  That's all I've got.
6        EXAMINATION
7   BY MR. VALLAS:
8     Q.   I do have just a very few follow-up
9   questions to that.
10        Miss Bautista, at any time during
11   Mr. Moses' employment at Ashley --
12     A.   Yes.
13     Q.   -- not subsequently but during his
14   employment, were you aware of his religious
15   faith?
16     A.   No, I was not.
17     Q.   At any time during Mr. Mansour's
18   employment with Ashley, were you aware of his
19   religious faith?
20     A.   Yes.
21     Q.   And do you know what it was?
22     A.   He was Muslim.
23     Q.   How did you know?
24     A.   He had told me.
25     Q.   Were you aware of where Mr. Mansour
```

                                          [Page 94]

```
1     A.   Don't remember that.
2   his bag?
3     Q.   Do you ever remember him commenting
4   that they should place a metal detector at the
5   door to check Mr. Mansour for bombs?
6     A.   I don't remember that.
7     Q.   Do you ever remember Mr. Sciarrino
8   asking Mr. Mansour if he was upset because we
9   captured Bin Ladin?
10     A.   That I don't remember.
11     Q.   Do you remember Mr. Sciarrino asking
12   Mr. Mansour if he could give him a heads up when
13   they were going to blow the tunnel so they would
14   not drive through that day?
15     A.   I did not remember that.
16     Q.   Do you remember Mr. Sciarrino saying
17   to Mr. Mansour that we destroyed Islam and
18   Muslims?
19     A.   I do not remember that.
20     Q.   Did you consider -- strike that.
21        How were you aware of the comments
22   that you were aware of being made?  Were they
23   made in your presence?
24     A.   Not all the time.  They would have
25   their bantering once in a while, but a lot of
```

                                          [Page 96]

```
1   is from?
2     A.   I don't remember.
3     Q.   You mentioned a moment ago that
4   Mr. Mansour and Mr. Sciarrino would banter.
5        Do you remember if the content of
6   that banter ever involved Mr. Mansour's religion?
7     A.   Yes.
8     Q.   And what sort of comments about Mr.
9   Mansour's religion would be made?
10     A.   They would make references to each
11   other.  I believe at one time he called him a
12   Guinea, I hate using these words, and he would
13   calm him a Guinea and Sal would call him a
14   terrorist.  They would go back and forth.
15     Q.   Do you ever remember Mr. Mansour --
16   strike that.
17        Do you ever remember Mr. Sciarrino
18   referring to Mr. Mansour as a Taliban?
19     A.   Yes.
20     Q.   Do you know how many times?
21     A.   No.
22     Q.   Do you ever remember Mr. Sciarrino
23   referencing -- strike that.
24        Do you ever remember Mr. Sciarrino
25   asking whether Mr. Mansour was carrying bombs in
```

                                          [Page 95]

```
1   their time was on the floor and I wasn't on the
2   floor with them.
3     Q.   So when the statements were made
4   outside of your presence, how did you become
5   aware of them?
6     A.   Because they would tell me that they
7   had that conversation.  I called him this.  I
8   called him that.  They would go back and forth.
9     Q.   Why would they, why would they tell
10   you that they were having that conversation?
11     A.   Casual conversation.  Not sure why.
12     Q.   As human resources representative,
13   did you think that that sort of banter was
14   appropriate?
15     A.   It was inappropriate when they were
16   on the floor when they were in the presence of
17   others, which was a separate conversation I had
18   with both of them; that they needed to be very
19   careful.
20        I knew that they were friends.  I
21   knew that they went out and I didn't have a
22   problem with that.
23        It was nice to know that they were
24   friends and they had a relationship outside of
25   work, but they had to be careful while they were
```

                                          [Page 97]

**[25]  (Pages 94 to 97)**

1  at work because they can offend someone.
2     Q.  Do you know when it was that you had
3  that conversation?
4     A.  No.
5     Q.  At any time did Mr. Mansour ever
6  express discomfort with some of the comments that
7  were being made by Mr. Sciarrino?
8     A.  In bantering, in joking, yes, but
9  Sal said the same thing.
10    Q.  When you say in joking, what do you
11 mean?
12    A.  Sal would say to me, um, Mohammad
13 said that I'm at fat Guinea and I'm going to eat
14 everything out of the refrigerator, something
15 sort of, and then they would go bantering back
16 and forth.
17    And he said he called me a terrorist
18 and tell people to be careful with me. So they
19 would go back and forth.
20    Q.  At any time did Mr. Mansour express
21 to you an opinion that this banter had crossed
22 the line?
23    A.  No.
24    Q.  When did this sort of banter begin?
25    A.  I couldn't remember. They got,

[Page 98]

1  became very close very quickly. They were both
2  working there before I started with the company,
3  well, working for the company. I'm not sure
4  working for the same location.
5     Q.  Did you ever have conversations with
6  anybody else other than Mr. Mansour and
7  Mr. Sciarrino about these sorts of comments?
8     A.  Not directly, no.
9     Q.  Indirectly?
10    A.  No.
11    MR. VALLAS: Nothing further. No
12 further questions from plaintiff.
13    EXAMINATION
14 BY MR. RITSON:
15    Q.  Miss Bautista, do you know whether
16 at the present time Mr. Mansour, Mr. Sciarrino
17 still have that friendly relationship?
18    A.  I don't know.
19    Q.  Did you ever hear Mr. Sciarrino use
20 the word "Nigger"?
21    A.  Never.
22    Q.  Did anyone ever tell you that he had
23 used that word?
24    A.  No one has ever come to me with
25 that.

[Page 99]

1     MR. RITSON: No further questions.
2     MR. VALLAS: Nothing more from
3  plaintiff. I'd like to thank you again for
4  taking the time out of your evening, Miss
5  Bautista.
6     THE VIDEOGRAPHER: This will
7  conclude Aazel Bautista's videotape deposition at
8  8:08 p.m. Going off the video record.
9     (Time noted: 8:08 p.m.)
10
11
12
13    _____
14    AAZEL BAUTISTA
15
16
17
18
19 Subscribed and sworn to before me this _____
20 day of _____, 20_____.
21    _____
22    Notary Public
23
24
25

[Page 100]

1     C E R T I F I C A T E
2
3     I, MICHAEL WILLIAMS, a Registered
4  Professional Reporter and Notary Public of the
5  State of New Jersey, do hereby certify that prior
6  to the commencement of the examination, the
7  witness was duly sworn by me to testify to the
8  truth, the whole truth and nothing but the truth.
9     I DO FURTHER CERTIFY that the foregoing is
10 a true and accurate transcript of the testimony
11 as taken stenographically by and before me at the
12 time, place and on the date hereinbefore set
13 forth, to the best of my ability.
14    I DO FURTHER CERTIFY that I am neither a
15 relative nor employee nor attorney nor counsel of
16 any of the parties to this action, and that I am
17 neither a relative nor employee of such attorney
18 or counsel, and that I am not financially
19 interested in the action.
20
21    _____
22 MICHAEL WILLIAMS, RPR
23
24
25

[Page 101]

[26]  (Pages 98 to 101)

```
 1        E R R A T A   S H E E T
 2
 3   CORRECTION          PAGE  LINE
 4   ------------------------------
 5   ------------------------------
 6   ------------------------------
 7   ------------------------------
 8   ------------------------------
 9   ------------------------------
10   ------------------------------
11   ------------------------------
12   ------------------------------
13   ------------------------------
14   ------------------------------
15   ------------------------------
16   ------------------------------
17   ------------------------------
18   ------------------------------
19   ------------------------------
20   ------------------------------
21   ------------------------------
22   ------------------------------
23   ------------------------------
24   ------------------------------
25
```

[Page 102]

[27]  (Page 102)

## A

**Aazel** 1:10 4:4,15 5:2,22 6:1 45:8,17 69:5 100:7,14
**ability** 8:7 101:13
**able** 8:13 43:23 57:22 65:25 85:18,19,22 92:21,22
**absence** 22:18 23:4 24:24
**access** 78:10
**account** 82:17
**accurate** 101:10
**accusations** 53:19
**accused** 46:12 52:11
**acted** 57:23
**action** 1:3 5:6 18:17,18,20 26:25 45:20 51:21 52:14 101:16,19
**actual** 73:19 85:17
**adamant** 55:10
**addition** 47:20
**address** 28:19
**administration** 10:1
**administrator** 15:25 16:5
**adopt** 46:25
**adopted** 45:22
**advances** 14:17
**adverse** 18:20
**advised** 73:11
**affect** 8:7
**affidavit** 4:15 9:3,4 63:24 64:19 66:23 70:9 72:3 77:16 80:10
**ago** 6:7 24:7 30:15 47:17 63:25 95:3
**agree** 24:18
**agreed** 3:3,8,11 27:10
**allegation** 26:3,5,9,11 46:10 65:4,6 68:10,14 71:24 72:1
**allegations** 53:23 57:6 58:23 61:1,3,10 64:22 65:1 73:14 73:18 78:13,25 82:22 89:8
**allow** 7:4
**allowance** 82:10
**allowed** 84:8
**amount** 68:11 69:14,16
**analyze** 78:20
**analyzed** 78:22
**and/or** 45:19
**answer** 7:4,6,8,13 8:2,13 13:2

22:9 33:13 39:7 43:10 47:7 52:18 68:2 69:9 78:15 80:18 91:3
**answered** 81:15
**answering** 39:10
**answers** 55:7
**anybody** 31:16 71:11 99:6
**anyone's** 53:13
**apologize** 37:20
**appearances** 5:14
**appease** 24:21 27:12,21 74:23
**applied** 11:5
**appropriate** 97:14
**approval** 76:12,16,21 77:3
**approximately** 22:19 47:22 53:25
**Archer** 1:15 2:7 5:8,18
**area** 37:11 55:1
**Arias** 66:2,2 67:17 68:15 80:23
**Ariasias** 68:7
**Ashley** 1:6 5:4,20 6:10,13 10:9,15,20 11:14,17 12:17 12:22,23,25 13:9 15:6 20:6 20:6,9,19,22 21:1 23:17 24:8 26:5 28:17,18 30:19 31:18 36:5 61:6,11,21,22 66:15 68:8 69:13 70:12,16 71:4,9 73:7 76:5 77:10 80:2 84:18 85:15 88:16 93:5 94:3,11,18
**Ashley's** 77:22 84:16
**aside** 36:10
**asked** 27:7 43:14 49:21 62:21 62:24 63:1,3 65:17 83:15 93:21
**asking** 17:7 48:18 61:21 95:25 96:8,11
**asleep** 26:6,20,21,25 27:3 30:16,25
**assign** 62:10
**associate** 21:18 23:14 26:10 32:7 41:18 92:11
**associates** 15:21 43:20 76:11 76:20
**assume** 7:14 33:14
**assuming** 29:19 70:24
**attempt** 70:14 79:2,4 82:21

**attempted** 59:10 79:3,21
**attention** 13:6 14:14 34:5,6 36:11 61:6 64:1,17 66:23 77:14
**attorney** 8:4,17,20 101:15,17
**attorneys** 8:24
**August** 88:20 89:7
**authority** 18:16
**Avenue** 2:4
**aversion** 15:1
**aware** 14:3,11,13 20:5 25:1,6 25:7 26:2,4,12 30:18 31:12 31:15 32:8 38:20,23 62:5 69:19,20,21 76:5 77:7,11 80:3 84:7 89:4 91:19 94:14 94:18,25 96:21,22 97:5

## B

**B** 4:8 77:18 85:13,14 86:2
**Bachelors** 10:5
**back** 13:7 21:11 22:7,9,17,25 27:5,24 34:3,6 45:8,13,17 47:10 52:6 55:23 59:24 69:6,8 89:21 93:7 95:14 97:8 98:15,19
**background** 6:16
**bad** 68:12 87:6
**bag** 96:1
**banter** 95:4,6 97:13 98:21,24
**bantering** 93:7 96:25 98:8,15
**base** 69:23
**based** 51:3 75:24 77:25 78:2 84:18 88:6,6 92:8
**basically** 59:6
**basis** 24:1 84:12 85:11
**Bautista** 1:10 4:4,16 5:2,22 6:1,6 8:7 9:11 12:20 13:9 13:15,17 14:1,6 28:1,2,4,16 28:18 30:14 33:20,22 34:4,5 34:7 36:12 44:17,19,22 55:5 63:13,14,21 64:18 67:1 69:12 82:2 86:7 88:17 89:22 92:3 94:10 99:15 100:5,14
**Bautista's** 69:5 100:7
**bearing** 20:3
**beginning** 55:21 69:5
**behalf** 67:5
**behaved** 52:10

belief 91:10
believe 16:11 21:20 23:5 25:8
   27:6 32:25 33:5,12 35:17,21
   37:4 38:17 42:21,24 46:16
   48:23 50:8 55:13 58:8,11
   63:12 65:2,25 67:16,17,19
   68:3 69:11 70:19 71:15
   72:22 74:4,23,25 76:7,14
   79:18 83:4,15 85:7 86:23
   87:4 89:24 90:8,17,20 95:11
beneath 16:8
benefits 11:23
best 64:11 101:13
better 23:8 34:23
Bible 90:4
bill 82:10,12
Bin 96:9
bit 37:21 86:14
blank 50:18 51:6
bless 34:10
blow 96:13
board 92:10,15
bombs 95:25 96:5
book 34:14,16,18 35:2 89:25
   90:8,9,15,22
books 34:13 35:5,6,8
bottom 14:16 37:15 86:10
break 8:2,2 22:5 36:16 68:24
   69:3 89:19
breaks 7:23
Brian 2:13 5:9
broke 36:16
brought 31:13,16 32:9,11,21
   32:23
building 79:22,24 80:16
business 5:20 6:10 10:1 29:15
   34:24,25 49:10
butchering 19:25

—————————————
                 C
—————————————
C 2:1,8 101:1,1
call 44:13 55:24 56:2 95:13
called 6:2 24:11 39:16 58:25
   59:25 60:2 62:8 74:13
   95:11 97:7,8 98:17
calls 44:11 59:14
calm 95:13
camera 31:7
cancelling 76:22

captured 96:9
care 81:16,18,25
careful 91:4 97:19,25 98:18
carrying 95:25
case 50:8 57:18 59:9,20
Casual 97:11
certain 14:20 62:13 68:11
   69:14 70:13
certification 3:6
certified 5:23
certify 101:5,9,14
cetera 40:20
change 13:1 24:1
changed 86:20
changes 86:11
charge 53:1 62:12
Chatman 9:16
check 96:5
Christian 36:7 90:6,15,23
   91:7
Christine 12:14
chronology 80:1
circumstances 14:20
Civil 1:3 5:5
claim 66:3
claimed 66:11,13
claims 59:8,20 70:13 74:3
clarification 30:10
clarify 12:21 15:12 17:6
   81:23 85:10
clear 41:16 77:17
clearance 61:4 65:8,10
clock 43:21 47:15,21
close 48:9 93:15,16 99:1
closed 50:8 56:9 57:18
closing 51:18
clothes 61:19
cock 38:2
coincide 40:4
collaborate 52:9
collected 18:15
college 9:21
com 28:16,17,18
come 11:3 15:22 16:19 17:2
   72:8 87:25 92:10,15 99:24
comes 34:12 45:8,17
comfortable 91:11
coming 17:20 54:14 81:2
   88:23

commencement 101:6
commencing 1:17
commenting 96:3
comments 95:8 96:21 98:6
   99:7
company 21:10 45:20,22
   67:5 82:1,5,6 84:6,9 99:2,3
complain 20:21 21:4
complained 19:9 25:2 33:4
complaint 19:1,2,3,5,7,11,15
   19:19 20:25 32:8,24 36:15
   37:7 38:6,9 39:15,23 50:12
   59:11 67:6,10,12 72:19
   82:20 83:20 91:13
complaints 20:8 23:22,25
   31:12,15,21 91:19
completed 18:10
completely 7:5
compliance 11:23,24
computer 62:25
conclude 100:7
concluded 49:24 50:1
conclusion 58:6 77:23,24,25
   84:12,17 85:2,11 87:23,24
conclusions 88:11
conduct 14:19,25
conducted 48:10,12
conducting 87:7
conducts 45:17
conference 56:2
conflict 45:19
connection 8:17 12:16 57:6
   76:25 83:24 84:2
consider 66:16 87:8 96:20
contact 45:19 68:9,18 82:21
contacted 66:19 68:14 89:7
content 35:23 38:6 95:5
continued 30:19
continuing 27:17
controller 76:3 78:4,5
convenience 6:11
conversation 16:20 21:9
   24:10 25:9,25 27:6,17 30:23
   39:22,24 40:2 42:8 46:5,19
   46:20 47:1 51:3,12 52:20
   53:2,3,12,17,19 55:16 56:8
   56:11 57:10,13,17 66:5,8
   74:24 80:11 81:1 83:17,22
   91:8,9,16 97:7,10,11,17

98:3
conversations 24:14 25:16
  35:21,24 49:4 91:5 99:5
convert 36:2,5
COO 17:20 18:5,14,22 70:1
  75:5
Cook 21:20 29:21 60:8 70:11
  72:25 73:1,2,6,11 74:21
  77:2,6 78:12 92:24,25
Cook's 60:10
correct 7:19 9:5 16:7,15 17:8
  17:9 21:6,12 36:8,9,18
  51:16 58:10 60:14 64:12
  66:20,21 67:8,9,18 71:5,6
  73:9 79:25 80:4,23 82:9,14
  88:12,14 92:16,17
CORRECTION 102:3
corrective 52:21
correctly 72:2
corroborate 53:22 54:15
  70:13
counsel 3:4 5:13,25 101:15
  101:18
counsel's 30:5
counselor 21:25
couple 72:3 73:20,23,23
  75:25
course 22:2 25:12 49:13
court 1:1,12 3:14 5:5,10,24
  7:6,9 12:20 13:7 32:4 33:20
  39:11 41:21 44:17 63:12
courtroom 7:1
coworkers 38:3
create 50:12
created 50:13 77:19 84:13
Crinion 11:12,18 18:2 35:5
  35:11,14 36:1,4,7 38:14,15
  38:16,22 39:22 40:5 46:8,19
  46:25 47:2 49:1 53:21
  62:12 71:13,16,20 75:13
  89:25 90:3,25 91:13,16
Crinion's 57:2 91:20
crossed 98:21
crotch 37:11 38:1
current 61:18
customer 70:12 73:7
customers 38:3

D

D 2:5 3:1 4:1 66:23 70:4
d/b/a 1:6
D120 14:15
D20 29:10
Daniel 2:8 4:5 5:18
date 32:13 67:7 101:12
dated 4:11,13,14
dates 80:6
day 15:24 16:4 96:14 100:20
days 25:13 37:4 77:19
December 45:4
decision 18:19 21:19 24:1,4
  51:25 67:22,25 68:17 70:6
decisions 54:13
declare 64:10
defend 70:14
defendant 1:8 2:6 5:19
Defendants 1:11 4:9
defines 14:16,24
definitely 92:21,22
definition 14:22 15:4 19:4
definitions 14:17 15:8,13
degree 9:13,15,17,19 10:2,4
deleted 77:21 84:15,25 86:20
  87:3,6,10,14
deleting 87:20
denigrates 15:1
deny 52:12
departed 79:22,23
department 12:3,5 25:3
  72:16
depends 61:12
deponent 5:22
deposed 6:17
deposit 62:15
deposition 3:6,12 5:2,7 6:12
  7:19 8:18 9:1 55:6 69:6
  100:7
depositions 59:7
describe 16:16 67:3 71:25
DESCRIPTION 4:9
despite 92:19
destroyed 96:17
detail 74:6 81:6
details 40:19 42:7 83:11,16
  84:5
detector 96:4
determine 81:4
different 46:21 47:3 77:19

difficult 39:12
Dina 73:7
dinner 93:9
direct 1:6 5:19 6:9,12 11:4
  12:17 14:14 20:6 64:1
  77:14
directed 69:25 70:3
direction 53:13
directly 17:3 28:25 99:8
director 60:11,19
discomfort 98:6
discovering 49:18
discuss 8:4 35:11,14,20
discussed 8:24 36:16 62:20
  67:13
discussing 9:7 70:20
discussion 83:10,19
dismissed 59:10
distribute 91:1
District 1:1,1 5:4,5
division 62:2
document 18:12 34:5,6 36:10
  36:12 44:23 62:3 63:12,20
  66:25
documents 9:9 28:5,7
doing 5:20 6:10 31:9 43:13
  52:11
door 96:5
dot 28:16,16,17,18
double-sided 29:12 63:17
drafting 13:25
drawn 88:5,5
drive 96:14
duly 6:2 101:7
Durborow 2:13 5:9
DVD 68:22 69:1,5

E

E 2:1,1 3:1,1 4:1,8 101:1,1
  102:1,1,1
e-mail 4:12,14 18:13 28:19
  33:2,7,10 36:13,18 37:2,15
  40:17 45:1,13 54:4
e-mailed 39:17
e-mails 4:11 33:13
earlier 23:13 60:13 70:20
  89:24 93:23
easiest 17:24
eat 98:13

education 9:12
EEOC 59:10
effect 3:13
effort 70:13 88:13
either 16:18 38:12 52:15,23
  55:2 72:23,23 89:2,12
elapsed 25:24
eliminate 45:18
employed 10:9 20:19 93:5
employee 4:10 13:17 18:20
  18:24 19:6,9,18 20:6,9,22
  21:1 23:17 26:4 31:18,24
  50:17 72:15 101:15,17
employees 12:2 23:23 35:6,6
  35:15 50:21 51:9,11 90:1,4
  90:7
employment 10:13,18 20:23
  20:24 21:3 71:4 82:8 94:3
  94:11,14,18
empowered 34:24
entering 87:17
entitled 16:9
ESQ 2:5,8
et 40:20
Eugene 11:10,11,12 46:5
  52:2 62:11 75:2 90:20
evening 6:6 100:4
events 73:12
everybody 88:1
evidence 70:15,18,22 85:11
evidently 75:1
exactly 40:14,16 65:9
examination 4:3 6:4 91:25
  94:6 99:13 101:6
excuse 5:17 7:20 19:25 21:23
  26:23 70:11 77:15 85:13
  86:12
Exhibit 13:15 28:2 33:22
  44:19 63:14 66:23 70:4
  77:15,17 86:1,8 87:1
Exhibits 85:14
experience 92:9,13
explanations 87:9,13
express 84:12 98:6,20
expressed 85:12
expresses 45:15

F

F 3:1 101:1

fabulous 92:23
fact 20:18 59:9
factors 15:2
Factory 1:6 5:19 6:9,12 11:4
fair 78:11
faith 94:15,19
fall 26:21 30:15
falling 26:20,25 27:3 30:25
false 52:24 53:18
familiar 14:21 15:3 19:21
  20:15,18 31:24 87:16,19
family 23:14
far 31:9
fat 98:13
favors 14:18
February 67:7 79:19
feed 23:14
feel 7:16,21 87:22 91:11
  92:13
feeling 92:19
feelings 29:14
fell 26:6
fello 34:10
felt 92:21
fifth 29:12
figured 20:2
file 50:9,11,12,14 51:15,18
  59:15 67:6
filed 6:9 79:18 83:7
files 42:25 43:3
filing 3:5 70:2,4 79:14
fill 50:24 51:1,9
filled 50:17
final 27:5 30:22 54:13 56:8
  56:10 57:10 84:17
financially 101:18
find 43:16 66:1 74:13 76:1,2
  84:23 85:22
findings 18:12 50:6 52:7
  57:20
fine 6:14
finish 7:5
finishes 39:7
Firm 2:3 5:16
first 6:2 13:22 15:24 16:23
  25:24 28:14 34:9 38:11
  39:3,4 44:10 45:6 46:19
  47:1 56:11 65:3,5 70:11
  80:11 81:7

five 13:22 47:25 63:13 68:21
  86:23
floor 40:13 97:1,2,16
follow 17:25 91:23
follow-up 55:11 94:8
followed-up 55:13
following 57:2
follows 6:3
force 3:13
foregoing 64:10 101:9
form 3:9 18:8 43:9 47:5 50:7
  51:5,19,20,21 52:17 68:1
  78:14 80:17 91:2
formal 19:2,5,7,11,19 59:11
forms 85:11
forth 93:7 95:14 97:8 98:16
  98:19 101:13
forward 29:21 70:1,4 71:23
forwarded 29:1,2,4
found 63:6,8 65:4,7 74:6,14
  84:24
four 86:22,24 87:1
frame 73:16
free 7:16,21
friendly 99:17
friends 93:6 97:20,24
front 38:3 64:6
full 12:9 41:5,19 60:15 61:7
fully 8:14
furniture 1:7 5:4,20 6:10,13
  10:10 11:15,18 13:10 15:6
  20:6,9,19,22 21:1 23:17
  24:8 26:5 30:19 31:18 36:5
  61:6,11,21,22 66:4,12,15,16
  67:13 68:9 69:13 72:4,8
  74:13,14 76:6 80:3 88:17
further 3:8,11 45:18 46:23
  91:22 99:11,12 100:1 101:9
  101:14
FWD 29:13

G

gathered 78:3
gathering 78:12,19
GCE 10:24
generally 12:23 17:7
generate 18:11 50:2,5
generated 85:17 86:19
generating 50:3 76:22

George 2:5 4:4 5:15 6:7 14:5
    17:6 39:6
give 6:24 18:14 23:19 37:5
    40:21 41:2 51:2 55:7 96:12
given 7:19,20 34:14,16 43:20
    46:16 62:9 63:25 73:22
    75:25 76:1 82:10 89:12
giving 7:6
go 9:23 16:1,4,21 21:25 43:13
    52:3 54:22 55:10 59:6
    73:24 83:11 85:19,20 89:15
    93:8,11,17,19 95:14 97:8
    98:15,19
God 34:10
going 5:12 6:12 7:3,13 13:7
    13:21 16:2 21:10 22:3,12
    26:24 55:5 63:11 69:1
    74:16,25 75:6 81:8,11 86:12
    89:18 96:13 98:13 100:8
good 6:6 34:10 92:9 93:6,9
goods 72:6
grabbed 37:25
graduate 9:21
greeters 37:24
Greiner 1:15 2:7 5:8,19
grow 92:22
guess 13:3 55:3,7
Guide 4:10
Guinea 95:12,13 98:13

H

H 4:8 102:1
H-O-A-N-G 32:5
Hackensack 1:16 2:8
hand 43:2
handbook 13:12,18,19 14:1
    14:12 16:2,2
handed 39:4 42:24 43:1
handled 39:4
hands 24:18 27:19
happen 16:24 62:15 74:16
happened 24:10 40:11,14
    42:22 43:17,22 80:21
happy 24:15 27:16
harassed 16:11
harassment 14:16,25 15:8,8
    16:8,9,12,17 17:14 18:3,8
    18:25 19:10 32:9
hard 29:14 37:19 87:5

hate 95:12
head 7:10,11 37:10,25 41:8
heading 68:5
heads 96:12
hear 7:15 89:6,10 90:19
    99:19
heard 90:18,20
held 1:14 5:7
help 34:25 80:19,19
hereinbefore 101:12
hereto 3:5
highest 9:11
hire 16:3
hires 15:11,16
Hoang 31:25 32:1,2,6,9 37:16
    40:8 42:20 43:5 47:2 52:16
    53:17 54:10,19 58:1 59:5
Hoang's 36:17 37:7 53:22
    59:8,20
hold 10:17,25 22:12 80:6
    86:3
Home 5:21
HOMESTORE 1:7
honest 47:8 82:24
honestly 36:25
hookah 93:14
hostility 15:1
hour 12:1
HR 10:16,22 11:21 12:16
    13:10 15:25 16:5 25:20
human 9:18 16:13 25:2 72:16
    97:12

I

idea 21:22 57:12
identification 13:16 28:3
    33:23 44:20 63:15
immediate 16:21,25
immediately 44:14 77:21
    84:15
important 83:23 84:1
impression 92:8
in-person 57:13
inappropriate 57:23 97:15
incident 19:10 30:20 38:20
    38:23 42:6 80:23,24
include 41:14
including 47:14
incorrect 54:17

indication 51:18
Indirectly 99:9
individual 15:2 19:8,17
    93:24
Industries 10:24
inferences 88:4
inform 16:12 18:1,7,9 38:25
    53:21 54:3 57:24 71:11,13
    83:9
informal 6:24 19:15 20:25
information 9:2,7 18:15
    40:22 41:1 43:12 44:15
    54:16 63:24 65:4 67:23
    68:6 73:25 76:4 78:2,9,13
    78:20,21,22 84:19,21 87:23
    88:5
informed 49:12 56:5 72:18
    72:21 73:14 75:8 89:11
informing 56:3
initially 72:8
instance 16:17 18:2
instruct 53:16
instructed 67:5
instructions 57:3
interested 101:19
internal 77:22 84:16
interrupt 31:10 68:21
interview 92:3
interviewed 11:6 47:12,13,20
    50:22 56:20,24
interviewing 11:17
interviews 48:10
investigate 62:17,22 73:18
investigated 64:25 74:2
investigating 61:10 62:13
investigation 16:9 17:16,18
    17:21 18:11,24 40:19 43:7
    45:18 46:23 47:11 48:5,7,16
    48:25 49:6,12,15,18,24 50:2
    52:8 55:12,22 56:6,13 58:6
    58:9 59:15 74:20 75:11,14
    75:19 78:8 82:20 83:20,25
    84:3 87:8
investigations 61:14 88:11
invoice 73:22,25 76:22 77:20
    77:21 84:14,15 85:16,17
    86:19 87:4,9,14
invoices 75:21 76:25 84:11
    84:20,22 85:12 88:6

involved 17:22 61:13,16,17
    61:18,23 76:8 78:7,12,19
    95:6
involving 62:18 68:15 71:24
Islam 96:17
issue 59:9,21
item 87:2
items 61:3 62:24 63:7,9

**J**
Jackie 72:12
Jacqueline 72:13,15
January 58:18,22 59:25
    62:21 67:14 73:6,12 74:3,9
    77:8,12 79:24 80:2
Jerry 29:13,19,19 34:12,16
    60:6,8 65:3,22 66:6 71:15
    72:23 74:10,19,23 78:3 85:6
    85:21 92:20,20,24,25
Jersey 1:1,14,16 2:8 5:5
    101:5
job 20:12
jog 80:7
joining 10:20
joking 98:8,10
July 22:21 23:6 24:22

**K**
keep 49:11 56:5
kind 13:4 20:2 88:2
knew 80:12 97:20,21
know 8:25 11:18 20:12 21:19
    21:21 22:13 24:2 29:4,7,14
    33:13 34:11,13,18,19,20,24
    35:2,8,10,16,19,23,25 36:1
    36:3,4 37:12 38:15,16,19,22
    39:10 41:5 42:22 44:7
    45:21 46:1 48:1 50:18 51:1
    54:12,20,23,24 55:2,3,4,9,9
    61:5,7 63:8,10 65:13,14,16
    65:23 66:10 67:20,21,25
    68:13,16 69:16 70:17,24
    71:16,18,19 72:11 73:2 74:2
    74:5,15 75:15,17 76:8,11,15
    76:18,20,23 78:17 80:5 81:6
    81:13,22 83:2,5,21,21 85:8
    86:21 90:13 93:11,13 94:2
    94:21,23 95:20 97:23 98:2
    99:15,18

knowledge 64:11 93:3
known 73:3

**L**
L 3:1,1
Labor 11:25
lack 34:23
Ladin 96:9
lasted 48:16,23
lawsuit 6:9
lead 45:20 52:24 74:10,20
leads 17:25
leave 22:17 23:4 24:24 88:19
left 42:25 43:3 68:21 80:15
    81:4
legal 5:9,11,21 45:20
let's 21:11 56:11
letting 59:6
level 9:12
liberal 59:5
limited 59:7
line 16:10 45:7 59:6 70:10,11
    87:2 98:22 102:3
list 85:23
listening 74:11
literally 24:24
literature 90:7 91:1
litigate 59:22
little 37:21 86:14
Liz 12:8 16:5
Liz's 12:9
LLC 1:6 5:20
location 99:4
long 7:24 10:25 23:4 31:3
    33:17 37:1 44:6,12 48:4,6
    54:22
longer 21:10 48:17,22,23
    74:15 84:6
look 28:14 29:10 37:14 62:16
    62:24 65:17 70:8 73:5
    74:25 78:18 80:6 86:23
    88:1
looked 30:6 75:23,24 84:19
    85:5,6,6,7
looking 28:23 72:5 75:20
    88:1,3
looks 13:19 28:10,15 29:2
    45:3 86:22
lot 96:25

lounges 93:14
low 37:21
luck 34:10
lying 46:11

**M**
M 29:13
Main 1:15 2:7
making 11:25 19:7 24:15
    26:2,5 46:10 53:18 54:13
Man 90:10,11,15
management 16:14
manager 10:16,22 11:21
    12:16 16:21,25 17:1 20:14
    21:17,18 23:12,13 25:21
    26:13 27:24 33:3 92:14,16
    92:23
managers 33:1 36:17
manner 52:10
Mansour 1:3 2:14 5:3,16,17
    6:8 31:13,16,20 33:5,8
    35:22 36:2 38:11,18 41:23
    42:5,16 43:6 45:15 55:14
    56:4,16,19,22 57:1,10 58:18
    58:22 60:24 62:18 66:20
    67:14 70:14,23 71:2,8,17,20
    74:15 77:3,19 78:24 79:8,10
    80:12,15 81:4,13,23 82:22
    83:3,6,10,13 84:2,9,13 89:7
    89:11 93:2,22 94:25 95:4,15
    95:18,25 96:5,8,12,17 98:5
    98:20 99:6,16
Mansour's 71:3 83:18 94:17
    95:6,9
mark 1:3 5:17 6:8 12:20
    13:13 18:6 20:16 26:20
    28:1 29:13,20 30:6,7,8,12
    33:20 34:16 44:17 46:6
    60:7,21,21,23 63:12 65:2,20
    71:15 75:2,4 83:4 85:7 92:4
marked 13:15 14:15 28:2
    29:10 33:22 34:5,7 44:19
    63:14
Mary 31:21 78:6,7 85:6,21
masters 9:13,15 10:8
match 76:6,13,21 77:4
matter 5:3 17:10,12 61:9
meals 93:14
mean 11:24 12:22 21:5 52:2

71:3 75:8 80:20 81:21 82:7
91:6,7 93:15 98:11
means 34:11
meant 12:25
medications 8:6
meet 31:20 41:25
meeting 26:6,22 30:16 40:12
42:3,16,20 58:17,21,24,25
59:24 60:5 62:21 63:5,6
64:23 67:14 71:14 73:12,17
73:19 74:3,8 81:5
meetings 42:13
member 16:13
memorialize 59:13
memorialized 59:16
memory 29:17 36:22 45:9
80:7
men 93:4
mention 77:2,6,10
mentioned 23:10 47:14,17,18
60:13 90:21,22 95:3
mentor 92:23
merchandise 61:25 62:7
merchandising 60:20
message 29:22 34:9 79:20
messages 28:22,25 29:18
30:2 81:10
messaging 28:16
met 6:6 40:8 41:23 43:5 73:6
74:6
metal 96:4
MICHAEL 1:12 101:3,22
middle 86:10
Mikael 5:11
Mindy 31:25 37:16 38:12
42:4 46:16 51:24 52:3
57:19 59:5
minute 37:17 39:3
minutes 68:21
Mirror 90:10,12,15
missing 61:4 62:15 63:7,9
65:11 70:21 85:14
Mohammad 1:3 2:14 6:8
98:12
Mohommad 5:17
moment 6:7 13:20 21:11 24:7
30:15 44:21 46:24 47:16
52:6 89:16 95:3
money 23:15 61:17,24 62:6

62:14 77:20 84:14
month 48:22,24 58:9
months 58:12,15
Moses 1:3 5:16,17 6:8 20:16
20:21 21:12,13,16 22:13
23:16 24:8,10,21 25:2,9
26:6,20,25 27:3,13,21 30:8
30:15,18 31:11 34:16 92:4
94:11
motivate 35:1
move 47:2 59:4 70:1,3 71:23
moved 57:19 58:1
moving 27:5 31:11 46:22
47:10 59:24
multiple 25:8
Muslim 94:4,22
Muslims 96:18

N

N 2:1 3:1 4:1
name 5:8 6:7 11:9 12:9,12
19:22 20:1,16 28:10 37:10
41:5,19 44:5,6 60:16 82:13
93:25
named 31:25 73:7 93:24
names 12:7
Nathan 52:2
nature 14:19
NE 28:17
need 59:22 80:9
needed 97:18
neither 101:14,17
never 56:24 81:15 99:21
new 1:1,14,16 2:4,4,8 5:5
15:11,16 16:3 101:5
nice 97:23
Nigger 99:20
nod 7:10
notary 1:13 3:13 64:7 100:22
101:4
note 45:3 59:4,8,13 85:25
notebook 51:7
noted 59:12 100:9
notes 42:12,16,19,23 50:20
51:11,14
notice 1:11
notified 38:18
notify 38:14
November 1:16 36:21 37:23

number 15:2 37:5 69:1,5
82:15
numbered 66:24
numbers 85:18
nurture 92:23

O

O 3:1
oath 6:21
object 43:9 47:5 59:19
Objection 52:17 68:1 78:14
80:17 91:2
objections 3:9 59:7
observed 16:12
obtain 9:19 10:2 76:21
obtained 76:15
obviously 18:21 27:10 40:20
46:12 52:20 54:15
occur 17:7
occurred 17:5 36:23 43:24
80:12
occurring 81:1
offend 98:1
offer 76:12,21
offers 76:6
office 16:19 25:20,22 43:4
offices 1:14
oh 30:13 43:11 58:20 77:15
93:6
okay 6:13 7:7,12,22 8:5 13:1
13:23 14:10 29:16 34:8
43:11 55:4 59:3 64:3,20
86:13 88:15 92:6 93:1
omit 67:22
once 90:20 96:25
One-page 4:12,14
ones 84:23
ongoing 48:25 49:15
opinion 45:7,16 98:21
opposed 61:25 62:7
opposite 46:15
option 46:16 89:2,12
order 18:23 76:12 78:17
orders 75:24
orientation 15:19
originally 29:8 52:3
Ottinger 2:3 5:16
outlined 62:3
outside 70:12 97:4,24

outside-of-work 93:10
overseed 11:22
owner 11:14 17:20 18:1,14
    18:21 46:5 49:9 69:25 75:1
    75:5 91:11

## P

P 2:1,1 3:1
P.C 1:15
p.m 1:17 5:13 22:6 33:24
    34:2 69:1,6 86:25 89:18,20
    100:8,9
page 4:3,9 14:15,24 28:10,14
    29:10,12 34:9 37:14 64:1
    66:24 77:16 102:3
pages 13:22 64:19
paid 65:12 82:6,7
paper 50:18,18 51:6
paperwork 16:3
paragraph 16:8 45:6 64:9
    66:3 70:8 71:1 73:5,10
    77:16 84:13 85:12
paragraphs 64:18 85:13
Paramus 46:17,22 52:4 54:11
    54:21
Park 2:4
part 24:18 27:7,19 81:17
participate 75:13,18
participating 60:5 88:10
particular 16:10 62:18
particularly 62:23
parties 3:4 38:13 101:16
partner 75:4
partnered 75:1,3,10
party 87:25
pass 13:7 35:5
passed 28:4
pay 13:5
payment 65:15,24
payments 85:15
payroll 11:23
PC 2:3,7
PCS 28:16
penalties 6:25
pending 8:1 91:23
people 12:3,4 17:22 47:11,17
    47:18,19,20 50:22 61:19
    72:10,23 78:16 81:16,18
    85:5 88:10 98:18

period 14:9,11 47:15
perjury 6:25
person 19:21 25:18,19 40:9
    46:13 47:13 48:11 53:8
personal 51:21 82:4
personally 16:19
Phoenix 9:24
phone 24:19 48:13 55:16
    56:1 57:14 82:1,4,5,7,10,12
    92:5,8
physical 14:19,25
piece 50:17,18 51:6 65:3,5
pieces 63:7,9 65:11,12,15,24
    66:4,11,16 70:19
place 48:5 75:11 91:16 96:4
    101:12
placed 37:10
plaintiff 5:3 99:12 100:3
plaintiffs 1:4 2:2 5:16
play 52:22
please 7:15,21 80:8 86:18
point 24:14 27:15 29:11
    52:22 55:15,17 84:5
pointing 86:1
police 66:20 68:9,13,18 69:14
    70:4 79:15,18 83:6
policies 13:11 17:10
policy 17:13 61:9 69:13,18,24
poor 86:14
portion 82:7
position 10:21 11:1 12:16
    21:17,18,18 27:24 46:13
    61:18
possibility 76:24
possible 23:6 29:23 32:17
Possibly 74:4
posters 11:25
Povanelli 12:10 16:6
power 46:3
practice 17:12 53:20 68:8
Precisely 17:9
predominantly 61:23
prepare 9:1
presence 96:23 97:4,16
present 2:12 53:10 66:7,9
    99:16
presented 89:1
pretty 74:11
previous 7:19 10:21

previously 7:21
price 76:6,12,21 77:3
prior 10:20 11:17 73:17,19
    77:8,12 79:14 81:1 83:6
    101:5
privilege 8:3
probably 44:10,14 51:20
problem 19:17 20:4 97:22
procedure 17:17
proceed 5:25
proceeded 40:17
proceeding 56:14 57:7
process 15:20 16:17 18:24
production 59:15
Professional 1:12 101:4
progress 29:15 49:12 56:6
promptly 16:12
pronounce 44:7
protocol 87:17,19
provide 13:10 15:7,12
providing 5:21
public 1:13 3:13 64:7 100:22
    101:4
pull 17:23 43:16 78:10
pulled 38:1 62:24 76:3 78:9
pursuant 1:11
put 16:20 27:23 36:10 40:16
    51:14,17 78:3
putting 46:13

## Q

question 3:10 7:5,13,15 8:1,3
    13:3,4 22:9 30:5 39:7 62:19
    67:11 69:9 81:16 83:25
    85:9 89:5,23
questioning 59:6
questions 6:16 7:3,9 8:13
    13:21 14:7 49:17,21 56:13
    56:17 91:22,23 94:9 99:12
    100:1
quick 13:20 80:6 92:2
quickly 48:9 99:1
quite 52:4

## R

R 2:1 3:1 101:1 102:1,1
R-A-Z 41:22
raise 76:24
raised 82:20 91:20

Ramona 66:2 80:23
Raz 37:9,25 41:14,15,16,17
  47:3 52:10,12,16 53:17
  57:22 93:24
Raz's 94:2
read 22:8,10 34:17 35:4
  37:19,21 44:14 67:15 69:8
  69:10 86:22 90:13,18
reading 34:13
reads 45:7
real 80:6 83:16
really 7:10 44:6 73:24 74:10
  79:1 81:15 87:5 92:2 93:15
reason 8:12 23:19 84:7
recall 26:10 46:2 72:2 93:25
receive 9:14 12:15,22 20:8
  30:2 66:4,13 72:5
received 33:7,10 66:11
receiving 28:21 44:25
recognize 28:7 36:13 44:23
  63:20 66:25
recollect 36:25 37:8
recollection 38:5 64:21 73:13
  79:17 86:16
recommend 35:6 52:14 90:3
  90:6
recommendation 45:21 46:7
  46:18,25 54:10,18
recommendations 49:14 90:1
recommended 46:14 92:10
record 5:12,14 22:4,5,7,10
  30:4 33:25 34:1,3 37:22
  59:4,8,18 65:14,24 69:2,3
  69:10,12 85:15 86:1 89:16
  89:18,19,21 100:8
records 62:16
recruiter 11:7 12:8 15:25
recruiter's 12:11
recruiting 11:23
reduce 50:6
refer 6:12 64:17 66:22 86:8
reference 67:12 80:22
referenced 66:3
references 95:10
referencing 13:18 86:9 95:23
referring 11:11 14:8 50:22
  60:21,23 75:11 85:4 95:18
reflected 69:18
reflecting 18:12

refresh 29:17 36:22 38:5 45:9
  64:21 73:13 79:17
refrigerator 98:14
regarding 19:7 31:21 67:17
  68:6 78:13 89:8 93:24
regards 26:20
Registered 1:12 101:3
regulations 12:1
relationship 93:4,10 97:24
  99:17
relative 101:15,17
relevance 59:19
relevant 83:19
religion 35:12,15,20 94:2
  95:6,9
religious 35:3,9 91:1,10
  94:14,19
remark 91:12
remember 10:7 11:8,9 12:7,9
  12:11,14 22:19,24 23:2 24:5
  24:23 25:15,17,23 26:8,15
  28:21,23 29:6,24 30:3,5,21
  31:3,23 32:13,15,23 33:18
  37:1,9 38:10,24 39:16,18,20
  39:21 40:5,7,24 41:3,7,9,10
  41:19 42:1,2,5,7,9,15,18,19
  44:2,5,8,12,25 45:12 47:4,6
  47:8,11,19,22 48:1,3,8,14
  48:21 49:3,7,16,20,23,25
  50:3 51:8,10,19,22 53:11,25
  54:2,6,8,12,20,21 55:15,19
  56:7,15,18,19,21,22 57:1,9
  57:15,16 58:3,4,13,14,16,17
  58:21 60:3,4,10,15 61:1
  63:2 64:25 67:15 70:5 72:7
  72:20,21,22,24 74:21 76:17
  77:1 79:9,10,12,21 81:17
  82:24 83:1,8 85:21 90:5,9
  91:15,17 95:2,5,15,17,22,24
  96:2,3,6,7,10,11,15,16,19
  98:25
remove 55:17
removed 23:12
rephrase 7:16 13:5 47:1
  53:15
report 17:14 18:2,11 50:2,4
  69:13 70:2,4 79:15,18 83:6
reporter 1:13 5:10,24 7:6,9
  12:20 13:7 32:4 33:20

39:12 41:21 44:17 63:12
  101:4
reporting 16:9,17 18:25
represent 6:8
representation 5:22
representative 97:12
represented 8:17
request 49:11
requests 14:18
require 76:12
reserved 3:10
resign 24:9 88:21 89:2,12
resignation 88:24
resigned 71:8,17
resigning 71:4
resolution 37:20 86:13
Resource 4:10
resources 9:18 16:13 25:3
  72:16 97:12
respect 15:7 62:6 93:2,3
respective 3:4
respond 19:13,14 27:9
response 17:14 19:12 30:1,5
  38:9 39:19 54:7 68:9,14
  74:18,22 81:14 91:13
responsibilities 11:20
responsibility 62:2,6
responsible 24:3
results 71:14
retail 43:14 44:2
returned 33:15 37:2 38:8
  39:2 44:13
review 9:6,9 13:20 37:18
  44:22 80:9
reviewed 9:4
revised 14:4,12
rhino 34:10,12,21
rhinos 34:20
right 10:7 17:11 19:13 22:17
  27:8 31:1 41:12 45:5 50:23
  55:23 59:23 73:21 80:5
  85:3,16 86:10 90:24
Ritson 2:8 4:5 5:18,18 8:21
  12:21 13:1 14:5 17:6 19:24
  30:4,11 31:5 39:6,9 43:9
  47:5,7 48:18 52:17 55:2
  58:19 59:1,3,18 61:20 63:16
  68:1 78:14 80:17 85:25
  86:4 91:2 92:1 94:5 99:14

100:1
Ritson's 91:23
Robin 37:25 41:4 48:15
Robin's 41:5
role 13:25 15:15,18 61:10
room 15:22 66:9 81:1
RPR 101:22
Rusee 31:21 78:6,7,11

**S**
S 2:1 3:1 4:8 102:1
sake 7:5
Sal 72:12,24 73:4,23 93:2,22
    95:13 98:9,12
sale 75:24 77:7
sales 15:21 21:17,18 23:12,13
    25:21 26:13 27:24 32:7
    33:1,3 41:17 60:11 76:11,20
    77:11,19,21,22 84:13,15,16
    84:20,22 86:11 87:17,20
    92:11,14,16,23
Salvatore 19:22
sat 17:4
save 63:18
saw 30:15 40:20 51:2 72:9
    92:20
saying 96:16
says 16:11 28:15 29:13 36:20
    37:15,23 64:9 73:5,11 77:17
    86:11
scenario 16:22
schedules 46:15,21 47:3
scheme 61:7
school 9:23
Sciarrino 19:22,24 20:5,10
    26:14,17,23,24 30:15 31:12
    31:22 33:6,8 38:11,17,20
    41:24 42:9,17 43:6 55:12,14
    56:4,11,12 57:11 73:11 93:3
    95:4,17,22,24 96:7,11,16
    98:7 99:7,16,19
Sciarrino's 20:12
Scott 18:6,7 38:25 39:14,18
    40:2 60:22,23 75:4,16 83:4
    83:5,9,19 85:7 89:1,7,11
screen 92:5,8
sealing 3:5
Secaucus 1:6 5:20 6:10 73:7
second 16:10,22 22:1 37:14

45:6 70:10
see 28:9 43:16 51:3 59:19
    85:23 87:5
seeking 27:22
seen 26:21 28:12 86:16
self-motivational 34:13
send 18:13
senior 16:13
sense 34:25,25
sent 28:25 29:7,18 30:6 36:18
    36:20 37:2 45:4,13
separate 53:6,7 55:25 97:17
separately 38:13 41:25
series 4:11 28:4
set 101:12
setting 6:24
sexual 14:16,17,18,19 15:8
shake 7:10 24:17 27:18
she'd 46:11
shortly 10:8 21:9 23:3 58:5
    63:4 79:12,21,23 80:15
show 77:18 84:23
shows 15:1 86:15 87:2,6
sick 8:10
side 84:5
signature 64:4
signed 3:12,14 64:6
significance 34:21 35:3,9
simply 57:2 78:20,22
sit 18:14 71:7 87:12
sitting 8:20
six 23:5
solution 50:9
somebody 54:16
somewhat 6:23
soon 39:2
sorry 21:24 25:5 30:13 31:6
    32:22 39:8 47:24 58:20
    68:20 77:15
sort 18:12 49:20 95:8 97:13
    98:15,24
sorts 99:7
sought 77:3
speak 17:22 78:24 79:1,2,21
    82:23 83:12,24 84:2,8
speaking 86:4
specialist 5:10 43:15 44:3
    60:12
specifically 12:25 13:21

14:15 24:16 35:19 42:15
    61:22 68:3,5 70:5,17 75:22
    80:20 86:8
specifies 14:20
specify 14:8
spoke 38:11,12 43:19,20 44:8
    83:2,5
spoken 56:23
Sprint 28:16
stage 66:19
standard 17:17 51:5
standing 37:24
start 17:15,21
started 99:2
state 1:14 5:13 12:1 54:16
    71:2 101:5
statement 51:9 67:4 68:4
    71:3
statements 50:13,15 52:24
    59:16 64:10,16 97:3
States 1:1 5:4
stating 19:6,10 50:9
station 37:24
stenographically 101:11
step 17:13 43:7,8,11,25
steps 75:7
stern 52:19 53:2
STIPULATED 3:3,8,11
stolen 66:17
store 5:21 20:14 21:17 23:12
    38:2,4 54:21 55:10 73:7
straight 38:12 80:2
Street 1:15 2:7
strike 13:24 35:18 38:20 50:5
    71:11 79:6 81:19 88:25
    95:16,23 96:20
study 9:25
subject 6:25
Subscribed 100:19
Subsequent 21:3 56:3
subsequently 59:17 72:4
    80:25 82:19 94:13
substance 37:6 42:3 51:23
    57:16 64:22 71:25 81:9
    83:10
substantial 54:16
suck 38:2
sufficient 87:23
suggested 54:19

suggestions 52:1
supervise 12:2
Support 5:9,12
supposed 17:1
sure 7:17 11:25 37:4 39:6,10
    76:19 78:17 87:3 89:17
    97:11 99:3
surgeries 22:22
surgery 23:1,1
surprise 57:5 71:19 89:6,10
surprised 89:14
suspend 45:7,16,23 46:9,11
suspending 46:2
swear 5:24
swearing 64:14
sworn 3:14 6:3,20 100:19
    101:7
system 76:2,2 77:22 84:16,25
    85:19,20,22 87:17,20

**T**

T 3:1,1 4:8 101:1,1 102:1,1
take 7:23 8:1 13:6,20 16:22
    18:16,18,19 26:24 37:17
    42:12 43:25 44:21 48:5,7
    56:11 58:12 68:23 70:8
    80:8,9 81:24 86:18
taken 1:10 5:2 22:5 37:10
    50:15 52:15 69:3 101:11
takes 81:16,18
Taliban 95:18
talked 17:4
talking 17:10 37:24 39:13
Tamer 60:7 65:2
Tamer's 60:15
team 26:6 30:16 43:14 88:13
Ted 44:4,9 60:7,12 65:2
telephone 25:18 54:3,5
telephoning 70:12
tell 8:23 17:19 22:16 23:9,16
    24:3,11 39:14 40:13,15
    47:24 57:20 63:23 74:17,19
    80:21 90:11,25 97:6,9 98:18
    99:22
telling 19:16 55:16 56:19,22
    57:1
terminate 27:2
terminated 21:12,13 24:8
    71:21 89:2,13

termination 52:25
terms 53:14,18 75:5
terrific 13:14 22:11
terrorist 95:14 98:17
testified 6:3 24:7 27:6 30:14
    47:16 71:20 89:24
testify 8:8 101:7
testifying 6:20 7:1
testimony 6:24 7:20 81:3
    85:10 90:14 93:23 101:10
text 79:5,6,8,20 80:14 81:10
texted 79:11 81:4,7,7
thank 12:24 13:8 14:6 20:3
    30:9 33:20 44:18 86:6
    100:3
theft 58:23 61:10,12,15 62:6
    62:7,18,20 67:13 68:10,14
    70:15,18,22 73:15 89:8
thefts 62:13 69:13
themes 90:16,23
thing 7:25 24:12 39:4,4 98:9
things 48:9
think 8:12 15:22 34:22 41:12
    47:16 54:24 58:9 60:19
    61:20 73:23 83:18,23 84:1
    87:13 97:13
thought 54:25
three 12:6 41:13 47:17,18,20
    58:14
Thursday 1:16
time 3:10 7:18 11:7,9 12:6
    14:7,7,9,11 15:7 24:17,20
    25:23 27:12,18 31:10 33:1
    36:24 40:1,20 41:24 43:15
    43:21,22 44:1 46:15 47:14
    47:15,21 53:22 54:22 62:16
    65:23 66:15 73:16 76:3,18
    76:19 78:4 80:5,8,9 82:2
    86:18 88:24 94:3,10,17
    95:11 96:24 97:1 98:5,20
    99:16 100:4,9 101:12
times 93:13 95:20
timing 45:10
title 10:15,17 20:13 24:1
    34:19 43:15 60:10,18
today 5:10 7:18 8:6,10 9:8
    37:23 55:8 71:7 87:12
today's 6:11 9:1 55:6
told 22:15 26:19 38:1 40:16

71:16 81:24 94:24
tonight's 8:18
top 28:9 36:20 41:8
touch 49:1,8
trail 84:24 86:21
training 12:15,22,23 13:10
    15:7,13,16,23 16:1,4
transcribe 7:10 39:12
transcript 101:10
transfer 46:17 51:20 52:15
    54:10
transferring 51:24
trees 63:19
trial 3:10
tried 24:13 36:2,5 44:7 74:23
    76:1
trigger 18:23
true 55:6 64:11 101:10
truth 64:14 101:8,8,8
truthfully 8:8,14
try 17:23 48:8 76:2 82:25
    84:4
trying 43:11 63:18 80:7,14
    81:24 83:1
Tuesday 36:21
tunnel 96:13
turn 34:4,6 36:11
two 11:2 15:23 22:22 58:12
    72:9,23 77:18 85:12
two-page 36:12
type 34:22 52:21 61:12,15
    78:10

**U**

U 3:1
U.S 5:9,11
ultimately 88:9 92:15
um 98:12
Um-hum 33:16 51:13
uncomfortable 91:9
understand 6:19 7:15 27:16
    64:13 69:15 71:10 81:19,20
    88:3
understanding 8:16 69:23
    71:8
understood 7:14 71:2
unfortunately 43:17,23
unhappiness 25:10
unhappy 21:14,15,16 22:14

22:15 23:10,11,20
**United** 1:1 5:4
**University** 9:16,24
**Unwelcome** 14:17
unwilling 51:9
upset 24:11 74:12 96:8
use 99:19
usually 15:24 40:3,3 42:14
  51:6

---
**V**
---

**vacation** 32:12,20 33:11,14
  37:3 38:9 45:10
**vague** 13:4
**validate** 43:12,18,23 52:23
  57:22 88:2
**validating** 52:10
**Vallas** 2:5 4:4 5:15,15 6:5,7
  12:19,24 13:13 17:9 22:2,8
  22:11 27:25 30:9 32:4
  33:19 39:11 41:21 44:16
  48:20 59:12,22 61:20 63:11
  63:18 68:23 69:8 89:15
  91:22 94:7 99:11 100:2
**vendor** 70:13
**verbal** 14:18,25
**verbally** 7:9
**verbatim** 37:12
**versus** 5:3
**video** 5:10 17:23,24 21:25
  22:4,7 31:7 34:3 43:16,16
  43:17 69:2,7 89:18,21 100:8
**Video-Deposition** 1:10
**Videographer** 2:13 5:1,23
  21:24 22:3,6 33:24 34:2
  68:20,25 69:4 89:17,20
  100:6
**videotape** 5:2 69:6 100:7
**vision** 86:11
**vs** 1:5

---
**W**
---

**wage** 12:1
**Wait** 22:21
**waived** 3:7
**walk** 88:2
**walked** 24:25 60:6
**walking** 80:25
**want** 6:15 7:18 8:23 12:13

16:22 27:23 39:9 43:25
  48:15 52:5 55:7 59:3 70:1
**wanted** 27:23 46:17 55:10
  74:15
**wanting** 52:3 54:22
**wasn't** 46:1 84:9 88:7 97:1
**way** 17:24 38:12
**ways** 24:18 27:7,19
**We'll** 46:24
**we're** 5:12 27:16 44:17 51:4
  51:24 63:13 69:1,6 89:18,21
**wearing** 61:19
**week** 15:23 48:17
**weeks** 23:5
**went** 16:24 21:17 38:12 69:11
  85:22 93:8 97:21
**weren't** 50:19 68:13
**Williams** 1:12 5:11 101:3,22
**willing** 50:19
**winter** 32:17
**withdraw** 24:6 26:3 62:19
  67:11 69:21 83:25 89:4
  91:18
**withdrawn** 48:5
**witness** 4:3 5:24 6:2 13:3
  30:8 59:2,15 86:1,3 101:7
**witnessed** 17:23
**witnesses** 40:18,25 41:2,7
  43:19 56:20,23
**word** 34:23 99:20,23
**words** 51:2 95:12
**work** 11:3 15:20 30:19 46:15
  61:19 88:16 92:21 93:8,12
  97:25 98:1
**worked** 78:17
**working** 93:9 99:2,3,4
**Wright** 72:13,15
**writing** 16:20 50:7 51:7
  59:14 69:19
**written** 18:25 19:2 52:21
**wrong** 65:8,10
**wrote** 37:16

---
**X**
---

**x** 1:2,9 4:1,8

---
**Y**
---

**yeah** 45:2 87:4 93:6
**year** 10:6 22:23 32:15 58:19

**years** 10:12 11:2
**York** 2:4,4
**Yousef** 71:24 73:8 83:24
**Yousef's** 72:19
**Yousefs** 73:17 74:9 75:25
  77:4,8,11,20 79:22 80:3,13
  82:21 84:14,22
**Yup** 28:11

---
**Z**
---

---
**0**
---

**07601** 2:8

---
**1**
---

**1** 4:10 12:20 13:15 64:19 69:1
**10** 48:2
**10/18/11** 4:11
**10016** 2:4
**11** 23:2
**11/13/2014** 5:8
**11/23/11** 4:13
**11/28/11** 37:16
**12** 77:15,16 84:13 85:12
**12/2/11** 4:14
**13** 1:16 4:10
**13-cv-2443(SRC-CLW)** 1:4
  5:6
**138** 86:21
**139** 86:21
**17th** 67:14 79:24,25 80:2,15
**18** 73:12
**18th** 77:8,12
**19** 73:6
**19th** 74:3,9

---
**2**
---

**2** 4:11 28:1,2 34:7 45:4 64:18
  64:19 69:5
**20** 67:7 79:19 100:20
**2000** 58:20
**2009** 9:20
**2010** 10:14,20 14:9 23:1
**2011** 23:7 24:22 32:18 36:21
  37:23 45:4
**2012** 10:14 14:9 22:22,23
  23:2 32:16 58:22 67:8 73:6
  73:12 79:19 88:20
**2013** 22:21

**2014** 1:17
**21** 1:15 2:7 64:9
**28** 4:11 37:23
**29** 36:21

---
**3**
---

**3** 4:12 33:20,22 34:5 36:12
  66:3 70:9
**33** 4:12

---
**4**
---

**4** 4:14 44:18,19 71:1 77:16
**4:39** 86:25
**401** 2:4
**4200383** 87:4
**430** 87:2
**438** 87:3
**439** 87:3
**44** 4:14

---
**5**
---

**5** 4:15 63:13,14 64:18
**5:49** 1:17 5:12

---
**6**
---

**6** 4:4 14:15 64:2 73:5
**6:10** 22:3
**6:11** 22:6
**6:26** 33:24
**6:37** 34:2
**63** 4:15

---
**7**
---

**7:15** 69:1
**7:28** 69:6
**7:50** 89:18
**7:57** 89:20

---
**8**
---

**8:08** 100:8,9
**830** 87:4,5
**8607707449** 28:15

---
**9**
---