IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MOHAMMAD MANSOUR and MARK
MOSES,

Plaintiffs,

v.

FACTORY DIRECT OF SECAUCUS, LLC
d/b/a ASHLEY FURNITURE
HOMESTORE,

Defendants.

ECF CASE

Civil Action No. 13-cv-2443-SDW-SCM

**RESPONSE TO COUNTER-STATEMENT
OF FACTS**

**DEFENDANT'S COUNTER-STATEMENT OF PLAINTIFFS' SEPARATE
STATREMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS**

In opposition to Defendant's motion for summary judgment, Plaintiffs submit a separate

statement of facts based almost entirely on Plaintiffs' affidavits and not from the documentary

evidence and the depositions of either Plaintiffs or the other players in this lawsuit. Although

Defendant countered those facts stated in Plaintiffs' affidavits, the facts should be rejected

outright because they result from "sham affidavits." The "sham affidavit doctrine" states that a

party's affidavit contradicting his prior deposition testimony does not create a factual dispute

barring summary judgment.

|  | Plaintiffs' Separate Statement of Disputed and Undisputed Material Facts | Defendants' Counter-Statement of Facts |
|---|---|---|
| 40. | Mr. Moses, an African-American Muslim, was hired in June 2011 as a Sales Manager at the Company's Fairfield store. Glatter Decl. Ex. B (Moses Dep.), at 45:11-16. | Disputed. Moses was hired as a sales manager in training. Horn Dec., Ex. 16 at 16:4-9, 22:16-19. |
| 41. | Beginning June 28, 2011, Mr. Moses reported | Disputed to the extent that this |

|  | | |
|---|---|---|
|  | to the Ashley location in Fairfield for approximately three days, getting to know staff and completing the onboarding process. While at Fairfield, Mr. Moses interacted with Mr. Cook about two times. And had no performance problems. Glatter Decl. Ex H (Moses Aff.), at ¶¶ 4-5. | purported statement of fact is incomplete. No one would expect any new hire to have performance problem during the onboarding process because that early time involved mere orientation with HR. Horn Reply Dec., Ex. 1 at 15:15-15:4. |
| 42. | On or about Monday, July 5, 2011 Mr. Cook requested that Mr. Moses meet him Ashley's warehouse and headquarters in Edison, New Jersey to learn the warehouse aspect of the business. Mr. Moses spent approximately two days at the Edison location. Other than a brief ten minute meeting with Mr. Cook in the morning of July 9, he had no in-person interactions with Mr. Cook and had no performance problems at the Edison location. Glatter Decl. Ex H (Moses Aff.), at ¶ 6. | Disputed to the extent that this purported statement of fact is misleading inasmuch as it implies that Cook was not involved in Moses's employment. To the contrary, it was Cook that wanted Moses to train for sales manager, Horn Reply Dec., Ex. 1 at 92:13-25, despite others at Defendant's company that thought from inception Moses would do better as a sales associate, Horn Reply Dec., Ex. 1 at 92:3-14.<br><br>Further, Moses had difficulty in performing his job from the start, despite Cook's attempts to help Moses succeed. Horn Dec., Ex. 16 at 23:4-24:16. |
| 43. | On approximately July 9, 2011, Mr. Moses was told by Jerry Cook that he would be sent to the Ashley Furniture in Nanuet, New York to learn the sales techniques and store processes. Mr. Moses was told to observe the store managers and assist in running the store. Mr. Moses never interacted with Mr. Cook and had no performance issues while at the Nanuet location. Glatter Decl. Ex H (Moses Aff.), at ¶ 7. | Disputed to the extent that this purported statement of fact is misleading inasmuch as it implies that Cook was not involved in Moses's employment. To the contrary, it was Cook that wanted Moses to train for sales manager, Horn Reply Dec., Ex. 1 at 92:13-25, despite others at Defendant's company that thought from inception Moses would do better as a sales associate, Horn Reply Dec., Ex. 1 at 92:3-14.<br><br>Further, Moses had difficulty performing his job from the start, despite Cook's attempts to help Moses succeed. Horn Dec., Ex. 16 at 23:4-24:16. |

| | | |
|---|---|---|
| 44. | On or about July 11, 2011, Mr. Moses was told by Mr. Cook to report to the Secaucus location *"to learn from Sal [Sciarrino] and Mohammed [Mansour]"* the Store Managers there. Mr. Moses was supposed to be in the Secaucus store for about three to four days, similar to my training at Edison and Nanuet, before returning to Ashley's Fairfield location to run the store as he was initially hired to do. However, he was never reassigned to the Fairfield store. Glatter Decl. Ex H (Moses Aff.), at ¶ 8. | Not disputed for purposes of this motion. |
| 45. | During his entire time at Ashley's Secaucus location, Mr. Moses interacted with Mr. Cook approximately three times. Glatter Decl. Ex H (Moses Aff.), at ¶ 9. | Disputed to the extent this purported statement of fact is misleading inasmuch as it implies that Cook was not involved in Moses's employment. To the contrary, it was Cook that wanted Moses to train for sales manager, Horn Reply Dec., Ex. 1 at 92:13-25, despite others at Defendant's company that thought from inception Moses would do better as a sales associate, Horn Reply Dec., Ex. 1 at 92:3-14. <br><br> Further, Moses had difficulty performing his job from the start, despite Cook's attempts to help Moses succeed. Horn Dec., Ex. 16 at 23:4-24:16. Contrary to Plaintiffs' attempt to minimize the interaction between Cook and Moses, Moses look to Cook as a mentor and business coach, even after Moses left Defendant. Horn Dec., Ex. 16 at 33:3-34:24. |
| 46. | When Mr. Moses's supervisor, Mr. Cook, introduced him to Mr. Mansour, he stated to Mr. Mansour that Mr. Moses is "one of your people" in reference to the religious faith of Mr. Moses and Mr. Mansour. Glatter Decl. Ex. A (Mansour Dep.), at 52:13-53:16. | Cook did not introduce Moses as being "one of your people." Horn Dec., Ex. 16 at 38:23-39:1. |
| 47. | Roughly one week into his training at the Company's Secaucus location, on or around | Disputed. Sciarrino did not converse with Moses about religion or race, or |

| | | |
|---|---|---|
| | July 12, 2011, Mr. Moses greeted Plaintiff Mohammed Mansour (who had just returned from a vacation) in Arabic on the Company's sales floor in the presence of Mr. Sciarrino. Upon recognizing that Mr. Moses speaks Arabic and is Muslim, Mr. Sciarrino responded with evident disdain, stating scornfully to Mr. Moses, "*Oh, you are one of those Muslims.*" Glatter Decl. Ex. B (Moses Dep.), at 46:6-25. | banter with Moses about religion or race. Horn Dec., Ex 17 at 40:11-24. |
| 48. | Beginning that same day, and continuing throughout the duration of Mr. Moses' employment at the Company, Mr. Sciarrino directed an unrelenting barrage of discriminatory and offensive racist and bigoted comments toward Mr. Moses on the basis of his religion and race, typically on multiple occasions each day, both on the sales floor and in the manager's office. Glatter Decl. Ex. B (Moses Dep.), at 47:12-48:21; Glatter Decl. Ex H (Moses Aff.), at ¶¶ 10-11. | Disputed. Sciarrino did not converse with Moses about religion or race, or banter with Moses about religion or race. Horn Dec., Ex 17 at 40:11-24. In fact, Sciarrino interviewed Moses and recommended him for the sales manager position. Horn Dec., Ex 17 at 38:23-39:5. |
| 49. | By way of examples only, Mr. Sciarrino frequently insinuated that Mr. Moses was a terrorist and enemy of the United States, demanding to know, for example, if Mr. Moses was carrying "a *bomb*" in his bag, or if he and Mr. Mansour were conspiring to wage "*jihad*," or "*making bombs*" as part of a terrorist plot, or, when Mr. Moses left the bathroom, comments such as "*I don't have to go back in the restroom and check, do I? There's no bombs in there?*" Glatter Decl. Ex. B (Moses Dep.), at 49:5-10. | Disputed. Sciarrino did not converse with Moses about religion or race, or banter with Moses about terrorism or bombs. Horn Dec., Ex 17 at 40:11-24.<br><br>In fact, Sciarrino interviewed Moses and recommended him for the sales manager position. Horn Dec., Ex 17 at 38:23-39:5. |
| 50. | Mr. Sciarrino would also make regular comments about Mr. Moses's race, such as, for example, when ordering lunch, "*I'm ordering sandwiches. Let me make sure I put pork in it for you Muslims. But you're black. You eat chicken. Right?*" Glatter Decl. Ex. B (Moses Dep.), at 48:22-49:4. | Disputed. Sciarrino did not converse with Moses about religion or race. Horn Dec., Ex. 17 at 40:11-24. |
| 51. | In addition, on the sales floor, Mr. Sciarrino had just gotten into an argument with an | Sciarrino never used the word "nigger." Horn Dec., Ex. 17 at 40:24-41:5. |

| | | |
|---|---|---|
| | African-American co-worker and, in the presence of Mr. Moses, referred to the co-worker as an *"angry nigger."* When Mr. Moses objected, Mr. Sciarrino stated that he was being *"uppity."* Glatter Decl. Ex. B (Moses Dep.), at 51:8-24. | Moses does not identify the "African American co-worker." Horn Dec., Ex. 18 at 50:19-54:5. Horn Reply Dec., Ex. 1 at 15-25. |
| 52. | Mr. Moses frequently objected to Mr. Sciarrino and requested that he refrain from using offensive religious and racial slurs in the workplace. In response, Mr. Sciarrino would simply state that, *"on the streets"* he was referred to as *"Sal the Bull."* Glatter Decl. Ex. B (Moses Dep.), at 54:21-55:18. | Disputed to the extent that this purported statement of fact is incomplete. Mr. Moses was unable to recall a single date on which these alleged statements were made. Horn Dec., Ex. 18 at 54:7-55:7. |
| 53. | On or around July 28, 2011, Mr. Moses met with his supervisor District manager Jerry Cook and complained about Mr. Sciarrino's constant stream of bigoted, discriminatory and offensive statements to him in the workplace, telling Mr. Cook that *"you have to talk to Sal because he's always making, you know, racist and bigoted comments towards me and towards other workers."* In response, Mr. Cook simply stated that *"Sal just jokes like that."* Glatter Decl. Ex. B (Moses Dep.), at 56:12-24. | Disputed. Sciarrino did not converse with Moses about religion or race. Horn Dec. Ex 17 at 40:11-24. Further, Moses never complained of discriminatory or offensive statements in the workplace to Jerry Cook, who was director of sales for Defendant. *See* Horn Dec. Exs. 16 at 22:5-8 and 18 at 58:5-9. |
| 54. | During that same meeting, however, Mr. Cook told Mr. Moses that he was being demoted from his position as a Sales Manager to instead become a Sales Representative at the Company. Glatter Decl. Ex. B (Moses Dep.), at 56:24-57:8. This demotion—together with the reduction in earning potential and diminishment in responsibilities—was extremely visible and humiliating for Mr. Moses. Glatter Decl. Ex H (Moses Aff.), at ¶ 14. | Disputed. Moses was demoted because he was not able to meet his sales goals. *See* Horn Dec. Exs. 15 at 22:16-19, 18 at 41:17-42:24, and 21.<br><br>Moses non-performance problems were known to Defendant's management. *See* Horn Dec. Ex. 18 at 42:16-24, Ex. 17 at 42:4-20.<br><br>Moses told Jerry Cook that the expectations of the job were more than he was capable of doing. *See* Horn Dec. Ex 16 at 26:2-17.<br><br>Moses fell asleep during an employee meeting. *See* Horn Dec. Ex. 17 at 44:20-45:15. Horn Reply Dec., Ex. 1 at |

| | | 26:4-27:4. |
|---|---|---|
| 55. | Mr. Moses was told that the demotion was due to the fact that the Company wanted "*other managers*" and was "*going in a different direction*." Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17 | Disputed to the extent that this purported statement of fact is incomplete, ambiguous, and misleading inasmuch as it implies that the demotion was due to anything other than poor sales performance. *See* Horn Dec. Ex. 15:3-12; Ex. 21.<br><br>By Moses's own admission, when Jerry Cook assigned Moses to a different position, Jerry Cook stated that Moses did not "have a good performance." Horn Dec., Ex. 18 at 57:2-3.<br><br>Moses's non-performance problems were known to Defendant's management. *See* Horn Dec. Ex. 17 at 42:16-24.<br><br>Moses told Jerry Cook that the expectations of the job were more than he was capable of doing. *See* Horn Dec. Ex 16 at 26:2-17.<br><br>Moses fell asleep during an employee meeting. *See* Horn Dec. Ex. 17 at 44:20-45:15. After falling asleep at the meeting, Salvatore Sciarrino, a sales manager, sent Moses home. *See* Horn Dec. Ex. 17 at 44:20-46:16. |
| 56. | At no time prior to his demotion did any employee of Ashley, including Mr. Mansour, Mr. Sciarrino, or Mr. Cook, ever contact Mr. Moses about his purportedly poor performance. Glatter Decl. Ex H (Moses Aff.), at ¶ 15. | Disputed. Moses met with Moses to discuss Moses's performance, and even attempted to help Moses succeed despite his poor performance. *See* Horn Dec. Ex 16 at 23:22-24:16, 25:8-13. |
| 57. | Mr. Mansour was not informed of Mr. Moses's purportedly poor performance, despite the fact that he was involved in training Mr. Moses while he was at the Secaucus location. Glatter Decl. Ex G (Mansour Aff.), at ¶ 8. | Disputed. Everyone knew that Moses was not performing. Horn Dec., Ex. 17 at 42:22-43:19. Moses's sales numbers plainly reflected his poor performance. Horn Dec., Ex. 17 at 42:5-19. |

| 58. | In fact, on the one occasion when Mr. Moses was entrusted with running the Secaucus location as a Sales Manager, on or about July 25, 2011, he and his team achieved Ashley's sales target, for which he was congratulated by both Mr. Sciarrino and Mr. Mansour. Glatter Decl. Ex H (Moses Aff.), at ¶ 16. | Disputed to the extent that this purported statement of facts is ambiguous and misleading inasmuch as it attempts to show that Moses succeeded as sales manager, when, in actuality, he performance was well below par. *See* Horn Dec. Ex. 17 at 50:18-53-6. |
|---|---|---|
| 59. | Moreover, on the same day that Mr. Moses complained about Mr. Sciarrino's harassment to Mr. Cook and was subsequently demoted—July 28—Mr. Moses was informed by a sales agent that a Caucasian man whom Mr. Moses witnessed walking into a meeting with Mr. Chrinian and other Ashley senior management staff in Ashley's Secaucus location, was his replacement as the Store Manager of Ashley's Fairfield location, indicating that his replacement had already been hired at the time of my demotion. Glatter Decl. Ex H (Moses Aff.), at ¶ 17. | Disputed to the extent that this purported statement of fact is ambiguous and misleading inasmuch as it implies that the demotion and replacement was due to anything other than poor sales performance. *See* Horn Dec. Ex. 15:3-12; Ex. 21. Indeed, No employee or representative of Defendant ever told Moses that his separation of employment was due to race, religion or national origin. *See* Horn Dec. Ex. 18 at 65:15-22. |
| 60. | Less than one week later, on or around August 3, 2011, Mr. Sciarrino abruptly confronted Mr. Moses and falsely accused him of purportedly "falling asleep" in a meeting ordering Mr. Moses to "go home and don't come back." Glatter Decl. Ex. B (Moses Dep.), at 61:4-15. | Disputed. Mr. Moses was not "falsely accused." Moses fell asleep during the employee meeting. *See* Horn Dec. Ex. 17 at 44:20-45:15. After Moses fell asleep at the meeting, Salvatore Sciarrino, a sales manager, called HR who advised that Moses should go home for the day. *See* Horn Dec. Ex. 17 at 44:20-46:16; Horn Reply Dec., Ex. 1 at 26:4-27:4. |
| 61. | Mr. Moses contacted Ms. Bautista that day to discuss Mr. Sciarrino's decision to terminate him and complained that "*I can't work around Sal because he's always making racist comments and jokes, and, you know, I want to report the matter to Jerry*." Glatter Decl. Ex. B (Moses Dep.), at 62:10-24. | Disputed. Sciarrino did not terminate Moses, Horn Dec., Ex. 17 at 44:20-45:9, nor did Sciarrino have the authority to terminate Moses, Horn Dec. Ex. 16 at 8-11. Horn Reply Dec., Ex. 1 at 20:21-21:2. |
| 62. | Rather than inquire further about Mr. Moses' complaint of harassment and discrimination, | Disputed. Moses resigned from Defendant's store. *See* Horn Dec. Exs. |

| | | |
|---|---|---|
| | Ms. Bautista stated, "*If you have an attitude and you think it's going to be some tension . . . I think it's best that you part ways with the company.*" Glatter Decl. Ex. B (Moses Dep.), at 62:25-63:3. | 17 at 44:5-8, 16 at 28:1-7; Horn Reply Dec., Ex. 1 at 21:12-18. |
| 63. | Mr. Moses's performance as a Product Specialist was not only in-line with other similarly situated employees, but he also achieved that level of performance after enduring the humiliation of being demoted immediately after having complained of enduring racial and religious discrimination and harassment. Moses Aff ¶ 20. | Disputed. Moses's performance ranked 11th out of 16 other Product Specialists. *See* Horn Dec. Ex. 21. |
| 64. | Mr. Mansour, a Palestinian/Arab Muslim, was hired on March 1, 2010 as a Sales Associate at the Company's Secaucus, New Jersey location where, after approximately six months of exemplary performance as a Sales Associate, he was promoted to a Sales Manager position in or around August 2010, in which position he served until his termination in January 2012. Glatter Decl. Ex. A (Mansour Dep.), at 51:14-52:8. | Disputed to the extent that this purported statement of facts states Monsour was terminated, when actually Monsour resigned from the position after being confronted with evidence that Monsour stole from Defendant. Horn Reply Dec., Ex. 1 at 71:1-10. |
| 65. | In or around July 2011, Mr. Moses began managerial training at the Company's Secaucus location, where Mr. Mansour was one of two Sales Managers. As noted above, Mr. Cook, a District Manager at the Company, introduced Mr. Moses to Mr. Mansour, by stating to Mr. Mansour that "*he [Mr. Moses] is one of your people.*" Glatter Decl. Ex. A (Mansour Dep.), at 52:13-53:16. | Disputed. Cook did not introduce Moses as being "one of your people." Horn Dec., Ex. 16 at 38:23-39:1. |
| 66. | Moreover, when Mr. Cook told Mr. Sciarrino, the second (and more senior) Sales Manager at the Secaucus location, that Messrs. Mansour and Moses were both Muslim, Mr. Sciarrino expressed dismay, stating, "*Uh, oh, we should get a metal detector now*" in the presence of Mr. Mansour. Glatter Decl. Ex. A (Mansour Dep.), at 54:3-16. | Disputed. Sciarrino never suggested Defendant needed a metal detector. Horn Dec., Ex. 17 at 25:17-19. |

| | | |
|---|---|---|
| 67. | Throughout Mr. Mansour's employment, Mr. Sciarrino directed an unrelenting barrage of discriminatory and offensive racist and bigoted comments toward Mr. Mansour on the basis of his religion, national origin and race, typically on multiple occasions each day. Glatter Decl. Ex. A (Mansour Dep.), at 60:9-16. | Disputed. Sciarrino did not direct discriminatory and offensive racist and bigoted comments towards Mansour. Horn Dec., Ex. 17 at 26:3-6. To the extent Sciarrino and Mansour joked with each other, it was mutual. Horn Dec., Ex. 17 at 24:8-10. Indeed, Sciarrino and Mansour shared a close, "personal relationship," Horn Dec., Ex. 17 at 21:23-22:22, even sharing meals and socializing in hookah lounges outside of work, Horn Reply Dec., Ex. 1 at 93:2-16. |
| 68. | By way of examples only, Mr. Sciarrino's discriminatory and offensive statements to Mr. Mansour included the following: | Disputed. |
| | a. *"The Taliban is here* [when referring to Mr. Mansour]." Glatter Decl. Ex. A (Mansour Dep.), at 60:5-61:7; Glatter Decl. Ex F (Bautista Dep.), at 95:17-21; | a. Sciarrino never referred to Mansour as the Taliban. Horn Dec., Ex. 17 at 25:14-16. |
| | b. *"We need to place a metal detector at the door to check you for bombs."* Glatter Decl. Ex. A (Mansour Dep.), at 61:8-25; | b. Sciarrino never suggested Defendant needed a metal detector. Horn Dec., Ex. 17 at 25:17-19. |
| | c. *"Are you carrying bombs in your bag?"* Glatter Decl. Ex. A (Mansour Dep.), at 62:1-14; | c. Sciarrino did not ask if Mansour was carrying bombs. Horn Dec., Ex. 17 at 26:3-6. |
| | d. *"Are you mad today because we captured Bin Laden?"* Glatter Decl. Ex. A (Mansour Dep.), at 62:15-63:3; | d. Sciarrino never asked Mansour if he was upset when Bin Laden had been captured. Horn Dec., Ex. 17 at 25:20-23. |
| | e. *"I have not met a Muslim who is not a terrorist."* Glatter Decl. Ex. A (Mansour Dep.), at 63:8-16; | e. Sciarrino did not state that he has not met a Muslim who is not a terrorist. Horn Dec., Ex. 17 at 26:3-6. |
| | f. *"Are you part of a hidden Muslim terrorist cell in New Jersey?"* Glatter Decl. Ex. A (Mansour Dep.), at 63:17- | f. Sciarrino never asked Mansour if he was part of hidden Muslim terrorist cell in New Jersey. |

|  |  |  |  |
|---|---|---|---|
|  | 64:7; |  | Horn Dec., Ex. 17 at 26:3-6. |
|  | g. *"Can you give me heads up when they're going to blow the tunnel so I won't drive through that day?"* Glatter Decl. Ex. A (Mansour Dep.), at 64:9-23; | g. | Sciarrino did not ask Mansour about blowing up the tunnel. Horn Dec., Ex. 17 at 26:3-6. |
|  | h. *"If you don't give Muslims discounts they will blow up the store."* Glatter Decl. Ex. A (Mansour Dep.), at 64:24-65:10; | h. | Sciarrino did not state that Muslims who do not receive a discount will blow up the store. Horn Dec., Ex. 17 at 26:3-6. |
|  | i. *"We cannot hire anymore Muslims here; this place is turning to be Afghanistan."* Glatter Decl. Ex. A (Mansour Dep.), at 65:11-18; | i. | Sciarrino never stated that Defendant should not hire Muslims. Horn Dec., Ex. 17 at 25:24-26:2. |
|  | j. *"We destroyed Islam and Muslims."* Glatter Decl. Ex. A (Mansour Dep.), at 65:19-25. | j. | Sciarrino did not state that "[w]e" destroyed Islam and Muslims. Horn Dec., Ex. 17 at 26:3-6. |
|  | k. *"Niggers accept Islam because we don't accept them in our society."* Glatter Decl. Ex. A (Mansour Dep.), at 66:1-9. | k. | Sciarrino never used the word "nigger." Horn Dec., Ex. 17 at 40:24-41:5. |
| 69. | On another occasion, Mr. Mansour was informed that Mr. Sciarrino had wrapped a rag around his head at a sales meeting and stated that *"he is Mohammad today and that if anybody does not listen to him, he is going to act like Mohammed."* Glatter Decl. Ex. A (Mansour Dep.), at 56:19-57:2. |  | Disputed. Sciarrino did not direct discriminatory and offensive racist and bigoted comments towards Mansour. Horn Dec., Ex. 17 at 26:3-6. To the extent Sciarrino and Mansour joked with each other, it was mutual. Horn Dec., Ex. 17 at 24:8-10. Indeed, Sciarrino and Mansour shared a close, "personal relationship," Horn Dec., Ex. 17 at 21:23-22:22, even sharing meals and socializing in hookah lounges outside of work, Horn Reply Dec., Ex. 1 at 93:2-16. |
| 70. | Mr. Mansour asked Mr. Sciarrino to cease making hostile and discriminatory comments on at least ten occasions, to no avail. Glatter Decl. Ex. A (Mansour Dep.), at 74:6-21. |  | Disputed. Sciarrino did not direct discriminatory and offensive racist and bigoted comments towards Mansour. Horn Dec., Ex. 17 at 26:3-6. To the |

|     |     |     |
| --- | --- | --- |
|     |     | extent Sciarrino and Mansour joked with each other, it was mutual. Horn Dec., Ex. 17 at 24:8-10. Indeed, Sciarrino and Mansour shared a close, "personal relationship," Horn Dec., Ex. 17 at 21:23-22:22, even sharing meals and socializing in hookah lounges outside of work, Horn Reply Dec., Ex. 1 at 93:2-16. |
| 71. | In addition to the hostile and discriminatory comments set forth above, Mr. Mansour was also subjected to constant harassment about his religious faith and attempts to convert him to Christianity by the owner and CEO of Ashley. Glatter Decl. Ex. A (Mansour Dep.), at 71:7-12. | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |
| 72. | In or around mid-November 2011, for example, Eugene Chrinian, the Company's CEO, approached Mr. Mansour on the floor of the Company's Secaucus showroom and asked him whether he "*believe[d] in Jesus Christ*" or "considered the Christian faith." Glatter Decl. Ex. A (Mansour Dep.), at 66:16-23. | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |
| 73. | When Mr. Mansour said no, Mr. Chrinian went to his car and returned with a Bible and another book entitled *The Man in the Mirror*—which has overtly Christian themes—and exhorted Mr. Mansour to read them. Glatter Decl. Ex. A (Mansour Dep.), at 66:23-67:3; Glatter Decl. Ex F (Bautista Dep.), at 90:3-24. | Disputed to the extent that this purported statement of fact is incomplete and misleading inasmuch as it implies that *The Man in the Mirror* was provided to Mansour because of it had "Christian themes" and Monsour was Muslim. *The Man in the Mirrow* is a leadership book that was read by a variety of persons at Defendant's store. Horn Dec., Ex. 15 at 35:8-36:19. Further, Chrinian did not know Monsour was Muslim while Mansour worked for Defendant. Horn Dec., Ex. 15 at 36:20-37:9. |
| 74. | Mr. Chrinian again approached Mr. Mansour at the Company's Secaucus store approximately one month later and asked him whether he had read the books Mr. Chrinian | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |

| | | |
|---|---|---|
| | had provided. When Mr. Mansour responded that he had not, Mr. Chrinian nevertheless continued to preach about his religious beliefs. Glatter Decl. Ex. A (Mansour Dep.), at 68:13-69:1. | |
| 75. | When Mr. Mansour again responded that he was not interested in conversion, Mr. Chrinian replied by stating to Mr. Mansour that he will *"burn in Hell unless [he] accepts Jesus as [his] Lord and Savior."* Glatter Decl. Ex. A (Mansour Dep.), at 70:18-71:12. | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |
| 76. | Mr. Mansour would regularly respond to these comments by asking Mr. Chrinian to "stop approaching [him] on the sale floor with issues that are not related to the business," at which Mr. Chrinian would get upset. Glatter Decl. Ex. A (Mansour Dep.), at 71:9:-15. | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |
| 77. | When his requests to Mr. Sciarrino to desist from his constant racial and religious harassment and commentary, Mr. Mansour complained about their conduct in a meeting with Aazel Bautista, the Company's Human Resources manager, in or around September 2011. Glatter Decl. Ex. A (Mansour Dep.), at 77:4-13. | Disputed. Bautista did not receive any complaints about Sciarrino. Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |
| 78. | Ms. Bautista responded by assuring Mr. Mansour that she would look into the matter. Glatter Decl. Ex. A (Mansour Dep.), at 77:14-16. | Disputed. Bautista did not receive any complaints about Sciarrino. Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |
| 79. | Two weeks later, Mr. Mansour complained again to Ms. Bautista regarding Mr. Sciarrino's behavior and inquired as to the status of her investigation into his prior complaint. At that time, Ms. Bautista told Mr. Mansour that she was very busy, and would look into the issue when she had time. Glatter Decl. Ex. A (Mansour Dep.), at 78:11-18. | Disputed. Bautista did not receive any complaints about Sciarrino. Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |
| 80. | Mr. Mansour made further complaints to Ms. Bautista regarding the ongoing discrimination and harassment by Mr. Sciarrino and, | Disputed. Bautista did not receive any complaints about Sciarrino or Chrinian. Horn Reply Dec., Ex. 1 at 20:8-11, |

| | | |
|---|---|---|
| | additionally, the conversion attempts by Mr. Chrinian that began in November 2011, on at least six different occasions, with his final such complaint being raised with her or around January 3, 2012 Glatter Decl. Ex. A (Mansour Dep.), at 72:17-73:5; 79:6-80:19. | 15:11-19. |
| 81. | The Company never investigated Mr. Mansour's repeated complaints of discrimination and harassment, and no employee or executive at the Company has been subject to meaningful discipline in connection with his mistreatment. Glatter Decl. Ex G (Mansour Aff.), at ¶ 5. | Disputed. Bautista did not receive any complaints about Sciarrino or Chrinian of which an investigation would occur. Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |
| 82. | In or around November 2011, an employee of Ashley under the supervision of Mr. Mansour complained to Mr. Mansour that she had been sexually harassed by another Ashley employee on the sales floor. Mr. Mansour in turn immediately passed this complaint on to Ms. Bautista and Mr. Cook for investigation. Glatter Decl. Ex. A (Mansour Dep.), at 81:17-22; Glatter Decl. Ex. N. | Not disputed for purposes of this motion. |
| 83. | In December 2011 Mr. Mansour followed up with Ms. Bautista about the complaint and she informed him that she had investigated it, interviewed witnesses and found the claim to be without merit. Glatter Decl. Ex G (Mansour Aff.), at ¶ 6. Mr. Mansour subsequently discovered through conversations with coworkers that Ms. Bautista actually never spoke with the individuals whom she claimed to have interviewed. Glatter Decl. Ex G (Mansour Aff.), at ¶ 6. When he confronted her with this fact on January 3, 2012, when Mr. Mansour followed up with Ms. Bautista about the status of the co-worker's complaint, she informed him that "*Per Eugene* [Chrinian], *the case has closed*" and that it was "*beyond her control.*" Glatter Decl. Ex. A (Mansour Dep.), at 81:23-82:8; Glatter Decl. Ex G (Mansour Aff.), at ¶ 6. | Disputed to the extent this purported statement of fact is incomplete, ambiguous, and misleading inasmuch as it implies that Defendant did not investigate the sexual harassment claim. Monsour did not testify that Defendant failed to investigate the sexual harassment claim. Horn Dec., Ex. 19 at 81:15-82:1.<br><br>Although Mansour questioned the credibility of the complainant, *see* Horn Dec. Exs. 3, 4, the sexual harassment claim was nevertheless investigated, Horn Dec. Ex. 17 at 17:13-19:1, and invested at length, Horn Reply Dec., Ex. 1 at 43:5-58:16. |

| | | |
|---|---|---|
| 84. | Mr. Mansour told Ms. Bautista that he had been contacted by the female employee who had reported being sexually harassed to serve as a witness in connection with a charge of discrimination that she was planning to file with the EEOC after the Company failed to investigate or take action in response to her complaint. Glatter Decl. Ex. A (Mansour Dep.), at 82:18-20. | Dispute inasmuch as the sexual harassment claim was investigated, Horn Dec. Ex. 17 at 17:13-19:1, and invested at length, Horn Reply Dec., Ex. 1 at 43:5-58:16. |
| 85. | Mr. Mansour also informed Ms. Bautista that he had been contacted with a similar request by Mr. Moses to serve as a witness in connection with a charge of discrimination that he had filed with the EEOC in connection with his employment and termination by the Company. Glatter Decl. Ex. A (Mansour Dep.), at 82:22 25. | Disputed inasmuch as Moses was not terminated but resigned from Defendant's store, see Horn Dec. Exs. 17 at 44:5-8, 16 at 28:1-7; Horn Reply Dec., Ex. 1 at 21:12-18, and Moses was not discriminated against, Horn Dec. Exs. 16 at 22:5-8, 17 at 40:11-24, 18 at 58:5-9. |
| 86. | Ms. Bautista responded to the revelation that Mr. Moses had contacted Mr. Mansour to be a witness in the EEOC proceedings by informing him she would speak to Eugene and get back to him, which she never did. Glatter Decl. Ex. A (Mansour Dep.), at 25:19-27:10; 83:18-19. | Disputed inasmuch as Plaintiffs failed to even ask Ms. Bautista at her deposition whether this in fact occurred. |
| 87. | At the January 3, 2012 meeting, Mr. Mansour also inquired about the status of Ms. Bautista's investigation into harassment by Mr. Sciarrino and Mr. Chrinian, and Ms. Bautista stated that she was still looking into it. Glatter Decl. Ex. A (Mansour Dep.), at 83:20-23. | Disputed. Bautista did not receive any complaints about Sciarrino. Horn Reply Dec., Ex. 1 at 20:8-11. |
| 88. | Later that month, in January 2012, Mr. Mansour himself contacted the EEOC to begin the process of filing a Charge of Discrimination on his own behalf in connection with the discriminatory actions of Ms. Sciarrino and Mr. Chrinian, which were continuing unabated despite his half-dozen or more complaints to Ms. Bautista. Glatter Decl. Ex G (Mansour Aff.), at ¶ 5. | Disputed inasmuch as neither Sciarrino nor Chrinian discriminated, Horn Dec., Exs. Ex. 15 at 35:5-7, 17 at 26:3-6, 24:8-10, 21:23-22:22, Horn Reply Dec., Ex. 1 at 93:2-16, and Monsour never complained about discrimination to Bautista, Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |

Dated:  March 9, 2015

**ARCHER & GREINER, P.C.**

/s/ Michael S. Horn
Michael S. Horn
Court Plaza South - West Wing
21 Main Street, Suite 353
Hackensack, New Jersey 07601
Phone: (201) 342-6000
Fax:  (201) 342-6611
Email:  mhorn@archerlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MOHAMMAD MANSOUR and MARK
MOSES,

                                    Plaintiffs,

v.

FACTORY DIRECT OF SECAUCUS, LLC
d/b/a ASHLEY FURNITURE
HOMESTORE,

                                    Defendants.

ECF CASE

Civil Action No. 13-cv-2443-SDW-SCM

**RESPONSE TO COUNTER-STATEMENT
OF FACTS**

**DEFENDANT'S COUNTER-STATEMENT OF PLAINTIFFS' SEPARATE
STATREMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS**

In opposition to Defendant's motion for summary judgment, Plaintiffs submit a separate

statement of facts based almost entirely on Plaintiffs' affidavits and not from the documentary

evidence and the depositions of either Plaintiffs or the other players in this lawsuit. Although

Defendant countered those facts stated in Plaintiffs' affidavits, the facts should be rejected

outright because they result from "sham affidavits." The "sham affidavit doctrine" states that a

party's affidavit contradicting his prior deposition testimony does not create a factual dispute

barring summary judgment.

|  | Plaintiffs' Separate Statement of Disputed and Undisputed Material Facts | Defendants' Counter-Statement of Facts |
|---|---|---|
| 40. | Mr. Moses, an African-American Muslim, was hired in June 2011 as a Sales Manager at the Company's Fairfield store. Glatter Decl. Ex. B (Moses Dep.), at 45:11-16. | Disputed. Moses was hired as a sales manager in training. Horn Dec., Ex. 16 at 16:4-9, 22:16-19. |
| 41. | Beginning June 28, 2011, Mr. Moses reported | Disputed to the extent that this |

| | | |
|---|---|---|
| | to the Ashley location in Fairfield for approximately three days, getting to know staff and completing the onboarding process. While at Fairfield, Mr. Moses interacted with Mr. Cook about two times. And had no performance problems. Glatter Decl. Ex H (Moses Aff.), at ¶¶ 4-5. | purported statement of fact is incomplete. No one would expect any new hire to have performance problem during the onboarding process because that early time involved mere orientation with HR. Horn Reply Dec., Ex. 1 at 15:15-15:4. |
| 42. | On or about Monday, July 5, 2011 Mr. Cook requested that Mr. Moses meet him Ashley's warehouse and headquarters in Edison, New Jersey to learn the warehouse aspect of the business. Mr. Moses spent approximately two days at the Edison location. Other than a brief ten minute meeting with Mr. Cook in the morning of July 9, he had no in-person interactions with Mr. Cook and had no performance problems at the Edison location. Glatter Decl. Ex H (Moses Aff.), at ¶ 6. | Disputed to the extent that this purported statement of fact is misleading inasmuch as it implies that Cook was not involved in Moses's employment. To the contrary, it was Cook that wanted Moses to train for sales manager, Horn Reply Dec., Ex. 1 at 92:13-25, despite others at Defendant's company that thought from inception Moses would do better as a sales associate, Horn Reply Dec., Ex. 1 at 92:3-14.<br><br>Further, Moses had difficulty in performing his job from the start, despite Cook's attempts to help Moses succeed. Horn Dec., Ex. 16 at 23:4-24:16. |
| 43. | On approximately July 9, 2011, Mr. Moses was told by Jerry Cook that he would be sent to the Ashley Furniture in Nanuet, New York to learn the sales techniques and store processes. Mr. Moses was told to observe the store managers and assist in running the store. Mr. Moses never interacted with Mr. Cook and had no performance issues while at the Nanuet location. Glatter Decl. Ex H (Moses Aff.), at ¶ 7. | Disputed to the extent that this purported statement of fact is misleading inasmuch as it implies that Cook was not involved in Moses's employment. To the contrary, it was Cook that wanted Moses to train for sales manager, Horn Reply Dec., Ex. 1 at 92:13-25, despite others at Defendant's company that thought from inception Moses would do better as a sales associate, Horn Reply Dec., Ex. 1 at 92:3-14.<br><br>Further, Moses had difficulty performing his job from the start, despite Cook's attempts to help Moses succeed. Horn Dec., Ex. 16 at 23:4-24:16. |

| | | |
|---|---|---|
| 44. | On or about July 11, 2011, Mr. Moses was told by Mr. Cook to report to the Secaucus location "*to learn from Sal [Sciarrino] and Mohammed [Mansour]*" the Store Managers there. Mr. Moses was supposed to be in the Secaucus store for about three to four days, similar to my training at Edison and Nanuet, before returning to Ashley's Fairfield location to run the store as he was initially hired to do. However, he was never reassigned to the Fairfield store. Glatter Decl. Ex H (Moses Aff.), at ¶ 8. | Not disputed for purposes of this motion. |
| 45. | During his entire time at Ashley's Secaucus location, Mr. Moses interacted with Mr. Cook approximately three times. Glatter Decl. Ex H (Moses Aff.), at ¶ 9. | Disputed to the extent this purported statement of fact is misleading inasmuch as it implies that Cook was not involved in Moses's employment. To the contrary, it was Cook that wanted Moses to train for sales manager, Horn Reply Dec., Ex. 1 at 92:13-25, despite others at Defendant's company that thought from inception Moses would do better as a sales associate, Horn Reply Dec., Ex. 1 at 92:3-14.<br><br>Further, Moses had difficulty performing his job from the start, despite Cook's attempts to help Moses succeed. Horn Dec., Ex. 16 at 23:4-24:16. Contrary to Plaintiffs' attempt to minimize the interaction between Cook and Moses, Moses look to Cook as a mentor and business coach, even after Moses left Defendant. Horn Dec., Ex. 16 at 33:3-34:24. |
| 46. | When Mr. Moses's supervisor, Mr. Cook, introduced him to Mr. Mansour, he stated to Mr. Mansour that Mr. Moses is "one of your people" in reference to the religious faith of Mr. Moses and Mr. Mansour. Glatter Decl. Ex. A (Mansour Dep.), at 52:13-53:16. | Cook did not introduce Moses as being "one of your people." Horn Dec., Ex. 16 at 38:23-39:1. |
| 47. | Roughly one week into his training at the Company's Secaucus location, on or around | Disputed. Sciarrino did not converse with Moses about religion or race, or |

| | | |
|---|---|---|
| | July 12, 2011, Mr. Moses greeted Plaintiff Mohammed Mansour (who had just returned from a vacation) in Arabic on the Company's sales floor in the presence of Mr. Sciarrino. Upon recognizing that Mr. Moses speaks Arabic and is Muslim, Mr. Sciarrino responded with evident disdain, stating scornfully to Mr. Moses, "*Oh, you are one of those Muslims.*" Glatter Decl. Ex. B (Moses Dep.), at 46:6-25. | banter with Moses about religion or race. Horn Dec., Ex 17 at 40:11-24. |
| 48. | Beginning that same day, and continuing throughout the duration of Mr. Moses' employment at the Company, Mr. Sciarrino directed an unrelenting barrage of discriminatory and offensive racist and bigoted comments toward Mr. Moses on the basis of his religion and race, typically on multiple occasions each day, both on the sales floor and in the manager's office. Glatter Decl. Ex. B (Moses Dep.), at 47:12-48:21; Glatter Decl. Ex H (Moses Aff.), at ¶¶ 10-11. | Disputed. Sciarrino did not converse with Moses about religion or race, or banter with Moses about religion or race. Horn Dec., Ex 17 at 40:11-24. In fact, Sciarrino interviewed Moses and recommended him for the sales manager position. Horn Dec., Ex 17 at 38:23-39:5. |
| 49. | By way of examples only, Mr. Sciarrino frequently insinuated that Mr. Moses was a terrorist and enemy of the United States, demanding to know, for example, if Mr. Moses was carrying "a *bomb*" in his bag, or if he and Mr. Mansour were conspiring to wage "*jihad*," or "*making bombs*" as part of a terrorist plot, or, when Mr. Moses left the bathroom, comments such as "*I don't have to go back in the restroom and check, do I? There's no bombs in there?*" Glatter Decl. Ex. B (Moses Dep.), at 49:5-10. | Disputed. Sciarrino did not converse with Moses about religion or race, or banter with Moses about terrorism or bombs. Horn Dec., Ex 17 at 40:11-24.<br><br>In fact, Sciarrino interviewed Moses and recommended him for the sales manager position. Horn Dec., Ex 17 at 38:23-39:5. |
| 50. | Mr. Sciarrino would also make regular comments about Mr. Moses's race, such as, for example, when ordering lunch, "*I'm ordering sandwiches. Let me make sure I put pork in it for you Muslims. But you're black. You eat chicken. Right?*" Glatter Decl. Ex. B (Moses Dep.), at 48:22-49:4. | Disputed. Sciarrino did not converse with Moses about religion or race. Horn Dec., Ex. 17 at 40:11-24. |
| 51. | In addition, on the sales floor, Mr. Sciarrino had just gotten into an argument with an | Sciarrino never used the word "nigger." Horn Dec., Ex. 17 at 40:24-41:5. |

|  | | |
|---|---|---|
|  | African-American co-worker and, in the presence of Mr. Moses, referred to the co-worker as an "*angry nigger*." When Mr. Moses objected, Mr. Sciarrino stated that he was being "*uppity*." Glatter Decl. Ex. B (Moses Dep.), at 51:8-24. | Moses does not identify the "African American co-worker." Horn Dec., Ex. 18 at 50:19-54:5. Horn Reply Dec., Ex. 1 at 15-25. |
| 52. | Mr. Moses frequently objected to Mr. Sciarrino and requested that he refrain from using offensive religious and racial slurs in the workplace. In response, Mr. Sciarrino would simply state that, "*on the streets*" he was referred to as "*Sal the Bull*." Glatter Decl. Ex. B (Moses Dep.), at 54:21-55:18. | Disputed to the extent that this purported statement of fact is incomplete. Mr. Moses was unable to recall a single date on which these alleged statements were made. Horn Dec., Ex. 18 at 54:7-55:7. |
| 53. | On or around July 28, 2011, Mr. Moses met with his supervisor District manager Jerry Cook and complained about Mr. Sciarrino's constant stream of bigoted, discriminatory and offensive statements to him in the workplace, telling Mr. Cook that "*you have to talk to Sal because he's always making, you know, racist and bigoted comments towards me and towards other workers*." In response, Mr. Cook simply stated that "*Sal just jokes like that.*" Glatter Decl. Ex. B (Moses Dep.), at 56:12-24. | Disputed. Sciarrino did not converse with Moses about religion or race. Horn Dec. Ex 17 at 40:11-24. Further, Moses never complained of discriminatory or offensive statements in the workplace to Jerry Cook, who was director of sales for Defendant. *See* Horn Dec. Exs. 16 at 22:5-8 and 18 at 58:5-9. |
| 54. | During that same meeting, however, Mr. Cook told Mr. Moses that he was being demoted from his position as a Sales Manager to instead become a Sales Representative at the Company. Glatter Decl. Ex. B (Moses Dep.), at 56:24-57:8. This demotion—together with the reduction in earning potential and diminishment in responsibilities—was extremely visible and humiliating for Mr. Moses. Glatter Decl. Ex H (Moses Aff.), at ¶ 14. | Disputed. Moses was demoted because he was not able to meet his sales goals. *See* Horn Dec. Exs. 15 at 22:16-19, 18 at 41:17-42:24, and 21.

Moses non-performance problems were known to Defendant's management. *See* Horn Dec. Ex. 18 at 42:16-24, Ex. 17 at 42:4-20.

Moses told Jerry Cook that the expectations of the job were more than he was capable of doing. *See* Horn Dec. Ex 16 at 26:2-17.

Moses fell asleep during an employee meeting. *See* Horn Dec. Ex. 17 at 44:20-45:15. Horn Reply Dec., Ex. 1 at |

| | | 26:4-27:4. |
|---|---|---|
| 55. | Mr. Moses was told that the demotion was due to the fact that the Company wanted "*other managers*" and was "*going in a different direction.*" Glatter Decl. Ex. B (Moses Dep.), at 56:12-57:17 | Disputed to the extent that this purported statement of fact is incomplete, ambiguous, and misleading inasmuch as it implies that the demotion was due to anything other than poor sales performance. *See* Horn Dec. Ex. 15:3-12; Ex. 21.<br><br>By Moses's own admission, when Jerry Cook assigned Moses to a different position, Jerry Cook stated that Moses did not "have a good performance." Horn Dec., Ex. 18 at 57:2-3.<br><br>Moses's non-performance problems were known to Defendant's management. *See* Horn Dec. Ex. 17 at 42:16-24.<br><br>Moses told Jerry Cook that the expectations of the job were more than he was capable of doing. *See* Horn Dec. Ex 16 at 26:2-17.<br><br>Moses fell asleep during an employee meeting. *See* Horn Dec. Ex. 17 at 44:20-45:15. After falling asleep at the meeting, Salvatore Sciarrino, a sales manager, sent Moses home. *See* Horn Dec. Ex. 17 at 44:20-46:16. |
| 56. | At no time prior to his demotion did any employee of Ashley, including Mr. Mansour, Mr. Sciarrino, or Mr. Cook, ever contact Mr. Moses about his purportedly poor performance. Glatter Decl. Ex H (Moses Aff.), at ¶ 15. | Disputed. Moses met with Moses to discuss Moses's performance, and even attempted to help Moses succeed despite his poor performance. *See* Horn Dec. Ex 16 at 23:22-24:16, 25:8-13. |
| 57. | Mr. Mansour was not informed of Mr. Moses's purportedly poor performance, despite the fact that he was involved in training Mr. Moses while he was at the Secaucus location. Glatter Decl. Ex G (Mansour Aff.), at ¶ 8. | Disputed. Everyone knew that Moses was not performing. Horn Dec., Ex. 17 at 42:22-43:19. Moses's sales numbers plainly reflected his poor performance. Horn Dec., Ex. 17 at 42:5-19. |

| 58. | In fact, on the one occasion when Mr. Moses was entrusted with running the Secaucus location as a Sales Manager, on or about July 25, 2011, he and his team achieved Ashley's sales target, for which he was congratulated by both Mr. Sciarrino and Mr. Mansour. Glatter Decl. Ex H (Moses Aff.), at ¶ 16. | Disputed to the extent that this purported statement of facts is ambiguous and misleading inasmuch as it attempts to show that Moses succeeded as sales manager, when, in actuality, he performance was well below par. *See* Horn Dec. Ex. 17 at 50:18-53-6. |
|---|---|---|
| 59. | Moreover, on the same day that Mr. Moses complained about Mr. Sciarrino's harassment to Mr. Cook and was subsequently demoted—July 28—Mr. Moses was informed by a sales agent that a Caucasian man whom Mr. Moses witnessed walking into a meeting with Mr. Chrinian and other Ashley senior management staff in Ashley's Secaucus location, was his replacement as the Store Manager of Ashley's Fairfield location, indicating that his replacement had already been hired at the time of my demotion. Glatter Decl. Ex H (Moses Aff.), at ¶ 17. | Disputed to the extent that this purported statement of fact is ambiguous and misleading inasmuch as it implies that the demotion and replacement was due to anything other than poor sales performance. *See* Horn Dec. Ex. 15:3-12; Ex. 21. Indeed, No employee or representative of Defendant ever told Moses that his separation of employment was due to race, religion or national origin. *See* Horn Dec. Ex. 18 at 65:15-22. |
| 60. | Less than one week later, on or around August 3, 2011, Mr. Sciarrino abruptly confronted Mr. Moses and falsely accused him of purportedly "falling asleep" in a meeting ordering Mr. Moses to "go home and don't come back." Glatter Decl. Ex. B (Moses Dep.), at 61:4-15. | Disputed. Mr. Moses was not "falsely accused." <br><br> Moses fell asleep during the employee meeting. *See* Horn Dec. Ex. 17 at 44:20-45:15. After Moses fell asleep at the meeting, Salvatore Sciarrino, a sales manager, called HR who advised that Moses should go home for the day. *See* Horn Dec. Ex. 17 at 44:20-46:16; Horn Reply Dec., Ex. 1 at 26:4-27:4. |
| 61. | Mr. Moses contacted Ms. Bautista that day to discuss Mr. Sciarrino's decision to terminate him and complained that "*I can't work around Sal because he's always making racist comments and jokes, and, you know, I want to report the matter to Jerry.*" Glatter Decl. Ex. B (Moses Dep.), at 62:10-24. | Disputed. Sciarrino did not terminate Moses, Horn Dec., Ex. 17 at 44:20-45:9, nor did Sciarrino have the authority to terminate Moses, Horn Dec. Ex. 16 at 8-11. Horn Reply Dec., Ex. 1 at 20:21-21:2. |
| 62. | Rather than inquire further about Mr. Moses' complaint of harassment and discrimination, | Disputed. Moses resigned from Defendant's store. *See* Horn Dec. Exs. |

| | | |
|---|---|---|
| | Ms. Bautista stated, "*If you have an attitude and you think it's going to be some tension . . . I think it's best that you part ways with the company.*" Glatter Decl. Ex. B (Moses Dep.), at 62:25-63:3. | 17 at 44:5-8, 16 at 28:1-7; Horn Reply Dec., Ex. 1 at 21:12-18. |
| 63. | Mr. Moses's performance as a Product Specialist was not only in-line with other similarly situated employees, but he also achieved that level of performance after enduring the humiliation of being demoted immediately after having complained of enduring racial and religious discrimination and harassment. Moses Aff ¶ 20. | Disputed. Moses's performance ranked 11th out of 16 other Product Specialists. *See* Horn Dec. Ex. 21. |
| 64. | Mr. Mansour, a Palestinian/Arab Muslim, was hired on March 1, 2010 as a Sales Associate at the Company's Secaucus, New Jersey location where, after approximately six months of exemplary performance as a Sales Associate, he was promoted to a Sales Manager position in or around August 2010, in which position he served until his termination in January 2012. Glatter Decl. Ex. A (Mansour Dep.), at 51:14-52:8. | Disputed to the extent that this purported statement of facts states Monsour was terminated, when actually Monsour resigned from the position after being confronted with evidence that Monsour stole from Defendant. Horn Reply Dec., Ex. 1 at 71:1-10. |
| 65. | In or around July 2011, Mr. Moses began managerial training at the Company's Secaucus location, where Mr. Mansour was one of two Sales Managers. As noted above, Mr. Cook, a District Manager at the Company, introduced Mr. Moses to Mr. Mansour, by stating to Mr. Mansour that "*he [Mr. Moses] is one of your people.*" Glatter Decl. Ex. A (Mansour Dep.), at 52:13-53:16. | Disputed. Cook did not introduce Moses as being "one of your people." Horn Dec., Ex. 16 at 38:23-39:1. |
| 66. | Moreover, when Mr. Cook told Mr. Sciarrino, the second (and more senior) Sales Manager at the Secaucus location, that Messrs. Mansour and Moses were both Muslim, Mr. Sciarrino expressed dismay, stating, "*Uh, oh, we should get a metal detector now*" in the presence of Mr. Mansour. Glatter Decl. Ex. A (Mansour Dep.), at 54:3-16. | Disputed. Sciarrino never suggested Defendant needed a metal detector. Horn Dec., Ex. 17 at 25:17-19. |

| | | |
|---|---|---|
| 67. | Throughout Mr. Mansour's employment, Mr. Sciarrino directed an unrelenting barrage of discriminatory and offensive racist and bigoted comments toward Mr. Mansour on the basis of his religion, national origin and race, typically on multiple occasions each day. Glatter Decl. Ex. A (Mansour Dep.), at 60:9-16. | Disputed. Sciarrino did not direct discriminatory and offensive racist and bigoted comments towards Mansour. Horn Dec., Ex. 17 at 26:3-6. To the extent Sciarrino and Mansour joked with each other, it was mutual. Horn Dec., Ex. 17 at 24:8-10. Indeed, Sciarrino and Mansour shared a close, "personal relationship," Horn Dec., Ex. 17 at 21:23-22:22, even sharing meals and socializing in hookah lounges outside of work, Horn Reply Dec., Ex. 1 at 93:2-16. |
| 68. | By way of examples only, Mr. Sciarrino's discriminatory and offensive statements to Mr. Mansour included the following:<br><br>  a.  *"The Taliban is here* [when referring to Mr. Mansour]." Glatter Decl. Ex. A (Mansour Dep.), at 60:5-61:7; Glatter Decl. Ex F (Bautista Dep.), at 95:17-21;<br><br>  b.  *"We need to place a metal detector at the door to check you for bombs."* Glatter Decl. Ex. A (Mansour Dep.), at 61:8-25;<br><br>  c.  *"Are you carrying bombs in your bag?"* Glatter Decl. Ex. A (Mansour Dep.), at 62:1-14;<br><br>  d.  *"Are you mad today because we captured Bin Laden?"* Glatter Decl. Ex. A (Mansour Dep.), at 62:15-63:3;<br><br>  e.  *"I have not met a Muslim who is not a terrorist."* Glatter Decl. Ex. A (Mansour Dep.), at 63:8-16;<br><br>  f.  *"Are you part of a hidden Muslim terrorist cell in New Jersey?"* Glatter Decl. Ex. A (Mansour Dep.), at 63:17- | Disputed.<br><br>  a.  Sciarrino never referred to Mansour as the Taliban. Horn Dec., Ex. 17 at 25:14-16.<br><br>  b.  Sciarrino never suggested Defendant needed a metal detector. Horn Dec., Ex. 17 at 25:17-19.<br><br>  c.  Sciarrino did not ask if Mansour was carrying bombs. Horn Dec., Ex. 17 at 26:3-6.<br><br>  d.  Sciarrino never asked Mansour if he was upset when Bin Laden had been captured. Horn Dec., Ex. 17 at 25:20-23.<br><br>  e.  Sciarrino did not state that he has not met a Muslim who is not a terrorist. Horn Dec., Ex. 17 at 26:3-6.<br><br>  f.  Sciarrino never asked Mansour if he was part of hidden Muslim terrorist cell in New Jersey. |

|  |  |  |
|---|---|---|
|  | 64:7; | Horn Dec., Ex. 17 at 26:3-6. |
|  | g. *"Can you give me heads up when they're going to blow the tunnel so I won't drive through that day?"* Glatter Decl. Ex. A (Mansour Dep.), at 64:9-23; | g. Sciarrino did not ask Mansour about blowing up the tunnel. Horn Dec., Ex. 17 at 26:3-6. |
|  | h. *"If you don't give Muslims discounts they will blow up the store."* Glatter Decl. Ex. A (Mansour Dep.), at 64:24-65:10; | h. Sciarrino did not state that Muslims who do not receive a discount will blow up the store. Horn Dec., Ex. 17 at 26:3-6. |
|  | i. *"We cannot hire anymore Muslims here; this place is turning to be Afghanistan."* Glatter Decl. Ex. A (Mansour Dep.), at 65:11-18; | i. Sciarrino never stated that Defendant should not hire Muslims. Horn Dec., Ex. 17 at 25:24-26:2. |
|  | j. *"We destroyed Islam and Muslims."* Glatter Decl. Ex. A (Mansour Dep.), at 65:19-25. | j. Sciarrino did not state that "[w]e" destroyed Islam and Muslims. Horn Dec., Ex. 17 at 26:3-6. |
|  | k. *"Niggers accept Islam because we don't accept them in our society."* Glatter Decl. Ex. A (Mansour Dep.), at 66:1-9. | k. Sciarrino never used the word "nigger." Horn Dec., Ex. 17 at 40:24-41:5. |
| 69. | On another occasion, Mr. Mansour was informed that Mr. Sciarrino had wrapped a rag around his head at a sales meeting and stated that *"he is Mohammad today and that if anybody does not listen to him, he is going to act like Mohammed."* Glatter Decl. Ex. A (Mansour Dep.), at 56:19-57:2. | Disputed. Sciarrino did not direct discriminatory and offensive racist and bigoted comments towards Mansour. Horn Dec., Ex. 17 at 26:3-6. To the extent Sciarrino and Mansour joked with each other, it was mutual. Horn Dec., Ex. 17 at 24:8-10. Indeed, Sciarrino and Mansour shared a close, "personal relationship," Horn Dec., Ex. 17 at 21:23-22:22, even sharing meals and socializing in hookah lounges outside of work, Horn Reply Dec., Ex. 1 at 93:2-16. |
| 70. | Mr. Mansour asked Mr. Sciarrino to cease making hostile and discriminatory comments on at least ten occasions, to no avail. Glatter Decl. Ex. A (Mansour Dep.), at 74:6-21. | Disputed. Sciarrino did not direct discriminatory and offensive racist and bigoted comments towards Mansour. Horn Dec., Ex. 17 at 26:3-6. To the |

| | | |
|---|---|---|
| | | extent Sciarrino and Mansour joked with each other, it was mutual. Horn Dec., Ex. 17 at 24:8-10. Indeed, Sciarrino and Mansour shared a close, "personal relationship," Horn Dec., Ex. 17 at 21:23-22:22, even sharing meals and socializing in hookah lounges outside of work, Horn Reply Dec., Ex. 1 at 93:2-16. |
| 71. | In addition to the hostile and discriminatory comments set forth above, Mr. Mansour was also subjected to constant harassment about his religious faith and attempts to convert him to Christianity by the owner and CEO of Ashley. Glatter Decl. Ex. A (Mansour Dep.), at 71:7-12. | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |
| 72. | In or around mid-November 2011, for example, Eugene Chrinian, the Company's CEO, approached Mr. Mansour on the floor of the Company's Secaucus showroom and asked him whether he "*believe[d] in Jesus Christ*" or "considered the Christian faith." Glatter Decl. Ex. A (Mansour Dep.), at 66:16-23. | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |
| 73. | When Mr. Mansour said no, Mr. Chrinian went to his car and returned with a Bible and another book entitled *The Man in the Mirror*—which has overtly Christian themes—and exhorted Mr. Mansour to read them. Glatter Decl. Ex. A (Mansour Dep.), at 66:23-67:3; Glatter Decl. Ex F (Bautista Dep.), at 90:3-24. | Disputed to the extent that this purported statement of fact is incomplete and misleading inasmuch as it implies that *The Man in the Mirror* was provided to Mansour because of it had "Christian themes" and Monsour was Muslim. *The Man in the Mirrow* is a leadership book that was read by a variety of persons at Defendant's store. Horn Dec., Ex. 15 at 35:8-36:19. Further, Chrinian did not know Monsour was Muslim while Mansour worked for Defendant. Horn Dec., Ex. 15 at 36:20-37:9. |
| 74. | Mr. Chrinian again approached Mr. Mansour at the Company's Secaucus store approximately one month later and asked him whether he had read the books Mr. Chrinian | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |

|  | had provided. When Mr. Mansour responded that he had not, Mr. Chrinian nevertheless continued to preach about his religious beliefs. Glatter Decl. Ex. A (Mansour Dep.), at 68:13-69:1. |  |
|---|---|---|
| 75. | When Mr. Mansour again responded that he was not interested in conversion, Mr. Chrinian replied by stating to Mr. Mansour that he will *"burn in Hell unless [he] accepts Jesus as [his] Lord and Savior."* Glatter Decl. Ex. A (Mansour Dep.), at 70:18-71:12. | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |
| 76. | Mr. Mansour would regularly respond to these comments by asking Mr. Chrinian to "stop approaching [him] on the sale floor with issues that are not related to the business," at which Mr. Chrinian would get upset. Glatter Decl. Ex. A (Mansour Dep.), at 71:9:-15. | Disputed. Chrinian never discussed his religious beliefs with Mansour. Horn Dec., Ex. 15 at 35:5-7. |
| 77. | When his requests to Mr. Sciarrino to desist from his constant racial and religious harassment and commentary, Mr. Mansour complained about their conduct in a meeting with Aazel Bautista, the Company's Human Resources manager, in or around September 2011. Glatter Decl. Ex. A (Mansour Dep.), at 77:4-13. | Disputed. Bautista did not receive any complaints about Sciarrino. Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |
| 78. | Ms. Bautista responded by assuring Mr. Mansour that she would look into the matter. Glatter Decl. Ex. A (Mansour Dep.), at 77:14-16. | Disputed. Bautista did not receive any complaints about Sciarrino. Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |
| 79. | Two weeks later, Mr. Mansour complained again to Ms. Bautista regarding Mr. Sciarrino's behavior and inquired as to the status of her investigation into his prior complaint. At that time, Ms. Bautista told Mr. Mansour that she was very busy, and would look into the issue when she had time. Glatter Decl. Ex. A (Mansour Dep.), at 78:11-18. | Disputed. Bautista did not receive any complaints about Sciarrino. Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |
| 80. | Mr. Mansour made further complaints to Ms. Bautista regarding the ongoing discrimination and harassment by Mr. Sciarrino and, | Disputed. Bautista did not receive any complaints about Sciarrino or Chrinian. Horn Reply Dec., Ex. 1 at 20:8-11, |

| | | |
|---|---|---|
| | additionally, the conversion attempts by Mr. Chrinian that began in November 2011, on at least six different occasions, with his final such complaint being raised with her or around January 3, 2012 Glatter Decl. Ex. A (Mansour Dep.), at 72:17-73:5; 79:6-80:19. | 15:11-19. |
| 81. | The Company never investigated Mr. Mansour's repeated complaints of discrimination and harassment, and no employee or executive at the Company has been subject to meaningful discipline in connection with his mistreatment. Glatter Decl. Ex G (Mansour Aff.), at ¶ 5. | Disputed. Bautista did not receive any complaints about Sciarrino or Chrinian of which an investigation would occur. Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |
| 82. | In or around November 2011, an employee of Ashley under the supervision of Mr. Mansour complained to Mr. Mansour that she had been sexually harassed by another Ashley employee on the sales floor. Mr. Mansour in turn immediately passed this complaint on to Ms. Bautista and Mr. Cook for investigation. Glatter Decl. Ex. A (Mansour Dep.), at 81:17 22; Glatter Decl. Ex. N. | Not disputed for purposes of this motion. |
| 83. | In December 2011 Mr. Mansour followed up with Ms. Bautista about the complaint and she informed him that she had investigated it, interviewed witnesses and found the claim to be without merit. Glatter Decl. Ex G (Mansour Aff.), at ¶ 6. Mr. Mansour subsequently discovered through conversations with coworkers that Ms. Bautista actually never spoke with the individuals whom she claimed to have interviewed. Glatter Decl. Ex G (Mansour Aff.), at ¶ 6. When he confronted her with this fact on January 3, 2012, when Mr. Mansour followed up with Ms. Bautista about the status of the co-worker's complaint, she informed him that "*Per Eugene* [Chrinian], *the case has closed*" and that it was "*beyond her control.*" Glatter Decl. Ex. A (Mansour Dep.), at 81:23-82:8; Glatter Decl. Ex G (Mansour Aff.), at ¶ 6. | Disputed to the extent this purported statement of fact is incomplete, ambiguous, and misleading inasmuch as it implies that Defendant did not investigate the sexual harassment claim. Monsour did not testify that Defendant failed to investigate the sexual harassment claim. Horn Dec., Ex. 19 at 81:15-82:1.<br><br>Although Mansour questioned the credibility of the complainant, *see* Horn Dec. Exs. 3, 4, the sexual harassment claim was nevertheless investigated, Horn Dec. Ex. 17 at 17:13-19:1, and invested at length, Horn Reply Dec., Ex. 1 at 43:5-58:16. |

| 84. | Mr. Mansour told Ms. Bautista that he had been contacted by the female employee who had reported being sexually harassed to serve as a witness in connection with a charge of discrimination that she was planning to file with the EEOC after the Company failed to investigate or take action in response to her complaint. Glatter Decl. Ex. A (Mansour Dep.), at 82:18-20. | Dispute inasmuch as the sexual harassment claim was investigated, Horn Dec. Ex. 17 at 17:13-19:1, and invested at length, Horn Reply Dec., Ex. 1 at 43:5-58:16. |
|---|---|---|
| 85. | Mr. Mansour also informed Ms. Bautista that he had been contacted with a similar request by Mr. Moses to serve as a witness in connection with a charge of discrimination that he filed with the EEOC in connection with his employment and termination by the Company. Glatter Decl. Ex. A (Mansour Dep.), at 82:22 25. | Disputed inasmuch as Moses was not terminated but resigned from Defendant's store, *see* Horn Dec. Exs. 17 at 44:5-8, 16 at 28:1-7; Horn Reply Dec., Ex. 1 at 21:12-18, and Moses was not discriminated against, Horn Dec. Exs. 16 at 22:5-8, 17 at 40:11-24, 18 at 58:5-9. |
| 86. | Ms. Bautista responded to the revelation that Mr. Moses had contacted Mr. Mansour to be a witness in the EEOC proceedings by informing him she would speak to Eugene and get back to him, which she never did. Glatter Decl. Ex. A (Mansour Dep.), at 25:19-27:10; 83:18-19. | Disputed inasmuch as Plaintiffs failed to even ask Ms. Bautista at her deposition whether this in fact occurred. |
| 87. | At the January 3, 2012 meeting, Mr. Mansour also inquired about the status of Ms. Bautista's investigation into harassment by Mr. Sciarrino and Mr. Chrinian, and Ms. Bautista stated that she was still looking into it. Glatter Decl. Ex. A (Mansour Dep.), at 83:20-23. | Disputed. Bautista did not receive any complaints about Sciarrino. Horn Reply Dec., Ex. 1 at 20:8-11. |
| 88. | Later that month, in January 2012, Mr. Mansour himself contacted the EEOC to begin the process of filing a Charge of Discrimination on his own behalf in connection with the discriminatory actions of Ms. Sciarrino and Mr. Chrinian, which were continuing unabated despite his half-dozen or more complaints to Ms. Bautista. Glatter Decl. Ex G (Mansour Aff.), at ¶ 5. | Disputed inasmuch as neither Sciarrino nor Chrinian discriminated, Horn Dec., Exs. Ex. 15 at 35:5-7, 17 at 26:3-6, 24:8-10, 21:23-22:22, Horn Reply Dec., Ex. 1 at 93:2-16, and Monsour never complained about discrimination to Bautista, Horn Reply Dec., Ex. 1 at 20:8-11, 15:11-19. |

Dated:  March 9, 2015                    **ARCHER & GREINER, P.C.**

/s/ Michael S. Horn
Michael S. Horn
Court Plaza South - West Wing
21 Main Street, Suite 353
Hackensack, New Jersey 07601
Phone: (201) 342-6000
Fax:  (201) 342-6611
Email:  mhorn@archerlaw.com